Dale M. Cendali
Claudia Ray
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
dcendali@kirkland.com
cray@kirkland.com

*Attorneys for Defendant/Counterclaim Plaintiff*
THE ASSOCIATED PRESS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

SHEPARD FAIREY and OBEY GIANT ART, INC.,

                  Plaintiffs,

        v.

THE ASSOCIATED PRESS,

             Defendant and
             Counterclaim Plaintiff,

        v.

SHEPARD FAIREY, OBEY GIANT ART, INC., OBEY GIANT LLC and STUDIO NUMBER ONE, INC.

             Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

Civil Action No.: 09-01123 (AKH)

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF DEFENDANT, THE ASSOCIATED PRESS**

Defendant, The Associated Press (hereinafter "The AP"), by and through its attorneys, Kirkland & Ellis LLP, hereby answers the Complaint of Plaintiffs Shepard Fairey ("Fairey") and Obey Giant Art, Inc. ("Obey Inc.") (collectively, "Plaintiffs"), in this action, dated February 9, 2009, as follows:

## NATURE OF THE ACTION

1.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 1 of the Complaint and therefore denies the same, except admits that Plaintiffs have asserted claims for declaratory and injunctive relief.

2.     Denies the allegations contained in ¶ 2 of the Complaint, except admits that The AP has asserted that Plaintiffs have created derivative works that infringe The AP's rights in and to one or more of its copyrighted works, and further admits that Plaintiffs have asserted claims for declaratory and injunctive relief which seek, among other things, a declaration that Plaintiffs have not infringed The AP's copyrights.

## PARTIES

3.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 3 of the Complaint and therefore denies the same.

4.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 4 of the Complaint and therefore denies the same.

5.     Denies the allegations contained in ¶ 5 of the Complaint, except admits that its principal place of business is located in New York, New York and further admits that it is one of the largest, oldest and most prominent news-gathering organizations in the world.

## JURISDICTION AND VENUE

6.     States that the allegations contained in ¶ 6 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admits that this Court has subject matter jurisdiction over Plaintiffs' claims.

7.     States that the allegations contained in ¶ 7 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admits that this Court has personal jurisdiction over The AP.

8.     States that the allegations contained in ¶ 8 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admits that venue is proper in this District.

**<u>FACTUAL ALLEGATIONS</u>**

9.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 9 of the Complaint and therefore denies the same.

10.    Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 10 of the Complaint and therefore denies the same.

11.    Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 11 of the Complaint and therefore denies the same.

12.    Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 12 of the Complaint and therefore denies the same.

13.    Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 13 of the Complaint and therefore denies the same.

14.    Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 14 of the Complaint and therefore denies the same, except admits that a photographer named Mannie Garcia was employed by The AP as a staff photographer in 2006, and further admits that Mr. Garcia took photographs of then-Senator, now-President Barack Obama ("President Obama") at an event held at the National Press Club on April 27, 2006, while on assignment for The AP.

15.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 15 of the Complaint and therefore denies the same, except admits that among the photographs that Mr. Garcia took of President Obama at the National Press Club on April 27, 2006 was a photograph depicting President Obama looking up and to his left.

16.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 16 of the Complaint and therefore denies the same, except admits that Fairey has publicly stated that he has created various posters and other merchandise depicting President Obama, which posters were based on a photograph for which The AP owns the copyright.

17.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 17 of the Complaint and therefore denies the same, except admits that Fairey has publicly stated that he has created various posters and other merchandise depicting President Obama, which posters were based on a photograph for which The AP owns the copyright.

18.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 18 of the Complaint and therefore denies the same, except admits that Fairey has publicly stated that he has created various posters and other merchandise depicting President Obama, which posters were based on a photograph for which The AP owns the copyright.

19.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 19 of the Complaint and therefore denies the same, except admits that Fairey has publicly stated that he has distributed various posters and other

merchandise depicting President Obama, which posters were based on a photograph for which The AP owns the copyright.

20.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 20 of the Complaint and therefore denies the same.

21.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 21 of the Complaint and therefore denies the same.

22.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 22 of the Complaint and therefore denies the same.

23.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 23 of the Complaint and therefore denies the same.

24.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 24 of the Complaint and therefore denies the same, except admits that Fairey has publicly stated that he has created various works depicting President Obama based on a photograph for which The AP owns the copyright.

25.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 25 of the Complaint and therefore denies the same.

26.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 26 of the Complaint and therefore denies the same, except admits that President Obama was elected on November 4, 2008.

27.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 27 of the Complaint and therefore denies the same.

28.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 28 of the Complaint and therefore denies the same.

29.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 29 of the Complaint and therefore denies the same, except admits that Fairey has publicly stated that he has created various posters that were based on a photograph for which The AP owns the copyright.

30.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 30 of the Complaint and therefore denies the same, except admits that an individual named James Danziger has posted material on the Internet discussing Plaintiffs' posters depicting President Obama and the works owned by The AP on which such posters were based.

31.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 31 of the Complaint and therefore denies the same, except admits that an individual named Michael Cramer has posted material on the Internet discussing Plaintiffs' posters speculating as to the source of the images depicted in Plaintiffs' posters of President Obama.

32.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 32 of the Complaint and therefore denies the same, except admits that Mr. Danziger has posted material on the Internet discussing Plaintiffs' posters speculating as to the source of the images depicted in Plaintiffs' posters of President Obama.

33.     Denies knowledge or information sufficient to form a belief as to the allegations contained in ¶ 33 of the Complaint and therefore denies the same, except admits that an individual named Tom Gralish has posted material on the Internet

discussing Plaintiffs' posters speculating as to the source of the images depicted in Plaintiffs' posters of President Obama.

34.     Denies the allegations contained in ¶ 34 of the Complaint, except admits that Fairey used a photograph of President Obama taken by Mr. Garcia at the National Press Club on April 27, 2006 as the basis for his *Obama Hope* poster.

35.     Denies the allegations contained in ¶ 35 of the Complaint, except admits that on or about January 29, 2009, The AP attempted to contact Fairey regarding his unauthorized use of its photographs in creating Plaintiffs' posters depicting President Obama.

36.     Denies the allegations contained in ¶ 36 of the Complaint, except admits that on January 29, 2009 in-house counsel for The AP telephoned Fairey's studio but was unable to speak with him, and further admits that an individual claiming to represent Fairey called The AP's in-house counsel on January 30, 2009, during which call The AP's in-house counsel informed Fairey's representative that The AP was aware that a third-party had used technology to determine the source of the photo used to create *Obama Hope*, which was owned by The AP.  Further admits that The AP told Fairey's representative that it expected Fairey to provide attribution and compensation for the use of the photo consistent with The AP's licensing practices.

37.     Denies the allegations contained in ¶ 37 of the Complaint, except admits that on or about February 3, 2009 in-house counsel for The AP spoke with Plaintiffs' counsel, during which conversation Plaintiffs' counsel proposed a standstill agreement until February 6, 2009 to discuss a license agreement and The AP readily agreed to the proposal.

38.     Denies the allegations contained in ¶ 38 of the Complaint, except admits that on February 4, 2009, The AP's news department independently prepared and transmitted a news article with the headline "AP alleges copyright infringement of Obama image" and refers the Court to that news article, which document speaks for itself.

39.     Denies the allegations contained in ¶ 39 of the Complaint, except admits that The AP's news department independently prepared and transmitted the February 4, 2009 news article entitled "AP alleges copyright infringement of Obama image," which document speaks for itself.

40.     Denies the allegations contained in ¶ 40 of the Complaint, except admits that The AP's in-house counsel sent an e-mail to Plaintiffs' counsel on February 6, 2009, after Plaintiffs' counsel failed to respond to earlier communications stating that while The AP preferred an amicable resolution, it intended to file suit on Tuesday, February 10, 2009 if the parties were unable to resolve matters before then.

**FIRST CAUSE OF ACTION**

41.     Repeats and realleges each and every response to ¶¶ 1-40 above as if fully set forth herein.

42.     States that the allegations contained in ¶ 42 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admits that there is a dispute between the parties as to whether the various unauthorized posters created by Plaintiffs using The AP's copyrighted photograph infringe The AP's rights in and to such photograph.

43.     Denies the allegations contained in ¶ 43 of the Complaint.

## SECOND CAUSE OF ACTION

44.     Repeats and realleges each and every response to ¶¶ 1-43 above as if fully set forth herein.

45.     States that the allegations contained in ¶ 45 of the Complaint are conclusions of law as to which no responsive pleading is necessary, but that to the extent any response is required, admits that there is a dispute between the parties as to whether the various unauthorized posters created by Plaintiffs using The AP's copyrighted photograph infringe The AP's rights in and to such photograph and are not fair use.

46.     Denies the allegations contained in ¶ 46 of the Complaint.

47.     Denies the allegations contained in ¶ 47 of the Complaint, except admits that prior to Plaintiffs' creation of their posters, The AP had published photographs of President Obama which were taken by Mr. Garcia.

48.     Denies the allegations contained in ¶ 48 of the Complaint.

49.     Denies the allegations contained in ¶ 49 of the Complaint.

50.     Denies the allegations contained in ¶ 50 of the Complaint.

## DEFENDANT'S AFFIRMATIVE DEFENSES

### FIRST DEFENSE

51.     The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

52.     Plaintiffs' claims are barred in whole or in part by the doctrines of estoppel and unclean hands.

## DEFENDANT'S COUNTERCLAIMS

### NATURE OF THE ACTION AND RELIEF SOUGHT

53.    The AP's claims arise out of Plaintiffs' willful and blatant violation of The AP's copyright in a photograph of President Obama, taken by The AP staff photographer Mannie Garcia in April 2006 (the "Obama Photo").  Plaintiffs have used the Obama Photo without The AP's consent in violation of the Copyright Act of 1976, as amended.  Namely, Counterclaim Defendants Shepard Fairey, Obey Giant Art, Inc., Obey Giant LLC and Studio Number One, Inc. (all Counterclaim Defendants together, "Plaintiffs" or "Fairey"), fully aware that the Obama Photo was a copyrighted image, misappropriated The AP's rights in that image by developing a series of posters and other merchandise based on the Obama Photo (the "Infringing Works") and selling such merchandise through various distribution channels.

54.    The Infringing Works copy all the distinctive and unequivocally recognizable elements of the Obama Photo in their entire detail, retaining the heart and essence of The AP's photo, including but not limited to its patriotic theme.  As the following side-by-side comparison illustrates, the striking similarity between The AP's copyrighted image (displayed below on the left) of President Obama and the poster that Fairey made based on that image (displayed below on the right) is patently obvious:



The AP's Obama Photo       Fairey's Infringing Work

A true and correct copy of this side-by-side comparison is attached as **Exhibit A**.

       55.     While Plaintiffs have attempted to cloak their actions in the guise of politics and art, there is no doubt that they are profiting handsomely from their misappropriation.  As just one of myriad examples of Plaintiffs' commercialization of the Infringing Works, Plaintiffs' Web site <http://www.obeygiant.com/store> currently sells a $60 sweatshirt (depicted below) bearing an image derived from the Obama Photo, in blatant disregard of The AP's rights.



56.     The following images depict Plaintiffs' infringing T-shirts — yet another example of the commercial nature of the Infringing Works:



57.     Nowhere in Plaintiffs' Complaint for a declaratory judgment and other relief do they mention that they have made, and continue to make, substantial revenue from the Infringing Works.  According to published reports, however, as of September 2008 alone, Plaintiffs' profits from the reproduction and distribution of the Infringing Works had already exceeded $400,000.  Upon information and belief, in the intervening months, and with the publicity generated by this lawsuit, Plaintiffs' profits from the reproduction, distribution and sale of copies of the Infringing Works have far exceeded the level they had reached six months ago.

58.     Fairey could have selected from any one of countless images of President Obama in making his posters and other merchandise, or simply drawn him from life or taken his own photograph to use for his posters and other merchandise.  Instead, Fairey was drawn to the unique qualities of this <u>particular</u> photograph, made distinctive by Mr. Garcia's creative and artistic input, including (1) his deliberate selection of a specific moment in time to capture President Obama's expression; (2) his choice in using a particular type of lens and light for optimal impact; and (3) his careful and unique

composition of the photograph. These facts, combined with Mr. Garcia's experience, skill and judgment, resulted in the creation of a distinctive image of a unique moment and expression of President Obama.

59. The Infringing Works do not alter any of the distinctive characteristics that make the Obama Photo so striking — from the selection of subject matter, to the composition, to the exacting details of the photo. All the recognizable elements remain completely and unmistakably intact in the Infringing Works, including the angle and slant of President Obama's head, and his gaze and expression; the contrast, focus, and depth of field of the photograph; as well as the shadow lines created by the lighting in the original photo. Fairey even used the red, white and blue flag imagery that Mr. Garcia worked to capture in the background of The AP's photo. Fairey has done nothing that would excuse his blatant copying of, and creation of derivative works based on, the Obama Photo without first obtaining a license to use that photograph from The AP and agreeing to provide attribution to Mr. Garcia.

60. As is detailed below, Fairey's use of The AP's Obama Photo without notice, credit or compensation to the copyright owner is part and parcel of his willful practice of ignoring the property rights of others for his own commercial advancement. As is also detailed below, Fairey's practice contrasts dramatically with his aggressive and hypocritical enforcement against others of his own intellectual property rights. This highlights Fairey's knowing willfulness here and shows that his use of The AP's Obama Photo is anything but fair.

61. Simply put, the fair use doctrine cannot be contorted to permit Fairey to wholly replicate a photographer's prescient photograph and exploit it for his

own commercial benefit in utter disregard of The AP's long-established licensing program, which provides needed revenue to support The AP's not-for-profit mission of reporting the news as well as funding The AP's charitable efforts.

62.     Licensing is an important source of revenue for content creators, be they news or entertainment companies. This is especially true for The AP and particularly in these difficult times.  As a news agency, licensing of content is fundamental to The AP's existence.  The rule of law that Fairey argues here essentially would permit someone to take and commercialize a content owner's property without attribution or reasonable compensation, undermining the long-established practice of using such revenue streams to support the ongoing creation of new content.

63.     To create such a rule harming content owners is unnecessary as licensing programs already exist that strike a fair balance between the rights of the original content owner and the newcomer who wishes to use existing content to make a derivative work.  Here, The AP had made every effort amicably to enter into a license and avoid litigation but, as detailed below, in the midst of discussions Plaintiffs jumped the gun and filed this lawsuit anticipatorily in an attempt to gain a procedural advantage.

64.     In light of Plaintiffs' willful, unauthorized use of The AP's Obama Photo, The AP has no choice but to assert claims for damages and injunctive relief based on Plaintiffs' copyright infringement under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., and violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202, as well as a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Plaintiffs have no copyrights in the Infringing Works.

PARTIES

65.     Counterclaim Plaintiff The AP is a New York not-for-profit corporation with its principal place of business at 450 West 33rd Street, New York, New York 10001.  The AP is one of the largest and oldest news organizations in the world, serving as a source of news content in all formats — text, photos, graphics, audio, video and multimedia.

66.     Counterclaim Defendant Shepard Fairey is an individual who resides at 1331 West Sunset Boulevard, Los Angeles, California 90026.  He is an artist, graphic designer, merchandiser and business owner.

67.     Counterclaim Defendant Obey Inc. is a California corporation located at 1331 West Sunset Boulevard, Los Angeles, California 90026.  Obey Inc. engages in the business of selling and distributing Fairey's artwork, graphic designs and merchandise.

68.     Counterclaim Defendant Obey Giant LLC is a California limited liability corporation located at 1331 West Sunset Boulevard, Los Angeles, California 90026.  Upon information and belief, Obey Giant LLC engages in the business of selling and distributing Fairey's artwork, graphic designs and merchandise.

69.     Counterclaim Defendant Studio Number One, Inc. ("Studio One") is a California corporation located at 1331 West Sunset Boulevard, Los Angeles, California 90026.  Upon information and belief, Studio One engages in the business of corporate brand identity and manages the Obey® and Shepard Fairey brands, as well as distributing Fairey's artwork, graphic designs and merchandise.

## JURISDICTION AND VENUE

70.     This action asserts counterclaims arising under the Copyright Act, 17 U.S.C. § 101 et seq., and the DMCA, 17 U.S.C. § 1202.  This Court has federal question jurisdiction over The AP's counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1338(b) and subject matter jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court also has subject matter jurisdiction over The AP's state law claims pursuant to the principles of pendant jurisdiction under 28 U.S.C. § 1367(a).

71.     Upon information and belief, this Court has personal jurisdiction over all Plaintiffs because they have committed tortious acts outside New York causing injury within the State of New York and derive substantial revenue from interstate commerce.  Upon information and belief, this Court also has personal jurisdiction over all Plaintiffs because they transact business in New York.  Further, this Court has personal jurisdiction over Fairey and Obey, Inc. because they have chosen to avail themselves of the laws and protections of this Court and The AP's claims arise from the same series of operative facts that Fairey and Obey, Inc. allege.

72.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

## FACTUAL BACKGROUND

### The AP

73.     The AP is one of the oldest, largest and most highly-regarded news organizations in the world.  Founded in 1846, today it operates as a not-for-profit

membership cooperative that gathers and distributes to news outlets worldwide news and information that is informative, educational or otherwise of public interest.

74.     To support its worldwide news mission, The AP employs approximately 3,800 people in approximately 240 locations around the globe, providing thousands of newspapers, radio stations, television stations, news agencies, Web services, government and corporate clients with high-quality news around the clock in the form of text, photos, graphics, audio and video.  On any given day, The AP's content can reach more than half the world's population through its members and clients.

75.     The AP must invest significant resources to create and deliver this enormous volume of consistently high-quality reports.  The AP's journalists are actively engaged in gathering and reporting news, including textual, visual and audio materials. Access to information is crucial for these journalists, who must be present to the greatest extent possible at the moment when news occurs in order to capture it.  This requires them to travel quickly to the places where news is expected to happen, overcoming many obstacles and enduring significant hardships and risks to make sure that they are in a position to capture newsworthy events as they happen and transmit their original material immediately to an AP center for editing and distribution.

76.     As a not-for-profit news cooperative, The AP applies any incidental profit to its news operations.

77.     The AP's commitment is not limited to time and money.  Its reporters and photographers often put their lives in jeopardy to gain access to and report from dangerous and unstable regions of the world or areas affected by catastrophes and natural disasters.  More than 30 AP journalists have lost their lives in the line of duty

since the cooperative was established.  In addition, in the last few years alone, nearly 20 AP journalists have been incarcerated or otherwise detained, and at least several more have been harassed, intimidated or beaten.  Most recently, a photographer from The AP was imprisoned for two years without any formal legal charges because of his dramatic and poignant photographs of war.

78.     The AP's news gathering activities require it, often at great expense, to remain a strong advocate for the First Amendment and openness to public records in the United States and in other countries; to protect its journalists who have been detained or imprisoned in the course of their duties; and to provide both security to journalists stationed in conflict zones and comfort to their families.

79.     Each story that The AP reports, whether in text, visual, audio, or graphical form, represents and reflects the efforts of reporters on the ground.  With intimate knowledge of their beats and sources, reporters spend many hours — if not weeks — getting their stories.  In doing so, they benefit from The AP's international physical presence, as well as its freedom of information actions, transparent editorial standards, editorial checks and balances, and efforts that help to safeguard journalists from threats to their safety and defend journalists from incarceration.  It is for all of these reasons that the public has come to rely upon The AP to inform it about the most significant events occurring around the world.

80.     In addition to paying its journalists, photographers and videographers, The AP also must fund pension and other financial obligations for the men and women who have dedicated their lives, often for relatively modest financial remuneration, to informing the public.  In order to help its staff and their family members

cope with catastrophes, natural disasters and conflicts, The AP also supports The AP Emergency Relief Fund, which distributes grants to staffers and their families who are victims of tragedies such as Hurricane Katrina and the recent natural disaster in Myanmar.  See <http://www.ap.org/relieffund/>.  And for those AP journalists who have made the ultimate sacrifice in service of reporting the news, The AP also funds benefits to the families of those brave individuals who have fallen in the line of duty.

81.     As a not-for-profit news organization deeply rooted in American journalistic traditions, no institution has greater interest than The AP in preserving the rights of those who engage in free expression — including the right of journalists and photographers to earn a livelihood from the products of their skill, talent, hard work and dedication.  The AP's commitment to these core ideals has not wavered with the passage of time, in the face of adversity, as a result of dramatic changes in technology or on account of changes in the law.

The AP's Photography

82.     The outstanding quality and significance of The AP's efforts has been recognized over the years with numerous awards, including 49 Pulitzer Prizes to date.  Of these, 30 have been awarded to The AP for its photographic work.  The AP has also earned myriad other awards for its photography.  These awards reflect recognition within the photographic and journalism communities of the extent to which The AP's photographs have captured many significant moments in history in a way that words alone simply cannot, producing images that have become woven into our nation's cultural fabric.

83.     The AP's photographers capture these iconic and newsworthy images through their thoughtful creative process, judgment and expertise.  While

photographing events, they carefully seek out those elements that might make a compelling photograph that also is relevant to the story at hand. Such elements include the choice of camera and lens, the timing and selection of subject matter, the angle, lighting and shadows, depth of field, color contrast, symmetry, scale and focus, as well as capturing peak action, emotion, or any number of other unique visual elements. It requires the creative talent and ability of the individual photographer to recognize these elements and find a way to create a compelling photograph.

84. The AP has a rich tradition of covering more than a century and a half of American politics. For example, The AP is one of the few contemporaneous sources of the text of Abraham Lincoln's Gettysburg Address. And The AP's photography is synonymous with some of America's most historic moments, often capturing highly original elements in otherwise familiar subjects. The AP Presidential Exhibit commemorates more than 80 iconic photographs of past U.S. Presidents and their families, including unforgettable photos of the Reagans, the Bushes (I and II), the Clintons, and the Obamas, among others. See <http://www.ap.org/americanpresident/>.

85. With respect to politicians, in particular, because they are photographed almost every day, it takes skill and imagination to photograph them in a way that captures and conveys a compelling story.

86. Among The AP's many distinctive photographs are those covering political events and campaigns. One such example is Scott Applewhite's photograph (depicted below) of President Clinton, taken as he walked to a podium in the Rose Garden of the White House in 1998 to deliver a short statement about the then-impending impeachment inquiry. Although the photograph depicted a public figure in a public and

familiar setting, and was covered by the White House Press Corps, Applewhite was able to capture in a single image the enormous impact of the Monica Lewinsky affair on President Clinton as a person as well as a politician.  The President had just emerged into view from behind the pillars of the White House, his somber expression punctuated by the long shadows and his just-visible wedding band.  It is a foreboding image of a Presidency nearly ended by the shadow of an extra-marital affair.  Mr. Applewhite "spotted this angle as photographers were moved to a camera platform and then hung back from the pack waiting for the right moment as President Clinton moved towards [the] podium."  See Brian Horton, Guide to Photojournalism 33 (2d ed. 2001).



87.     Another example of The AP's rich history of photographing presidents is shown in the photograph depicted below of former Presidents John Kennedy and Dwight Eisenhower in Camp David as they walked away from a posed photo op to discuss problems created by the Bay of Pigs invasion.  The AP's Paul Vathis took this

photograph, a photograph that transcends time, through the use of extraordinary skill, observation, planning and persistence.  After the Press Secretary had declared no more pictures, and other photographers started packing their gear, Mr. Vathis observed the two presidents walking away.  He quickly conceived the image in his mind and skillfully managed to take the shot through the legs of a Secret Service Agent.



        88.     As these examples demonstrate, The AP's photographs speak to their audiences in a way that words simply cannot — by conveying visually a unique narrative captured at a specific moment in time.

Dependence on Licensing Revenue

        89.     The AP does not generate significant revenue from advertisers or sponsors.  Nor does The AP have a large endowment, as do other large institutions such

as museums, private universities or even law schools.  As a not-for-profit, membership-based news cooperative, The AP depends for the support of its newsgathering and reporting mission on revenue earned by licensing the intellectual property rights in and to its content.

90.     Because The AP's content is of such high quality and significance and its reports provide such essential information to the public at large, potential users of its content are prepared to pay, and do pay, fair consideration for the right to use The AP's works.  A vast array of customers under a variety of commercial arrangements directly or indirectly license from The AP the right to access and use its content across a variety of media, genres, geographies and languages.  Some of these customers have licensed rights in and to The AP's content for over a century.

91.     The AP distributes its licensed content through feeds, satellite transmissions, hosted platforms and other means, including, in the case of photography, via a digital photo archive housing more than 10 million images, all of which are readily available for licensing via the Internet.  See < http://www.apimages.com>.  The AP's digital archive is also authorized to license images that belong to third parties, acting as a repository for historic, cultural and other iconic photographs.

92.     Over the years, The AP has licensed its photographs not only to media organizations, but also to a wide range of commercial and non-commercial licensees seeking to incorporate The AP's photos into their work.  The AP has licensed its photos to individuals for use in political campaigns and advertisements, and to publishers, graphic designers, merchandisers and others seeking to incorporate The AP's images into, among other things, books, posters, buttons, T-shirts and other merchandise.

For example, The AP licensed rights to a photograph of President Obama from its digital photo archive for use on a tote bag.




The AP Photo                                    Licensed Derivative Work

93.     The AP is not unique in licensing images for use in advertising, artistic works and merchandise, including on tote bags, T-shirts, posters, prints, banners and the like.  The talent, skill and effort required to create compelling still images has fostered a vibrant market for professional photography, one on which many photographers have come to rely for their livelihoods.  In addition, many content providers, whether news or entertainment in nature, rely on this revenue to support their activities.  The AP's licensing program not only allows it to continue operating its full scale, robust and dependable newsgathering services worldwide, but it enables The AP to pursue efforts protecting the First Amendment and guaranteeing public access to open government on the local, state and federal levels.

The Obama Photo

94.     On March 29, 2006, The AP hired Mr. Garcia as a full-time, salaried staff photographer.  While working as a staff photographer in April 2006, Mr. Garcia covered an event at the National Press Club headlined by actor George Clooney, who spoke about his then-recent visit to war-torn Darfur and released video footage from

his trip.  The event was also attended by, among others, U.S. Senator Sam Brownback and then-Senator Barack Obama, long before he announced his candidacy for the Presidency.  Senators Brownback and Obama had co-sponsored a bill, titled The Darfur Peace and Accountability Act, which sought to increase funding for peacekeeping operations in Sudan.

95.     The focus of the contemporaneous coverage of the event — and indeed the headline and text of The AP's story that day — was Clooney's involvement with, and recent trip to, Darfur.  Mr. Garcia, however, also focused on then-Senator Obama for several of his photographs, positioning himself in such a way that he was able to illustrate the charismatic junior Senator at a unique and expressive angle against the patriotic backdrop of the American flag.

96.     In one of the photographs he took that day, Mr. Garcia consciously and deliberately captured now-President Obama at a specific moment in time, one for which he had patiently waited.  The unique composition, angle, center of focus, framing, and depth of field, along with the particular reflection of light, shadow lines and contrast, combined with the particular type of lens that Mr. Garcia used, created a unique image of President Obama, his head slanted slightly to the left, his chin lifted and his eyes fixed off into the distance.  A true and correct copy of this photo (the "Obama Photo") is shown below and attached hereto as **Exhibit B**:



The AP holds a copyright registration, Registration No. VA 1-356-885, in the Obama Photo.

        97.    Mr. Garcia has described some of the elements that went into capturing the Obama Photo at the National Press Club that day, demonstrating the thought, craft, patience and judgment that he brought to bear on its creation: "I'm on my knees, I'm down low, and I'm just trying to make a nice, clean head shot. And I'm waiting. I'm looking at the eyes. I mean, sure, there's focus, and I want the background to be a little bit soft. I wanted a shallow depth of field. I'm looking and waiting. I'm waiting for him to turn his head a little bit. I'm just patiently making a few pictures here and there, and I'm just looking for a moment when I think is right, and I'm taking some images as I'm going along, and then it happened. Boom, I was there. I was ready." See Interview of Mannie Garcia on National Public Radio, February 26, 2009, available at <http://www.npr.org/templates/story/story.php?storyId=101184444>.

<u>Fairey's History of Misappropriating the Works of Others</u>

98.     Fairey is an artist, graphic designer, merchandiser and business owner who has claimed to specialize in "referencing" pre-existing works to create, among other things, commercial works, including merchandise and posters, and to promote and sell his Obey®-branded products.  Upon information and belief, his efforts began in the 1980s with an image of the late, famous wrestler, Andre the Giant (born André René Roussimoff, May 19, 1945).  Fairey later adorned that image with his brand, Obey® (claimed subject matter of three trademark registrations filed with the United State Patent and Trademark Office, Registration Nos. 2632359, 2762299 and 3282078), and placed it, often illegally, in public spaces in communities across the country, including New York, Boston, Providence and San Diego.

99.     Further demonstrating Fairey's willful disregard for the property rights of others, upon information and belief, he has been arrested more than a dozen times for targeting communities with his graffiti, vandalism and related crimes, most recently in Boston on two outstanding warrants, just three days before filing this lawsuit.

100.    Upon information and belief, Fairey's merchandise is often based in whole or in great part on works misappropriated from other artists, designers and copyright owners.  In fact, at a recent forum, Fairey admitted that he had a "long history" of copyright infringement.  Though Fairey's remarks may have been somewhat tongue-in-cheek, they reflect a shared understanding by Fairey and his audience that Fairey misappropriates the works of others.

101.    As illustrated below, Fairey's willful pattern and practice is to repeatedly copy the works of other artists and photographers without providing, on information and belief, any credit, compensation or attribution to those authors.  For

instance, the photo below on the left, titled *Black Panther*, was taken by photographer Pirkle Jones in 1968, portraying a Panther at a political rally in Oakland, California. Below on the right is a poster produced by Fairey. It contains an image that is strikingly similar to the one created by Mr. Jones, who, upon information and belief, received no credit, compensation or attribution from Fairey for the use of his work.



Pirkle Jones Photo          Fairey Poster

102. Fairey similarly misappropriated the work of Cuban poster artist Rene Mederos. In so doing, Fairey took a poster that Mr. Mederos created in 1972 and printed it on T-shirts, as shown in the two images below. Upon information and belief, Fairey failed to give Mr. Mederos any credit, compensation or attribution for the T-shirt.




Mederos Poster          Fairey T-shirts

103.    In 1969, Rupert Garcia created a silkscreen print titled *Down with the Whiteness* (shown below on the left), which is featured in the permanent collection of the Fine Arts Museum of San Francisco.  Fairey later misappropriated the image (shown below on the right) and, upon information and belief, simply kept the same graphic design and, using a computer graphics program, substituted the head on the image and replaced the text, without giving any credit, compensation or attribution to Mr. Garcia.



Garcia's Work          Fairey's Work

104.    Upon information and belief, yet another example of Fairey's unauthorized copying is shown below.  Fairey misappropriated a Swiss photographer's image of a woman covering her ears (below on the left), creating an image that was almost identical to the original but for the omission of the original text and the addition of Fairey's "Obey" trademark and the phrase "Obey With Caution."  As with his other works described above, upon information and belief, Fairey gave no credit, compensation or attribution to the original artist.



Swiss Work          Fairey's Work

105.    Fairey's copy-and-paste style is evidenced yet again in a poster he titled *Noveau Black* (pictured below on the right), which, upon information and belief, strikingly takes directly from Austrian artist Koloman Moser's work, titled *Ver Sacrum* (1898) (pictured below on the left). Once again, on information and belief, Fairey took the original image in its entirety and gave no credit, compensation or attribution to the estate of the original artist.



Moser's Work          Fairey's Work

106.     Fairey's conduct over the years clearly evidences a willful practice and pattern of ignoring other's rights in and to their own works.  Their work, it appears, is fair game for him to exploit commercially without so much as an acknowledgement.

Plaintiffs' Hypocritical Approach to Intellectual Property Rights

107.     In a striking departure from the casual disregard that Fairey shows for the creative works of others, Plaintiffs act hypocritically and aggressively when it comes to the protection of Fairey's works and enforcement against those who make use of them.

108.     For example, Plaintiffs are quick to use the law to restrict others from using their materials and to preserve their exclusive use of Fairey's designs.  Since the late 1990s, Fairey and his related entities have filed at least nine trademark applications, including for the words "SHEPARD FAIREY," "OBEY," and "DISOBEY" and the "OBEY®" design, with the United States Patent and Trademark Office, asserting ownership over those particular words and images.  In other words, through these trademark registrations, Fairey seeks the legal right to prevent others from commercially using these words and phrases.

109.     In so doing, Fairey seeks to protect his commercial interests.  For example, Fairey's current active trademark registrations cover a wide range of merchandise, including T-shirts, jackets, caps, knit shirts, woven shirts, pants, shorts, jackets, sweatshirts, sweaters, belts, scarves, beanies, hats, handbags, backpacks, wallets, leather key chains, stickers, posters, postcards and the like.  With respect to the Obey® trademark (Registration No. 2632359), Fairey has filed a Section 15 Affidavit claiming "incontestable" rights in that word and design.

110.     Plaintiffs also demonstrate a sophisticated understanding of licensing and copyright protection — with respect to Fairey's own works — contrasting

sharply with Fairey's repeated failure to obtain permission and a license to use other artists' works. For example, the ObeyGiant.com Web site allows fans to download for free certain specific Fairey trademarks and images that promote his brands, but it does not allow visitors to download any of Fairey's "Photographs," "Fine Art," or other items. In other words, Fairey restricts the copying of his own works, even including an "All Rights Reserved" copyright notice on every page of his Web site.

111. The contrast between Fairey's use of others' works and his approach to copyright enforcement in his own works is further shown with respect to the very Infringing Works at issue in this case. During the 2008 presidential campaign, Fairey offered free licenses to download the "Obama Hope" poster from his website. See <http://www.obeygiant.com/ headlines/the-real-deal>. However, the license was subject to several restrictions, including that the poster was "not to be used for merchandise or any other profitable means." Further, Fairey's Web site also warned that the poster was the "copyrighted image of Shepard Fairey and OBEY GIANT ART" and that all rights were "Reserved."

112. In keeping with Plaintiffs' hypocritical approach to intellectual property rights, notwithstanding their misappropriation and commercialization of other creators' works for their own gain, they are quick to hunt down artists who they believe unlawfully use Fairey's intellectual property, without apparent regard to the principles of fair use that Plaintiffs conveniently espouse in this case. For example, upon information and belief, in March and April 2008 Fairey and his related enterprises sent Texas-based artist Baxter Orr a series of cease-and-desist letters in connection with Orr's creation of a

work that borrows from Fairey's Obey® image.  Orr's work, titled *Protect Yourself* (bottom right), covered the face of Fairey's *Protect* (bottom left) with a surgeon's mask.



Fairey's Protect        Orr's Protect Yourself

113.    Fairey's first demand letter accused Orr of making "unauthorized use" of Fairey's "copyrighted work" and asserted that Orr's *Protect Yourself* poster infringed the copyright in Fairey's *Protect*.  Fairey asserted that Orr's work was "essentially identical" to Fairey's.

114.    In the letter, Fairey further asserted that Orr had "neither asked nor received permission to use" Fairey's work, "nor to make or distribute copies, including electronic copies, of same."

115.    Fairey's letter went on to threaten the artist, stating, "I believe you have willfully infringed our rights under 17 U.S.C. Section 101 et. seq. and could be liable for statutory damages as high as $150,000 as set forth in Section 504(c)(2) therein."

116.    The letter concluded by demanding that Orr either (1) destroy all copies of his *Protect Yourself* works, or (2) surrender them to Fairey's company.  If Orr failed to comply, the letter threatened him with unspecified "further action."

117.    It is noteworthy that Fairey's letter to Orr could just as easily have been sent by The AP to Fairey in this case — if The AP had sent one, which it did not — regarding Fairey's use of The AP's Obama Photo.  In fact, The AP's approach to Fairey's

infringement was much more moderate and involved simply calling Fairey's

representatives to discuss a reasonable license.  The AP never demanded that Fairey

"destroy" or "surrender" his work.

118.    Upon information and belief, when Orr apparently did not

capitulate to Fairey's first demand letter, Plaintiffs sent yet another letter to Orr.  In this

letter, Fairey's counsel went on to detail exactly how Orr's failure to obtain a license

harmed Fairey and his related entities.

> One of the many factors contributing to the value and desirability of my
> Client's [defined in the letter as "Shepard Fairey and his related entities"]
> Intellectual Property is the limited licensed uses and his control over such
> uses.  **Such exclusivity commands a significant premium over the
> designs supplied by the average designer.  My Client has long
> required the purchase of a license in connection with a right to use its
> Intellectual Property on goods, services, advertising, and publicity**.
> My Client identifies the permitted uses in a License Agreement which
> accompanies each license granted.  This agreement governs the use of the
> Intellectual Property.  People and businesses seek out my Client and his
> distinctive artwork when they desire to have a certain look to their work
> and/or to appeal to a certain audience which favors my Client's work.  My
> Client typically warrants that his licensees acquire exclusive rights in their
> licensed categories, and they expect my Client to pursue those who are
> using the same or confusingly similar marks on their goods and services
> and thus diminishing the value of their licenses.  Indeed, it is through
> clients and potential clients that your use came to my Client's attention.

(Emphasis added.)

119.    In sharp contrast to Fairey's refusal here to obtain a license to use

The AP's Obama Photo, Plaintiffs' letter went on to detail at length not only the

importance of licensing content from the owners of intellectual property, but also

demanded that Orr agree to license Fairey's image:

> **You have not secured a license to use and distribute the Intellectual
> Property either for its own uses or in connection with its products and
> marketing**.  Specifically, your apparent unlicensed appropriation, use,
> copying, dilution, and distribution of the Intellectual Property for your

> financial benefit and any other uses, are each infringements and dilutions of my Client's valuable trademarks and copyrights. Be advised that your actions may violate both federal and state unfair competition and trademark laws.

(Emphasis added.)

120.    The second letter went on to threaten Orr with the filing of a "complaint in the appropriate court" if the parties could not otherwise reach an agreement. The letter noted that "[u]nless and until we reach such an agreement, I must insist that you immediately cease and desist from all infringing uses of my Client's Intellectual Property," and that "[a]ll my Client's rights are expressly reserved."

121.    What is even more striking about Fairey's hypocritical approach with respect to Orr, as compared to his position in this case, is that the second demand letter to Orr attempted to <u>censor</u> Orr from even telling anyone that Fairey was claiming infringement. As this letter demonstrates, Fairey is hardly a champion of the First Amendment. Under a seldom-invoked common-law copyright provision incorporated in the California Civil Code, Fairey's counsel then warned Orr to refrain from publishing any of Fairey's cease-and-desist letters:

> Finally, I want to call your attention to California Civil Code § 985, which reads in part "Letters and other private communications in writing belong to the person to whom they are addressed and delivered; but they cannot be published against the will of the writer, except by authority of law." Accordingly, I do not expect to see this letter in a public forum and you are not authorized to publish it, including (without limitation) by putting it on the Internet. This also applies to your posting of my Client's first cease and desist letter online. Demand is also made that you remove your public copies of my Client's correspondence.

122.    In yet another example of Plaintiffs' hypocritical approach to intellectual property rights that evidences Fairey's willfulness in using The AP's Obama Photo without a license, upon information and belief, just weeks before filing this

lawsuit, Obey, Inc. sent online store CafePress.com a cease-and-desist letter asserting that certain merchandise offered for sale through the store infringed an Obey® trademark. Upon information and belief, CafePress.com had sold a blue-eyed kewpie doll clad in a knit black-and-gold uniform bearing the word "Obey," designed by a Pittsburgh-based graphic designer, which Fairey said infringed his trademark rights in the word "Obey."

123. Upon information and belief, rather than deal with legal costs, the designer decided to remove the items from sale. Upon information and belief, in the three months before the items were withdrawn, the designer made less than $70 for the sale of 16 items, 10 of which had "Obey" written on them.

124. Upon information and belief, Fairey and his related entities routinely police and enforce Fairey's intellectual property rights. This hypocritical approach highlights the willfulness of his conduct, and also constitutes, inter alia, unclean hands that should also estop Fairey from claiming that his misappropriation of The AP's Obama Photo is fair use, free for him to take without having obtained a license.

Plaintiffs' Infringement of Defendant's Copyright

125. Just as he has done time and time again, Fairey created the Infringing Works by misappropriating an image that belonged to someone else, in this case a photograph copyrighted by The AP. After processing The AP's Obama Photo through his computer, Fairey proceeded to create and distribute virtually identical copies of the Obama Photo as his own original creation without proper attribution to Mr. Garcia and without credit and fair compensation to The AP.

126. Upon information and belief, after months of Plaintiffs' attempts to obscure the true source of the Infringing Works, a third party, using advanced image recognition technology that matches images based on their distinctive elements,

determined in late January 2009 that the Infringing Works were unmistakably derived from the Obama Photo.

127.    Only then was Fairey forced to admit that he "came across" The AP's Obama Photo after doing searches on Google Images in January 2008 for images of President Obama.  Fairey has said that he was looking for an image of Obama that was "Presidential," and in which Obama was "gazing off into the future, saying, 'I can guide you.'"  That was exactly what Mr. Garcia had captured in Obama Photo and exactly what Fairey took when he copied it.

128.    As his words demonstrate, Fairey deliberately chose to use The AP's Obama Photo because it captured the essence of what Fairey was looking for, due to the unique qualities imparted to it by the photographer's own creative input.  In other words, although Fairey's Google search must have returned dozens, if not hundreds, of images available on the Internet, Fairey selected the Obama Photo — almost two years after the photograph was originally published — because of its transcendent qualities.

129.    Upon information and belief, rather than simply contacting The AP and obtaining permission and a reasonable license, which would have been both easy and relatively inexpensive to do, Fairey proceeded to take all of the unique characteristics of the Obama Photo, copying those distinctive characteristics in their entirety, to create the Infringing Works, without any credit to The AP.  Thus, rather than invest the effort to create his own iconic image, or to contact The AP to procure a reasonable license, Plaintiffs elected to free-ride on Mr. Garcia's efforts and creative choices.

130.    Fairey's minimal changes to The AP's Obama Photo add nothing to the distinctive characteristics of Mr. Garcia's image.  Rather, Fairey essentially has

engaged in a form of computerized "paint by numbers" with The AP's copyrighted image — taking the work in its entirety. The amount and substantiality of Plaintiffs' use is unmistakable — it is a wholesale copying of The AP photo.

131.    Plaintiffs' use of the Obama Photo cannot be said to serve a different purpose than the original work, or transform the original image into a new expression. Like the creative works of countless of The AP's photographers, each of which convey a unique narrative, the Obama Photo conveys a defining impression of President Obama. The Infringing Works, in turn, convey only what was already present in the Obama Photo — indeed, not only the particular elements, but also the essence of the photo. On information and belief, it was exactly the distinctive qualities in the original that led Fairey to select the Obama Photo in the first place, as opposed to others he reviewed. Accordingly, the Infringing Works serve exactly the same character and purpose as the Obama Photo in communicating these evocative themes, regardless of whether the Infringing Works were used in a political campaign or sold as commercial merchandise.

132.    Plaintiffs' Infringing Works also cannot be characterized as commenting on or criticizing the Obama Photo. In fact, upon information and belief, Plaintiffs failed to disclose The AP and the Obama Photo as the true source of the Infringing Works despite numerous opportunities to do so. Because Fairey never acknowledged The AP or Mr. Garcia as the source of the image, the public had no way of knowing what photo, if any, Fairey used in developing the Infringing Works. Accordingly, any claim that the Infringing Works "comment on" or engage in "criticism of" the Obama Photo or Mr. Garcia's viewpoint or skill is unsupported by the facts.

Rather, Fairey's conduct was deliberately calculated to mislead the public as to the source of the distinctive and unequivocally identical elements of the Infringing Works — namely those that were copied in their entirety from the Obama Photo.

133.     As detailed above, news photography is an art form that requires skill, artistic judgment, dedication, countless hours of preparation and imagination. The AP's photographers document world events every day through a creative and painstaking journalistic process. Before The AP ever publishes a photograph, it first selects events for journalists to report on and capture, carefully chooses visual elements that will help create a compelling image, composes the relevant visual aspects of a story (based on experience, training and judgment), selects "the" image or images from multiple options and edits it to tell the full story.

134.     Plaintiffs' unauthorized use of the Obama Photo has caused substantial impairment to the potential market for the original photo, namely, The AP's ability to license its use to both commercial and non-commercial customers across all media, genres, geographies and languages. This strikes at the heart of The AP's business and is particularly unfair competition in light of Plaintiffs own enforcement efforts with Fairey's intellectual property.

Fairey and the Other Plaintiffs' Bad Faith Conduct

135.     Fairey and his related entities have routinely engaged in bad faith conduct and practices related to their intellectual property rights and the Obama Photo in particular. This further highlights the willfulness of Fairey's conduct and the lack of fair use.

136.     First, upon information and belief, Fairey took the Obama Photo from Google Images and, despite Google's clear policy explicitly requiring users to

obtain permission from copyright owners prior to use, he admittedly used the photo without ever bothering to obtain The AP's permission or offering it any compensation.

137.    Second, notwithstanding Google's clear copyright policy and Fairey's sophisticated understanding of intellectual property rights, upon information and belief, Fairey stripped away the copyright management information, as defined in 17 U.S.C. § 1202(c).  Upon information and belief, when the Obama Photo is downloaded through Google Images, it is accompanied by the copyright management information depicted below, which identifies The AP as the owner of the copyright in the work and Mr. Garcia as the photographer.  Also upon information and belief, when Fairey downloaded the Obama Photo through Google Images, it bore this copyright management information, which he stripped from the image.



138.    Third, as described above, Fairey himself has demonstrated by his own actions a sophisticated understanding of intellectual property licensing and enforcement and thus surely knew that he needed a license to use the Obama Photo and to credit The AP and Mr. Garcia for his use — yet he failed to do so.

139.    Fourth, upon information and belief, Fairey and his related entities defrauded the U.S. Copyright Office by failing to state in the application to register the copyright in the Infringing Works (Reg. Nos. VA0001651320, VA0001651318 and VA0001651319) that they were actually derivative works of The AP's Obama Photo.  To obtain a copyright registration, applicants must disclose, and exclude from the registration application, any pre-existing material or material not owned by the applicant — i.e., applicants must disclose whether the work is wholly new or rather is a derivative work based on a pre-existing work.  Upon information and belief, Fairey's copyright applications for the Infringing Works failed to identify the Obama Photo in the "Material Excluded" section of the applications even though Fairey is now forced to admit that his posters were derived from The AP's Obama Photo.  Fairey's failure to properly identify his Infringing Works as derivative of the Obama Photo constitutes fraud on the Copyright Office, further demonstrating Fairey's cavalier attitude towards the intellectual property rights of others and disregard for the copyright laws.

140.    Fifth, upon information and belief, in at least one other instance involving circumstances nearly identical to those presented here, Fairey recognized that, contrary to his regular practice of misappropriating the works of others, he was required to obtain permission and give appropriate credit.  Specifically, upon information and belief, Fairey obtained permission and gave credit to photographer David Turnley for the use of his photograph to create Fairey's "VOTE" poster, which is pictured below.



Turnley's Photo                              Fairey's Licensed Work

141.    Upon information and belief, Plaintiffs did not distribute the "VOTE" poster virally nor did they sell merchandise incorporating Mr. Turnley's photograph.

142.    Sixth, upon information and belief, in a further act of bad faith, Plaintiffs deliberately misrepresented the source of the Infringing Works in their Complaint.  Specifically, upon information and belief, although Plaintiffs were well aware that the Infringing Works were based on the Obama Photo, Plaintiffs deliberately misidentified in their Complaint another photo taken by Mr. Garcia, which included an image of the actor George Clooney seated next to President Obama (the "Clooney Photo"), as the source of the Infringing Works.  A true and correct copy of the Clooney Photo, attached hereto as **Exhibit C**, is pictured below along with images of the true Obama Photo and one of Fairey's Infringing Works.

  

Clooney Photo                  Obama Photo            Obama Hope Poster

143.      Upon information and belief, by misrepresenting the true source of the Infringing Works, Plaintiffs have engaged in a misguided effort to argue that Fairey made more substantial changes to the photograph — i.e., that he at least had to crop it — than he actually did.  But a simple comparison of the Clooney Photo to the Infringing Works and the Obama Photo make clear to even the casual observer that Fairey used the Obama Photo, depicting President Obama sitting alone, as the basis for the Infringing Works.  Moreover, it has been widely reported that third-party image recognition software has been used to determine that the Obama Photo was indeed the photo which Fairey used.  Unlike the Clooney Photo, both the Obama Photo and the Infringing Works depict exactly the same close-up of President Obama, tightly framed with his head tilted at the same angle, with the same expression on his face and the same focus of his eyes, along with the same lighting and shading.  Significantly, in both the Obama Photo and the Infringing Works, Mr. Clooney is nowhere to be seen.

144.      Moreover, upon information and belief, when he was interviewed in 2008 about the Infringing Works, Fairey made no mention of cropping Clooney's image from the photograph that he downloaded from Google Images.  Nor, upon

information and belief, did Fairey make any mention of altering the angle at which President Obama's head was turned, the tilt of President Obama's head, the angle of his gaze, or the reflection of light, shadow lines, contrast, center of focus, framing, or the depth of field of the photograph. Thus, Plaintiffs' misidentification of the Clooney Photo as the source for the Infringing Works can only be understood as a deliberate attempt to obscure the Obama Photo as the true source material for the Infringing Works and to minimize the nature and extent of Fairey's unauthorized copying of the Obama Photo.

145.    Lastly, Plaintiffs have engaged in bad faith conduct by jumping the gun and filing this lawsuit anticipatorily in order to gain a procedural advantage.

146.    As soon as The AP learned that the Obama Photo was the source of the Infringing Works, The AP conducted a thorough analysis of the nature and usage of the works before contacting Fairey and his representatives. In response to The AP's initial inquiry, Plaintiffs' marketing representative contacted The AP's in-house counsel on January 30, 2009, who explained that the use of the Obama Photo in the Infringing Works required permission from The AP and, under The AP's standard licensing procedure, appropriate credit and attribution and the payment of a reasonable fee commensurate with the scope of Fairey's use of The AP's copyrighted work. The AP's in-house counsel made it clear from the outset that The AP wished to handle the discussion in an amicable manner and that any proceeds that The AP received as compensation for past use of the Obama Photo would be contributed to The AP Emergency Relief Fund.

147.    Plaintiffs' outside counsel then contacted The AP on February 2, 2009 to assert that Plaintiffs' use of the Obama Photo in the Infringing Works was a "fair

use" and did not require permission from The AP. The AP's in-house counsel disagreed with Plaintiffs' counsel, but again made it clear that The AP wished to resolve the matter amicably. Plaintiffs' counsel requested more time to discuss the matter with his clients.

148.     Plaintiffs' counsel then contacted The AP's in-house counsel again on February 4, 2009, to request additional time — until Friday, February 6 — to discuss the matter with The AP. Plaintiffs' counsel also proposed a standstill agreement, whereby the parties agreed not to initiate any lawsuit until they spoke on Friday. This proposal surprised The AP, as it did not view the matter as anything other than a routine licensing discussion. Accordingly, The AP's in-house counsel readily agreed to the litigation standstill agreement proposed by Plaintiffs' counsel.

149.     Unfortunately, Plaintiffs' counsel never called The AP's in-house counsel on Friday, February 6th, nor did counsel make any further attempt to discuss a licensing arrangement.

150.     In the meantime, The AP was aware that, according to a 2006 press release, the stated mission of Plaintiffs' counsel, the Stanford Fair Use Project, is to "defend 'fair use' rights in a digital environment through declaratory judgment actions." Therefore, The AP was concerned that Plaintiffs had no intention of engaging in further discussions, but were instead likely to rush to file a declaratory judgment action against The AP in order to further their counsel's mission. Upon information and belief, Plaintiffs' counsel has done so at least on one prior occasion.

151.     This led The AP to grow even more concerned that Plaintiffs were intentionally avoiding discussions and delaying so that they could file an unwarranted complaint for declaratory relief. Only after Plaintiffs' counsel engaged in further delay

that Friday did The AP's in-house counsel reluctantly notify Plaintiffs' counsel that if the matter was not amicably resolved, it would bring legal action against Plaintiffs in the Southern District of New York on Tuesday afternoon, February 10, 2009. The AP's in-house counsel hoped that this would allow the parties sufficient time to resolve what it still believed at heart was a routine matter, of the sort that is normally resolved in a matter of days.

152.    However, upon information and belief, Plaintiffs were stalling The AP while at the same time busily drafting their Complaint. Plaintiffs' counsel ultimately reneged on their standstill agreement without ever discussing the matter again with The AP's in-house counsel and filed the instant lawsuit anticipatorily on Monday, February 9, 2009, without so much as a courtesy e-mail stating that they were planning to bring this action.

Plaintiffs' Sophisticated Merchandising and Marketing Enterprise

153.    Plaintiffs have built a sophisticated merchandising and viral marketing enterprise based on Fairey's designs, which in turn are often based on the artistic works of others. Upon information and belief, this fits perfectly with Fairey's commercial creed as a self-described "capital-embracing entrepreneur" who, according to published reports, specializes in marketing campaigns that "get alternative kids talking about mainstream brands."

154.    In addition, much of the merchandise covered by the Obey® and related trademarks, including merchandise created from The AP's Obama Photo, can be purchased at <http://shop.obeyclothing.com> and <http://obeygiant.com/>, which, as one would expect of a sophisticated merchandising operation, has been optimized to allow Google search results to efficiently render access to different aspects of Plaintiffs' Web

sites.  Plaintiffs' graphic design and merchandising operations also extend to distributors and retailers, including Amazon.com.

155.    Upon information and belief, Fairey and his related entities have created successful marketing campaigns for Levi Strauss & Co., Mountain Dew, Universal Pictures, Express, Sunkist, Honda Civic, Dewars, Virgin Megastore, Guggenheim, Adidas and Motorola, among many others.

156.    It was reported recently that Plaintiffs will soon launch a marketing campaign for Saks Fifth Avenue, which will include the display of Fairey's designs in the store and on shopping bags.

157.    Moreover, as described above, Plaintiffs regularly register intellectual property rights to their works and are quick to hunt down alleged infringers and assert their rights against third parties.

Plaintiffs' Commercial Exploitation of the Obama Photo

158.    On information and belief, despite Plaintiffs' bald assertions to the contrary, they have benefitted handsomely from The AP's Obama Photo by making commercial use of the Infringing Works.  That Plaintiffs may have reinvested profits in increasing production, as Plaintiffs have alleged, does not diminish the commercial nature or overall profits of their Infringing Works.

159.    Upon information and belief, the success of Plaintiffs' commercial enterprise is evidenced by the more-than $400,000 in profits derived from the Infringing Works and the hundreds of thousands of Infringing Works already sold.

The Harm to The AP

160.    While Fairey is of course free to establish a commercial, for-profit enterprise designed to make money from his work, it is not fair for him to do so at the

expense of others.  As stated above, The AP derives most of its revenue from licensing photographs and other original content, which in turn is the primary source of funding for its current and future news operation and to meet its financial obligations to generations of past journalists.  When third parties such as Plaintiffs misappropriate The AP's photographs without compensation, credit or attribution, they undermine The AP's ability to pursue its First Amendment objectives, and the ability of visual journalists — as well as that of photographers and visual artists generally — to earn a fair livelihood.

161.    The equities of this lawsuit can be grasped by examining the parties involved, their conduct and the works involved.  On the one hand, a commercially-minded designer and his for-profit companies have created hundreds of thousands of infringing copies of copyrighted works, have contributed to the viral distribution of these works, have fraudulently registered them with the U.S. Copyright Office as having been created solely based on their own work and have profited from their activities.  Those same entities now seek to avoid giving attribution to the photographer whose photograph they misappropriated and credit and compensation to the not-for-profit news organization who owns the copyright to the photograph.

162.    Moreover, Plaintiffs absurdly suggest that it would be beneficial for The AP (or any photographer for that matter) for merchandisers to have free rein to copy a photographer's image and commercialize derivative works based on it without first obtaining the photographer's permission.  To the contrary, if such activity were to become the norm it would undermine The AP's entire licensing program, ruining the livelihoods of the many hard-working photographers and other artists who rely on control of their intellectual property to make a living.  It would also harm the interests of other

content owners who rely on fair compensation for their work in order to support their creative endeavors.

## FIRST COUNTERCLAIM — COPYRIGHT INFRINGEMENT

(17 U.S.C. § 101 et seq.)

163.    The AP incorporates by reference ¶¶ 1-162 above as if fully set forth herein.

164.    By the actions alleged above, Fairey has infringed and will continue to infringe The AP's copyright in the Obama Photo by using this original copyrighted photograph as a basis for the Infringing Works without permission.

165.    The AP is entitled to recover from Plaintiffs the damages, including attorneys' fees, it has sustained and will sustain, and any gains, profits and advantages obtained by Plaintiffs as a result of their acts of infringement alleged above. At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by The AP, but will be established according to proof at trial. The AP is also entitled to recover statutory damages for Fairey's willful infringement of their copyright.

## SECOND COUNTERCLAIM — CONTRIBUTORY COPYRIGHT INFRINGEMENT

(17 U.S.C. § 101 et seq.)

166.    The AP incorporates by reference ¶¶ 1-165 above as if fully set forth herein.

167.    By the actions alleged above, Fairey has encouraged, assisted, induced, caused, and/or materially contributed to a vast number of actual or imminent copyright infringements of The AP's Obama Photo in violation of 17 U.S.C. §§ 106 and 501.

168. Fairey knows or has reason to know of the actual or imminent direct infringement of The AP's copyright in the Obama Photo. Indeed, Fairey actively promotes the infringements through the purchase of products and merchandise bearing the Infringing Works, provide tools that are indispensable to these infringements, and continuously facilitate the infringements.

169. The infringements of The AP's copyrighted works that Fairey encourages, assists, induces, causes and/or materially contributes to through the conduct described above is without The AP's consent and not otherwise permissible under the Copyright Act.

170. The foregoing acts of infringement by Plaintiffs have been willful, intentional, purposeful, and with indifference to The AP's rights.

171. The AP is entitled to recover from Plaintiffs the damages, including attorneys' fees, it has sustained and will sustain, and any gains, profits and advantages obtained by Plaintiffs as a result of their acts of infringement alleged above. At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by The AP, but will be established according to proof at trial. The AP is also entitled to recover statutory damages for Fairey's willful infringement of its copyright.

## THIRD COUNTERCLAIM — DECLARATORY JUDGMENT
### (28 U.S.C. §§ 2201 and 2202)

172. The AP incorporates by reference ¶¶ 1-171 above as if fully set forth herein.

173. Fairey improperly obtained copyright registrations in three of the Infringing Works, which are unauthorized derivative works, Registration Nos. VA0001651320, VA0001651318, and VA0001651319 (the "Unauthorized

Registrations"). Such conduct constitutes fraud on the U.S. Copyright Office as Plaintiffs were required to disclose that their Unauthorized Registrations were based on Pre-Existing Materials.

174.    As such, The AP requests that this Court declare that the Unauthorized Registrations were obtained through fraud, and thus not subject to copyright protection under 17 U.S.C. § 409, and order the U.S. Copyright Office to cancel the Unauthorized Registrations.

175.    By reason of the foregoing, there now exists between the parties an actual and justiciable controversy concerning Plaintiffs' and The AP's respective rights and obligation to the use of the Obama Photo, requiring declaratory relief.

176.    The aforesaid declaration is necessary and appropriate at this time to affirm The AP's right to continue to make use of the Obama Photo.

177.    The AP has no adequate remedy at law.

178.    Accordingly, The AP seeks, pursuant to 28 U.S.C. §§ 2201 and 2202, a judgment from this Court that Plaintiffs' copyright registration in the Infringing Works is invalid and should be cancelled.

## FOURTH COUNTERCLAIM — VIOLATION OF THE DMCA
### (17 U.S.C. § 1202)

179.    The AP incorporates by reference ¶¶ 1-178 above as if fully set forth herein.

180.    The AP includes a copyright notice line on all AP photographs that includes The AP's name and the name of The AP photographer who took the photograph.

181.    The inclusion of The AP's name in all of its news reports is "copyright management information," as defined in 17 U.S.C. § 1202(c).

182. Upon information and belief, Fairey, without authority of The AP or the law, has intentionally removed and/or altered and has caused and induced others to remove and/or alter copyright management information from The AP's Obama Photo, including for use in the Infringing Works, and have thereafter distributed said works, having reasonable grounds to know that such acts will induce, enable, facilitate or conceal an infringement of copyright under Title 17, United States Code, in violation of 17 U.S.C. § 1202(b)(1) and (3).

183. Fairey's removal or alteration of copyright management information from The AP's Obama Photo, including for use in the Infringing Works, and subsequent distribution of the Infringing Works, as alleged above, was and is willful and intentional, and was and is executed with full knowledge of The AP's rights under copyright law, and in disregard of The AP's rights.

184. The AP is entitled to recover its actual damages suffered as a result of the violation and any profits of Fairey attributable to the violation and not taken into account in computing actual damages, or, at The AP's election, statutory damages pursuant to 17 U.S.C. § 1203(c).

185. The AP is entitled to recover costs and attorneys' fees from Plaintiffs pursuant to 17 U.S.C. § 1203(b)(4) and (5).

186. Plaintiffs' violations of 17 U.S.C. § 1202(b)(l) and (3) have caused, and, unless restrained by this Court, will continue to cause, irreparable injury to The AP not fully compensable in monetary damages. Pursuant to 17 U.S.C. § 1203(b)(1), The AP is entitled to a preliminary and permanent injunction enjoining Plaintiffs from such further violations.

## PRAYER FOR RELIEF

187.   The AP incorporates by reference Paragraphs 1-186 as if set forth

herein.

WHEREFORE, The AP requests:

(a)   That the Complaint and each Count thereof be dismissed with

prejudice;

(b)   That the Court find that Plaintiffs have infringed Defendant's

copyright in the Obama Photo;

(c)   That the Court enter judgment for Defendant against Plaintiffs for

Defendant's actual damages according to proof, and for any profits

attributable to infringement of Defendant's intellectual property in

accordance with proof;

(d)   That the Court enter judgment for Defendant and against Plaintiffs

for statutory damages based upon their acts of infringement

pursuant to the Copyright Act of 1976, 17 U.S.C. § 101, et seq.;

(e)   That the Court find that Plaintiffs cannot assert copyright

protection in any of the Infringing Works;

(f)   An award of three times the greater of

(i)   Defendant's damages for the wrongful acts of Plaintiffs in

an amount the Court deems appropriate, together with

appropriate interest on such damages; or

       (ii)     Plaintiffs' profits in accordance with the accounting

demanded in the preceding paragraph, pursuant to 15

U.S.C. § 1117, and

(g)     An award of Defendant's costs and disbursements of this action,

including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505

and 15 U.S.C. § 1117;

(h)     That the Court revise the caption of the litigation by the time of

trial to place The AP in the position of the Plaintiff and Fairey and

Obey Inc. in the position of Defendants based on the anticipatory

filing of the present action; and

(i)     That the Court grants such other, further, and different relief as the

Court deems just and proper.

Dated:  March 11, 2009

KIRKLAND & ELLIS LLP


__/s/Dale Cendali_____
Dale M. Cendali
Claudia Ray
Citigroup Center
153 East 53rd Street
New York, New York 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
dcendali@kirkland.Com
cray@kirkland.Com

*Attorneys for Defendant/Counterclaim Plaintiff*
THE ASSOCIATED PRESS

Of Counsel:

O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Tel: (212) 326-2000
Fax: (212) 326-2061

# EXHIBIT A



# EXHIBIT B



# EXHIBIT C

