Dale M. Cendali
Claudia Ray
Brendan T. Kehoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
Fax: (212) 446-4900

Michael F. Williams
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC  20005
Tel: (202) 879-5000
Fax: (202) 879-5200

*Attorneys for the Associated Press*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHEPARD FAIREY and OBEY GIANT ART, INC.,<br><br>            Plaintiffs,<br><br>   v.<br><br>THE ASSOCIATED PRESS,<br><br>            Defendant/Counterclaim Plaintiff,<br><br>   v.<br><br>SHEPARD FAIREY, et al.,<br><br>            Counterclaim Defendants,<br><br>And<br><br>MANNIE GARCIA,<br><br>            Defendant, Counterclaim Plaintiff &<br>            Cross Claim Plaintiff/Defendant,<br><br>   v.<br><br>SHEPARD FAIREY and OBEY GIANT ART, INC.,<br><br>            Counterclaim Defendants,<br><br>And<br><br>THE ASSOCIATED PRESS,<br><br>            Cross Claim Plaintiff/Defendant. | Case No.:   09-0-1123 (AKH)<br><br>       ECF Case<br><br><br>**MEMORANDUM OF LAW<br>IN SUPPORT OF THE<br>ASSOCIATED PRESS'S MOTION<br>FOR SUMMARY JUDGMENT<br>AGAINST ONE 3 TWO, INC.<br>D/B/A OBEY CLOTHING** |

# TABLE OF AUTHORITIES

**Cases**

Blanch v. Koons,
    396 F. Supp. 2d 476 (S.D.N.Y. 2005)...........................................................................40

Blanch v. Koons,
    467 F.3d 244 (2d Cir. 2006)..................................................................40, 41, 42

Burrow-Giles ..........................................................................................................................31

Burrow-Giles Litho. Co. v. Sarony,
    111 U.S. 53 (1884)...........................................................................................29

Campbell v. Acuff-Rose Music, Inc.,
    510 U.S. 569 (1994)................................................................................passim

Campbell v. Koons,
    No. 91-6055, 1993 WL 97381 (S.D.N.Y. Apr. 1, 1993) ...........................passim

Castle Rock Entmt., Inc. v. Carol Publishing Group,
    150 F.3d 132 (2d Cir. 1998)...................................................................passim

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)..........................................................................................27

Clean Flicks of Colorado, LLC v. Soderbergh,
    433 F. Supp. 2d 1236 (D. Colo. 2006)..............................................................60

College Entrance Exam. Bd. v. Pataki,
    889 F. Supp. 554 (N.D.N.Y. 1995)...................................................................35

Davis v. The Gap, Inc.,
    246 F.3d 152 (2d Cir. 2001)..............................................................................58

Edison v. Lubin,
    122 F. 240 (3d Cir. 1903) .................................................................................31

Fitzgerald v. CBS Broad., Inc.,
    491 F. Supp. 2d 177 (D. Mass. 2007) ..............................................................58

Gaylord v. United States,
    595 F.3d 1364 (Fed. Cir. 2010)........................................................................52

Gilliam v. American Broad. Cos.,
    538 F.2d 14 (2d Cir. 1976)................................................................................62

Harlen Assocs. v. Village of Mineola,
    273 F.3d 494 (2d Cir. 2001)................................................................ 27

Harper & Row, Publ'g, Inc. v. Nation Enters.,
    471 U.S. 539 (1985)................................................................ passim

Images Audio Visual Prods., Inc. v. Perini Bldg. Co.,
    91 F. Supp. 2d 1075 (E.D. Mich. 2000)........................................ 30, 33, 35, 55

Infinity Broadcast Corp. v. Kirkwood,
    150 F.3d 104 (2d Cir. 1998)........................................................ 51, 56, 59

J.D. Salinger,
    641 F. Supp. 2d at 257-58 (S.D.N.Y. 2009) ................................................ 50

Jewelers' Circular Publ'g Co. v. Keystone Publ'g Co.,
    274 F. 932 (S.D.N.Y. 1921)........................................................ 30

Jewelers' Circular Publ'g Co. v. Keystone Publ'g Co.,
    281 F. 83 (2d Cir. 1922).......................................................... 30

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986).............................................................. 27

McCarthy v. Dun & Bradstreet Corp.,
    482 F.3d 184 (2d Cir. 2007)........................................................ 27

Nihon Kezai Shimbun, Inc. v. Comline Bus. Data, Inc.,
    166 F.2d 65 (2d Cir. 1999)........................................................ 33

Novelty Textile Mills v. Joan Fabrics Corp.,
    558 F.2d 1090 (2d Cir. 1977)...................................................... 28

Pagano v. Besler Co.,
    234 F. 963 (2d Cir. 1916) ........................................................ 31

Paramount Pictures Corp. v. Carol Publ'g Group,
    11 F. Supp. 2d 329 (S.D.N.Y. 1998)................................................ 59

Princeton Univ. Press v. Mich. Doc. Serv.,
    99 F.3d 1381 (6th Cir. 1996) ...................................................... 58

Reyes v. Wyeth Pharma., Inc.,
    603 F. Supp. 2d 289 (D.P.R. 2009)................................................ 52

Ringgold v. Black Ent'mt. Television, Inc.,
    126 F.3d 70 (2d Cir. 1997)........................................................ 51, 61

Rogers v. Koons,
    751 F. Supp. 474, 475 (S.D.N.Y. 1990), aff'd 960 F.2d at 307-08 .......................... passim

Rossi v. City of New York,
    246 F. Supp. 2d 212 (S.D.N.Y. 2002) ............................................................. 27

Roy Export,
    503 F. Supp. at 1146 ...................................................................................... 60

Salinger v. Colting,
    641 F. Supp. 2d 250 (S.D.N.Y. 2009), rem. and vac. on other gnds., 607 F.3d 68
    (2d Cir. 2010) ................................................................................................ 49

Sarl Louis Feraud Int'l v. Viewfinder Inc.,
    627 F. Supp. 2d 123 (S.D.N.Y. 2008) ............................................................. 55

Schiffer Publ'g, Ltd. v. Chronicle Books, LLC,
    No. Civ. A. 03-4962, 2004 WL 2583817 (E.D. Pa. Nov. 12, 2004) ................... 51

SHL Imaging, Inc. v. Artisan House, Inc.,
    117 F. Supp. 2d 301 (S.D.N.Y. 2000) ............................................................. 30

Sony Corp. of Am. v. Universal City Studios, Inc.,
    464 U.S. 417 (1984) .......................................................................... 35, 46, 62

Stewart v. Abend,
    495 U.S. 207 (1990) ...................................................................................... 36

Time Inc. v. Bernard Geis Assocs.,
    293 F. Supp. 130 (S.D.N.Y. 1968) ................................................................. 31

Twin Peaks Prods., Inc. v. Publ's Int'l, Ltd.,
    996 F.2d 1366 (2d Cir. 1993) .................................................................. 58, 59

Ty, Inc. v. Publications Int'l, Ltd.,
    333 F. Supp. 2d 7057 (N.D. Ill. 2004) ...................................................... 46, 51

United Feature Syndicate, Inc. ............................................................................ passim

Video-Cinema Films, Inc. v. The Lloyd E. Riggler-Lawrence E. Deutch Foundation, No.
    04 Civ. 5332, 2005 U.S. Dist. LEXIS 26302 (S.D.N.Y. Nov. 2, 2005) ..................... 52, 53

Wade Williams Distrib., Inc. v. American Broad. Co., Inc.,
    No. 00 Civ. 5002(LMM), 2005 WL 774275 (S.D.N.Y. Apr. 5, 2005) ........................... 54

Warner Bros. Entm't Inc. v. RDR Books,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008) ................................................. 49, 52, 58

Weissman v. Freeman,
    868 F.2d 1313 (2d Cir. 1989).................................................................... 43

Wright v. Warner Books, Inc.,
    953 F.2d 731 (2d Cir. 1991)..................................................................... 28

**Statutes**

17 U.S.C. § 101 ................................................................................................ 31

17 U.S.C. § 106 ........................................................................................... 36, 62

17 U.S.C. § 106(1-3) ....................................................................................... 29

17 U.S.C. § 107 ................................................................................................ 36

17 U.S.C. § 107(2) ........................................................................................... 53

17 U.S.C. § 107(4) ........................................................................................... 57

17 U.S.C. § 410(c) ........................................................................................... 28

**Other Authorities**

(Sarah Banet-Weiser & Marita Sturken, *The Politics of Commerce: Shepard Fairey and the New Cultural Entrepreneurship*, in *Blowing Up the BRAND: Critical Perspectives on Promotional Culture* 263-283, 278 (Melissa Aronczyk & Devon Powers eds. 2010) ............................................................................ 13

103 HARV. L. REV. at 1111. ............................................................................. 48

Hon. Pierre N. Leval, Toward a Fair Use Standard, 103 HARV. L. REV. 1105, 1111 (1990) ............................................................................................................ 48

**Rules**

FED. R. CIV. P. 56(c) ....................................................................................... 27

Fed. R. Civ. P. 56(e) ....................................................................................... 27

The Associated Press (the "AP") respectfully submits this memorandum of law in support of its motion pursuant to Rule 56 of the FRCP for summary judgment against Counterclaim Defendant One 3 Two, Inc. d/b/a/ Obey Clothing ("Obey Clothing") on AP's claims for direct and contributory copyright infringement.  The undisputed evidence shows that Obey Clothing's use of AP's copyrighted photo was an infringement of AP's copyrights in the Obama Photo.

## PRELIMINARY STATEMENT

This case presents the straightforward question of whether a t-shirt company may use a nearly-verbatim copy of a copyrighted image to generate millions in dollars of revenues for itself without securing the permission of the copyright owner.  The owner of the copyright at issue is the AP, a not-for-profit organization that uses revenues from its image-licensing business to help fund its newsgathering and reporting operations.  The copyrighted image is a compelling portrait of Barack Obama that was made by one of the AP's staff photographers at a press conference about the crisis in Darfur on April 27, 2006.  Between March 2008 and September 2009, the t-shirt company, Obey Clothing, sold approximately 233,800 pieces of merchandise bearing an image that copied the Obama Photo (the "Obama Image").  Obey Clothing collected revenues of ███████ from the sale of that merchandise.  Obey Clothing neither sought nor received permission from the AP to use the Obama Photo on its merchandise, even though its principal owner understood — at the outset of Obey Clothing's merchandising efforts — that Obey Clothing's unauthorized use of the photo without the photographer's permission "could open other legal issues."

Although this dispute has attracted significant interest in the media and among commentators, the legal issues it presents are not complicated at all.  In <u>Rogers v. Koons</u>, 960 F.2d 301 (2d Cir. 1992), the Second Circuit affirmed an award of summary judgment to a

copyright owner on facts that are substantively indistinguishable from the record before the Court.  In <u>Rogers</u> (as in this case), a the owner of a copyright in a photograph brought an action for damages after learning that his photograph had been copied, with minor modifications, to create a piece of art that was later sold without the authorization, or even the knowledge, of the copyright owner.  In <u>Rogers</u> (as in this case), the copier tried to argue that his use of the photograph did not amount to an unlawful appropriation, even though the substantial similarity between the work he had created and the copyrighted photograph at issue was plain to the Court. Moreover, in <u>Rogers</u> (as in this case), the copier tried to conceal his use of the photograph and then nevertheless argued that his copying constituted "fair use."  Both the Southern District of New York and the Second Circuit rejected the copier's fair use arguments on summary judgment in <u>Rogers</u>, and the AP respectfully submits that the same result should follow in this case.  Here, too, Obey Clothing's copying of the Obama Photo is significantly more egregious than in <u>Rogers</u> because Obey Clothing has made hundreds of thousands of units of the infringing merchandise, whereas in <u>Rogers</u> the defendant had made only a handful.

Indeed, even the (non-legal) reasons that this case initially attracted the public's attention are long gone.  When Shepard Fairey preemptively filed his claims against the AP in February 2009, he sought to portray this lawsuit as a landmark case of fair use and free expression.  The AP disagreed with Mr. Fairey's arguments even at the outset, but it became clear to all during the course of these proceedings that Mr. Fairey's claims of fair use were based upon false evidence. As a result of the AP's efforts, Mr. Fairey had to admit that he lied about which photo was actually used, and that he deleted documents and fabricated documents in an effort to cover up

his lie.  The ████████████████████████████████████████████████████
███████████████████████████  question of whether Obey Clothing violated the copyright

laws when it used a near-verbatim copy of the Obama Photo for the purpose of selling t-shirts

and other merchandise.

The AP recognizes that the Court had initially expressed skepticism that this case could

be resolved on summary judgment.  But as numerous Second Circuit cases, including <u>Rogers</u>,

have made clear, summary judgment is the appropriate, expeditious and cost-effective means of

resolving this case.  In light of the undisputed facts and directly applicable Second Circuit

precedent, summary judgment should be granted in favor of the AP, both on its claim of

copyright infringement as to the Obama Photo, as the Obama Image used on posters and t-shirts

is obviously substantially similar to the photo at issue, and also as to Obey Clothing's fair use

defense, as Obey Clothing's conduct in deliberately making, distributing and selling its t-shirts

without any effort to credit or compensate the AP is anything but fair.

First, in terms of copyright infringement, there is no dispute that the AP owns a valid

copyright registration and that Mr. Fairey admittedly copied the Obama Photo in making the

Obama Image.  Obey Clothing copied the Obama Photo when it reproduced the Obama Image on

t-shirts and other merchandise for sale.  The substantial similarity between the Obama Photo and

the image that appeared on Obey Clothing's t-shirts is plain to the ordinary observer even on

casual review.  Under the Second Circuit's precedent in <u>Rogers</u>, and other cases decided since,

these undisputed facts entitle the AP to a finding of infringement.

---

█ ███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

Similarly, there is no reason for the Court to defer resolution of Obey Clothing's claim that its use of the Obama Photo on t-shirts and other merchandise constituted fair use.  On the undisputed facts of this case, each of the fair use factors favors the AP, just as each favored the photographer in <u>Rogers</u>, and none of the fair use factors remotely justify Obey Clothing's commercial use of the AP's copyrighted image.  Specifically:

- ***Factor One (purpose and character of the use):***  The first fair use factor looks at three sub-factors, including (i) the defendant's good or bad faith, (ii) whether the defendant's use was commercial, and (iii) whether the defendant's use was transformative.  Each of the three sub-factors favors the AP in this case.  Obey Clothing's sale of millions of dollars worth of t-shirts and "hoodies" was highly commercial.  It did nothing to transform the image — it just used it on clothing.  Moreover, Mr. Fairey himself admitted that even he was not attempting to parody or comment on the Obama Photo.  He simply used a flattering, inspiring portrait of then-Senator Obama that made Mr. Obama look presidential, to make a flattering, inspiring portrait of Candidate Obama that made him look presidential.

  Moreover, Obey Clothing's use of the Obama Photo was tainted by Obey Clothing's bad faith, including its decision to go forward with merchandising based on the image despite the fact that, as the uncontroverted evidence shows, Obey Clothing was on specific notice that Mr. Fairey often used the protectable expression of others without permission, and indeed had granted him a <u>reverse</u> <u>indemnity</u> against third party claims arising out of that use.

4

- *Factor Two (nature of the copyrighted work):*  Obey Clothing cannot dispute that the Obama Photo was the product of substantial creative choices and has been recognized by licensors, photographers, artists, and even Mr. Fairey himself as a highly expressive work of the sort that merits the strongest degree of copyright protection under Factor Two.

- *Factor Three (amount and substantiality of the use):*  Obey Clothing cannot dispute that Mr. Fairey's image was a nearly verbatim copy of the Obama Photo that incorporated a full-frame, wholesale copy of the AP's entire photograph, which incorporated the protectable expressive elements in the photo almost entirely — down to the twinkles in then-Senator Obama's eyes -- thus supporting a finding of infringement by Obey Clothing under Factor Three.

- *Factor Four (effect of the defendant's use on the market for the original work):*  The market harm could not be clearer.  Virtually all of the AP's revenue comes from licensing.  Obey Clothing's use here is exactly the sort of use the AP licenses.  Yet the AP was deprived of that licensing revenue as well as additional benefits that might have been realized had Fairey and Obey Clothing timely credited the AP as the owner of the source image for the Obama Image.  Obey Clothing also took for itself the right to make derivative works based on the Obama Photo.  If conduct of the sort by Obey Clothing were to become widespread, and other entities could freely use the AP's photos without licensing them, the AP's whole licensing business would be eroded.  In addition, the AP's Constitutionally-contemplated incentive to create new images would be undermined.

At bottom, the legal issues presented by this case are garden-variety copyright infringement matters that are governed by the Second Circuit's well-settled precedent in <u>Rogers</u>

and numerous other cases.  Against the background of that well-settled law, Obey Clothing has

no valid argument for avoiding summary judgment in favor of the AP on its claims of

infringement and against Obey Clothing on its defense of fair use.  Mr. Fairey's conduct has

already prolonged this case longer than necessary.  The AP respectfully requests that the Court

grant summary judgment now in favor of the AP.

## FACTUAL BACKGROUND

### A.   The AP

#### 1.   The AP's Newsgathering and Photography Activities

The AP is a not-for-profit membership cooperative founded in 1846 and owned by its

1,500 U.S. daily-newspaper members.  (AP's Rule 56.1 Statement of Undisputed Facts ("AP

SUF") ¶ 1.)  The AP's mission is "to be the essential global news network, providing distinctive

news services of the highest quality, reliability, and objectivity with reports that are accurate,

balanced, and informed."  (Dale Decl. ¶ 6.)  To achieve this mission, the AP reports the news

from around the world, to all media platforms and formats.  (Dale Decl. ¶ 7.)  Headquartered in

New York City, the AP has approximately 3,700 employees working in more than 300 locations

around the world.  (AP SUF ¶ 3.)  Two-thirds of the AP's employees are newsgatherers,

including photographers.  (Ake Decl. ¶ 4.)  The AP serves over 1,700 newspapers and 5,000

radio and television outlets in the United States, as well as countless international newspaper,

radio, and televisions subscribers.  (Dale Decl. ¶ 4.)

According to the AP's research, more than half of the world's population sees news from

the AP on any given day.  (Dale Decl. ¶ 5.)  Because of the difficulties facing the news industry

today, the AP's importance as a news source is likely to increase even more.  Over the past

several years, the news industry has faced sharp declines in revenue, in part due to the rise of

online news, which generates far less revenue than the printed news due to lower advertising rates.  (AP SUF ¶¶ 159-60.)  To adjust for the decline in revenue, the remaining U.S. news outlets have had to cut back on their newsgathering operations, including closing domestic and foreign bureaus.  (AP SUF ¶¶ 161-62.)  The AP, however, still maintains news bureaus in all 50 states and around the world, more than any other news organization.  (AP SUF ¶ 4.)  For example, the AP is the only U.S. news organization with a permanent presence in Pyongyang, North Korea and Port-au-Prince, Haiti, and the only one with a full-service bureau in Kabul, Afghanistan.  (AP SUF ¶ 5.)  Thus, many news organizations now depend on the AP's presence to report the news.  (AP SUF ¶ 162.)

The AP has often been honored for the quality of its news content.  Beginning with its first Pulitzer Prize in 1922, the AP has received 49 Pulitzer Prizes to date, more than any other news organization in the categories in which it competes.  (Ake Decl. ¶ 11.)  The AP also has received 30 Pulitzers for its photography, more than any other news organization.  (Id.)  To gather the news, the AP's reporters and photographers frequently work in dangerous locations where they risk injury and death.  (Ake Decl. ¶ 12.)

## 2.  <u>The AP's Business Structure And AP Images</u>

The AP creates content that it licenses and distributes to news media outlets, which in turn broadcast and publish the news.  (AP SUF ¶ 2.)  The costs of the AP's news operations are funded almost entirely by the revenue generated from licensing.  (AP SUF ¶ 6.)  A key source of source of licensing revenue for the AP is receipt of assessments paid by its news-media-outlet members.  (AP SUF ¶ 7.)  Because of the financial difficulties facing the news industry, however, the AP's members have been unable to continue funding the monetary assessments at the same level as previously.  (AP SUF ¶ 8.)  To assist its members, in April 2009 the AP

recently decreased member assessments by nearly one-third, including cuts of $30 million in 2009 and $35 million in 2010.  (Dale Decl. ¶ 12.)

The combination of the financial difficulties facing its members and cuts in member assessments has led to the AP increasingly relying on alternative sources of revenue in order to support its newsgathering operations.  (Dale Decl. ¶ 13.)  In recent years, the AP's primary alternative source of revenue has been its AP Images photo-archive business, a strategic initiative that launched in late 2005 as an "essential source of editorial and creative photographs, videos, graphics and interactive for professional image buyers."  (AP SUF  ¶ 8; Dale Decl. ¶¶ 14-15; DeGrave ¶ 3.)  AP Images leverages the AP's vast archive of photographic images, serving as a steady, substantial revenue source.  (Dale Decl. ¶ 15.)  The revenue from AP Images has helped to offset declines in other areas stemming from the financial difficulties currently affecting the newspaper business.  (Dale Decl. ¶ 20.)

Using AP Images' web-based platform, <APImages.com>, customers can browse and search the AP's entire archive, which includes more than 8.6 million digitized photographs.  (AP SUF ¶ 11.)  AP Images makes images available to customers so that they can license them for myriad different uses, including but not limited to promotional, commercial, editorial, and educational uses, and for television and video.[2]  (AP SUF ¶ 10.)  AP Images licenses photos both to be used "as is" and for incorporation into derivative works. (AP SUF ¶ 12.)  For example, on December 12, 2008, the AP licensed an image of a Palestinian woman (the "Palestinian Woman" image) to Amanda Fairey, Shepard Fairey's wife and business partner, for use in a derivative

---

[2] The AP's members and customers are required to credit the AP as the copyright owner of a photograph when displaying the image, including on the Internet.  (Gerberich Decl. ¶ 11.)

image made by Mr. Fairey.  (See AP SUF ¶ 70; Degrave Decl. ¶ 9.)  Obey Clothing then used

that image, shown below, on t-shirts and other merchandise:

  

    AP Photograph    Fairey's Licensed Work  Obey Clothing's t-shirt

(Degrave Decl. ¶9.)

   AP Images also licenses its photographs, including photos of political leaders, for use by

political campaigns and to campaign supporters, with specific sales representatives assigned to

handle these licenses.  (AP SUF ¶¶ 13, 16.)  In addition, the AP has licensed images of political

leaders for use in connection with advertising and marketing.  (AP SUF ¶ 17.)  As an example,

AP Images licensed a photo of Mr. Obama to a company called Flashbags for use as a derivative

work on tote bags, both shown below:

 

      AP Photograph    Flashbags' Licensed Work

(AP SUF ¶ 14; DeGrave Decl. ¶ 13.)

The AP also licenses its images for use in advertising.  (Degrave Decl. ¶ 16.)  For example, it licensed an image of President Obama and Mrs. Obama at the 2009 inauguration to Apple Computer, Inc.  (Degrave Decl. ¶ 16.)  When working with customers, the AP's sales representatives customize the license for each customer based on the particular characteristics of its planned use and AP's pricing guidelines.  (AP SUF ¶ 19.)  It is difficult, if not impossible, for the AP to determine before the fact which images will be successful in generating substantial revenues, so the images that are successful are very important because they help to fund the entire business.  (AP SUF ¶ 20.)

Since launching AP Images, the AP has dedicated significant resources to the creation and development of AP Images' photo-licensing business, including <APImages.com>.  (AP SUF ¶ 21.)  In particular, the AP has made significant investment in personnel, technology, additional photo equipment, a reorganization of the company away from regional control of image sales, and the hiring of new managers and sales staff with experience and expertise in the business of image licensing.  (AP SUF ¶ 22.)  The development of AP Images also has involved significant capital expenditures, including $7.6 million from 2005 through 2010.  (AP SUF ¶ 23.)

Since AP Images was established in approximately 2005, the AP has sought to increase the amount of image content that is available for licensing by making a number of practical changes to ensure that the AP generates a steady stream of content for licensing through AP Images.  (AP SUF ¶¶ 24-25.)  For example, Washington-based staff photographers are required to archive all of the images they create onto company-supplied external hard disks.  Often the entire assignment is sent to AP Images where photo editors edit and transfer the images to AP Images' archive of images.   (AP SUF ¶ 26.)  This is in marked contrast to previous practice, whereby many unused pictures were deleted when the camera recording disks were reused for

10

the next assignment.  (AP SUF ¶ 26.)  Another change is that AP emphasizes to its

photographers that they should not only cover the news of the day, but should also to look

beyond the news of the day to create additional content for an unlimited variety of potential

future licensing uses.  (AP SUF ¶ 27.)  The result of these efforts is that AP Images is able to

offer a vastly greater selection of images than just those transmitted over the wire service to

subscription members.  (AP SUF ¶ 28.)  In fact, the AP typically adds approximately 4,000

photographs a day to its photo-archive database, which currently contains more than 8.6 million

unique images, of which approximately 16% (or approximately 1.36 million) were downloaded

at least once in 2009.  (AP SUF ¶ 30; Gerberich Decl. ¶ 5.)  The annual cost of acquiring and

producing images was more than $56 million in 2009, and more than $247 million from 2006

through 2009.  (AP SUF ¶ 29.)

**B.**     **<u>Shepard Fairey And His Companies</u>**

Shepard Fairey is a graphic designer, artist, entrepreneur, merchandiser, and business

owner based in Los Angeles, California.  (AP SUF ¶ 31.)  Mr. Fairey founded the "Obey" brand,

which he owns with his wife and business partner, Amanda Fairey.  (AP SUF ¶¶ 32-33.)  It

includes Obey Giant Art, a company that operates his <obeygiant.com> website and

manufactures and sells Mr. Fairey's screen prints, posters and other various products under the

"Obey" trademark.  (AP SUF ¶¶ 33, 34-35.)  Mr. and Mrs. Fairey also are the majority owners of

Obey Giant, with the minority interest owned by their business partner, Justin McCormack.  (AP

SUF ¶32.)  Obey Giant LLC owns trademark registrations for the "Obey" trademark and "Obey"

stylized logo.  (AP SUF ¶ 37.)  Mr. and Mrs. Fairey also own a third company, Studio Number

One.  (AP SUF ¶ 33.)

**C.**     <u>**Obey Clothing, Shepard Fairey's Exclusive Licensee**</u>

Obey Clothing is a privately-held company owned by Regan Donald ("Don") Juncal

(33%); Christopher Broders (15%); Steve Mellgren (29%); Eric Singer (15%); Michael Ternosky

(4%); and Dale Moody (5%).  (AP SUF ¶¶ 41-42.)  As its use of the term "Obey" implies, Obey

Clothing is closely associated with Mr. Fairey and his "Obey" brand.  It holds an exclusive

license from Obey Giant for the use on clothing and apparel of (i) the registered "Obey"

trademark and (ii) certain of Mr. Fairey's graphic images.  (AP SUF ¶¶ 37-38, 43, 51.)  Obey

Clothing distributes and sells apparel and merchandise bearing Mr. Fairey's images to major

national retailers such as Nordstrom's, Zumiez, and Urban Outfitters, as well as to dozens of

other international retailers.  (<u>See</u> AP SUF ¶ 44.)  Obey Clothing also directly sells apparel and

merchandise with Mr. Fairey's images online through its website, <Obeyclothing.com>.  (AP

SUF ¶ 45.)  In 2009 alone, Obey Clothing earned ████████████ in gross revenue.  (AP

SUF ¶ 46.)

Pursuant to the 2006 license agreement between Obey Clothing and Obey Giant (the

"Obey License"), Obey Clothing pays a tiered royalty of up to ███ of net sales on merchandise

and apparel bearing Mr. Fairey's images.  (AP SUF ¶ 47.)  Obey Clothing also pays Obey Giant

an additional ████ marketing-and-consulting fee on all full-royalty sales.  (AP SUF ¶ 48.)

Obey Giant in turn redistributes these royalties and fees to Mr. and Mrs. Fairey and Mr.

McCormack.  (<u>See</u> Kehoe Decl., ¶ 55, Ex. 44.)  Significantly, and contrary to the usual situation

where a licensor indemnifies its licensee against claims arising out of the licensed work, the

Obey License also includes a <u>reverse</u>-indemnity provision whereby Obey Clothing, as <u>licensee</u>,

agrees to indemnify Obey Giant LLC, as <u>licensor</u>, for the use of Mr. Fairey's artwork.  (<u>See</u> AP

SUF ¶ 49.)  In particular, the indemnity provision acknowledges that Mr. Fairey "<u>occasionally</u>

incorporates into [his] art … [the] protectable intellectual property of a third party." (AP SUF ¶ 50 (emphasis added).)

### D.     Prior Third Party Claims Against Fairey and Obey Clothing

Mr. Fairey has on numerous occasions used pre-existing photographs or works to create one of his images.[3] (AP SUF ¶ 39.) His practice of using other's works, often without authorization or credit, has previously resulted in claims against Mr. Fairey and/or Obey Clothing. For example, in July 2007, Mr. Fairey settled a dispute with the estate of Cuban poster artist Felix René Mederos regarding his unauthorized use a poster image by Mr. Mederos as a source image for a t-shirt that Fairey provided to Obey Clothing. (AP SUF ¶ 53.) As part of the settlement, Mr. Fairey paid compensation to the Mederos estate for the sale of t-shirts that were based on the Mederos image and produced by Obey Clothing. (AP SUF ¶ 54.) Below is a copy of the Mederos image and the t-shirt put out by Obey Clothing:



Mederos Image                    Obey Clothing T-shirt

---

[3] Fairey's own visual studies expert, Professor Marita Sturken, noted in a recent article that Mr. Fairey's style has been criticized as "too derivative" based on its "appropriative imaging techniques." (AP SUF ¶ 40 (Sarah Banet-Weiser & Marita Sturken, *The Politics of Commerce: Shepard Fairey and the New Cultural Entrepreneurship*, in *Blowing Up the BRAND: Critical Perspectives on Promotional Culture* 263-283, 278 (Melissa Aronczyk & Devon Powers eds. 2010).)

In October 2007, Mr. McCormack, Mr. Fairey's co-owner in Obey Giant, warned Mr. Juncal of Obey Clothing that, because of Mr. Fairey's use of pre-existing works, Obey Clothing needed to exercise independent judgment in deciding whether it was appropriate to create t-shirts based on Mr. Fairey's designs:

> *At the end of the day, we must reiterate that not all of Shepard's art can translate to apparel and, in lieu of submitting t-shirt art for our approval, you need to use your own best / educated judgement [sic].*

(AP SUF ¶ 55.)

Beginning at least as early as November 2006, a company called Bravado International Group Merchandising Services, Inc. ("Bravado") asserted a series of claims against Mr. Fairey and Obey Clothing regarding the use of Bravado's intellectual property on Obey Clothing's merchandise.  (AP SUF ¶ 56.)  In particular, Bravado asserted that images Mr. Fairey made and that Obey Clothing used infringed Bravado's intellectual property rights.  (AP SUF ¶ 56.)  In September 2008, Obey Clothing entered into a settlement agreement with Bravado ███████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ (AP SUF ¶¶ 58-59.)  Mr. Juncal of Obey Clothing likened the settlement amount to a "cost of doing business."  (AP SUF ¶ 60.)

**E.      Fairey's And Obey Clothing's Prior Licensing History**

Prior to this litigation, both Fairey and Obey Clothing had entered into licenses for the use of photographs in connection with Mr. Fairey's graphic works.  For example, in or around January 2008, Mr. Fairey secured rights for Obey Clothing to produce and sell t-shirts featuring Mr. Fairey's illustrated version of Glen E. Friedman's photograph of the band Public Enemy.

14

(AP SUF ¶ 61.)  Similarly, in December 2007, Mrs. Fairey secured the right for Obey Clothing to produce and sell t-shirts featuring designs based on graffiti artist WK Interact's photographs. (AP SUF ¶ 62.)

Obey Clothing's principals understood that it needed to secure from photographers the rights to use their photographs in Obey Clothing's merchandising activities.  (AP SUF ¶ 63.) Indeed, in an October 9, 2008 email soliciting the rights to use the likeness of Martin Luther King, Jr., Mr. Juncal assured a representative of the Martin Luther King Center that Obey Clothing was "<u>well versed on the need to get clearance on photographs used from the photographers</u>."  (AP SUF ¶ 65 (emphasis added).)

And in a January 4, 2008 e-mail to Chris Broders of Obey Clothing, Mrs. Fairey told Mr. Broders of the need to execute "legal" agreements with the photographers whose images where incorporated in the designs and merchandise that Obey Clothing offered, using as an example a Glen Friedman photograph of Public Enemy:

> *[W]e need something more "legal" for collab[oration]s like this . . . We also need to ALWAYS REMEMBER that we have to think of the "Personality (Public Enemy) Depicted in the photo", [sic] the "Photographer" (Glen Friedman) and the "Artist" illustrating the the [sic] photo (in this case, Shepard).*

(AP SUF ¶ 64.)

Consistent with this understanding, Obey Clothing itself has entered into formal licensing agreements with various photographers.  (AP SUF ¶ 66.)  For example, in October 2008, Obey Clothing entered into a license agreement with Al Rockoff whereby Obey Clothing was licensed to use Mr. Rockoff's photographs, and Mr. Fairey's works based on those photographs, on t-shirts and related merchandise.  (AP SUF ¶ 67.)

In situations where Obey Clothing licensed the photos that Mr. Fairey used in making images for Obey Clothing's apparel products, Obey Clothing also gave credit and/or attribution to the photographers.  (AP SUF ¶ 69.)

**F.**     **The Obama Photo**

On April 27, 2006, an AP staff photographer, Mannie Garcia, was assigned to cover a press conference at the National Press Club in Washington, D.C. (the "NPC press conference") about the conflict in Darfur.  (AP SUF ¶ 75.)  The NPC press conference featured Oscar-winning actor George Clooney and then-Senator Barack Obama.  (AP SUF ¶ 75.)  At the NPC press conference. Mr. Garcia made a photograph of then-Senator Obama that pictured him gazing upward and to the right against the backdrop of the American flag (the "Obama Photo").  (AP SUF ¶ 76.)  A true and correct copy of the Obama Photo is pictured below.



(AP SUF ¶69.)  The AP owns a valid copyright registration, Registration No. VA-1-356-885, in the Obama Photo.  (AP SUF ¶ 78.)

In making the Obama Photo, Mr. Garcia intended to make a "portrait" that would "capture the essence of Senator Obama."  (AP SUF ¶75.)  Thus, he exercised significant creative

16

skill and judgment in capturing Mr. Obama's expression, pose, demeanor and other essential qualities at a particular moment in time.  (AP SUF ¶ 83.)  As Fairey's own expert, Professor Marita Sturken, Ph.D., of New York University. has testified, Mr. Garcia also used effective political portraiture techniques, such as capturing Mr. Obama in a classic political pose to depict him in an inspiring, flattering manner, appearing "presidential," thoughtful," "serious," and in a "flattering light."  (AP SUF ¶¶ 80-81.)  Mr. Garcia's creative choices included how to frame the Obama Photo, the composition, what lens to use, the depth of field, the moment in time when he took the photograph, and Mr. Garcia's positioning relative to Mr. Obama.  (AP SUF ¶¶ 82, 85-87.)  Mr. Garcia adjusted his position in the room, changed lenses, looked for the angle he wanted, "and then all of a sudden it just happened.  It was there.  He moved himself.  I moved myself into position.  I waited for the eyes and then made it."  (AP SUF ¶ 84.)  Mr. Garcia's selection of the key moment in time to make the Obama Photo was his creative decision.  (AP SUF ¶ 85.)

    As he was instructed to do by the AP, Mr. Garcia intended to and did go beyond covering the news of the day, which was Oscar-winning actor George Clooney's appearance at the NPC press conference to discuss the humanitarian crisis in Darfur, in making the Obama Photo.  (AP SUF ¶¶ 88, 90.)  He made instead an inspiring portrait of then-Senator Obama that he knew would be sent to the AP Images archive for later licensing and use by AP's customers.  (AP SUF ¶¶ 89.)  In fact, the Obama Photo has been used by the AP and its members and customers from the time it was made in 2006 through the present as a portrait photo of then-Senator Obama for stories that were wholly unrelated to the NPC press conference, including stories about (i) the African-American vote in Ohio in advance of the 208 presidential campaign, (ii) Mr. Obama's

five-nation tour of Africa in August 2006, and (iii) singer-songwriter Neil Young's song

mentioning Mr. Obama in the lyrics, in May 2006.  (AP SUF ¶ 91.)

**G.    The Obama Image**

In October 2007, Mr. Fairey began discussing the possibility of making a poster for the

Obama presidential campaign.  (AP SUF ¶ 92.)  On January 22 or 23, 2008, Mr. Fairey searched

the Internet using Google Images, an Internet search engine for images, for a photo of Mr.

Obama that portrayed him as "presidential."  (AP SUF ¶¶ 93-94.)  Mr. Fairey reviewed

approximately 200 images of Mr. Obama before choosing the Obama Photo, which he selected

for its particular qualities.  (AP SUF ¶ 96.)

According to Mr. Fairey, the Obama Photo was a "strong portrait" of Mr. Obama that

depicted him as "dignified" and "serious," with a "sense of contemplation" and in a "flattering"

way.  (AP SUF ¶¶ 94, 97.)  Mr. Fairey has also stated that in selecting the source image:

> *I wanted strong, I wanted wise, but not intimidating . . . He is gazing off in to the future,*
> *saying "I can guide you."*

(AP SUF ¶ 94.)  According to Mr. Fairey:

> *what struck me about the photo wasn't the context of Darfur panel in 2006.  It was the*
> *way that Obama was looking the angle.  There are a lot of different historic photos of*
> *people like John F. Kennedy, the famous Korda Che Guevara photo that have this feeling*
> *of the subject knowing what lies in the future, having some sort of wisdom, and it's a*
> *specific angle of the gaze, and that was really what struck me about the photo.*

(AP SUF ¶ 95.)  In contrast, the other images that Mr. Fairey considered but rejected did not

possess the special qualities that he was looking for.  (See AP SUF ¶ 99.)  For example, in

several photos (images A, B and D below), Mr. Obama's mouth was open, which according to

Mr. Fairey made him "look a little bit unsure"; another (image B below) Mr. Fairey felt was too

18

dark; yet another (image C below) Mr. Fairey felt made Mr. Obama "look a little bit grumpy."[4]

(AP SUF ¶¶ 101-04.)

   

|   A   |   B   |   C   |   D   |

Mr. Fairey has admitted that he downloaded the Obama Photo through Google Images

and copied it to make the Obama Image.  (AP SUF ¶ 111.)  The metadata for the Obama Image

indicates that Mr. Fairey was able to make a "rough cut" of the image, shown below, in 71

minutes using Adobe Illustrator and Adobe Photoshop entirely on his computer.  (AP SUF ¶¶

112-13.)



Mr. Fairey copied the Obama Photo nearly verbatim to make the Obama Image,

including copying all of the characteristics that helped make the Obama Photo a compelling

---

[4] The images that Mr. Fairey considered but rejected were among the documents that he deleted in the course of this lawsuit.  (AP SUF ¶92.)  They were recovered only after his spoliation was discovered.

political portrait, such as the photo's pose, expression, angle, point of view, and composition. (AP SUF ¶¶ 114-16.)  All of the aesthetic qualities that are present in the Obama Photo — including the sense of Mr. Obama's vision, leadership, intelligence and thoughtfulness — were used by Mr. Fairey and Obey Clothing in making the Obama Image.  (AP SUF ¶ 117.)  Fairey or Obey Clothing could have licensed the Obama Photo prior to using it, but did not do so.  (AP SUF ¶ 122.)

On January 30, 2008, Fairey began selling on <obeygiant.com> an initial run of 350 posters displaying the Obama Image, with the tagline "Progress," at a price of $45 per print. (AP SUF ¶ 119.)  In total, Fairey sold, authorized, or gave away for promotional purposes more than <u>958,407 products</u> bearing the Obama Image, including approximately: (i) 103,826 posters, (ii) 175,250 pasters; (iii) 12 artworks; (iv) 109,319 items of apparel; (v) 570,000 stickers; and (vi) an untold number of Internet downloads — all of which generated at least ▮▮▮▮▮▮ in direct revenue for Fairey.  (AP SUF ¶ 120.)  Also, as Fairey's expert Professor Sturken admits, the Obama Image Mr. Fairey on the map in a new way.  (AP SUF ¶ 121.)

## H.  <u>Obey Clothing's Willful Infringement Of The Obama Photo</u>

On February 20, 2008, less than a month after Fairey began selling the Obama Image products, Mr. Juncal, the largest owner of Obey Clothing, sent Mr. Fairey an e-mail asking whether Fairey had the rights to use the Obama Image on t-shirts.  (AP SUF ¶ 133.)  Mr. Juncal told Mr. Fairey that "judging from the response to the [Obama Posters]" using the Obama Image on t-shirts "might be a good idea."  (AP SUF ¶ 134.)  In a reply e-mail, however, Mr. Fairey's financial manager, Olivia Perches, told Mr. Juncal that Fairey could not give approval for sales of t-shirts using the Obama Image.  (AP SUF ¶ 135.)

Nevertheless, Mr. Juncal continued to press the issue, following up less than a week later, on February 26, 2008, and pointing out to Mr. Fairey that another company, Upper Playground, another licensee of Fairey, was selling t-shirts bearing the Obama Image.  (See AP SUF ¶ 136.) Mr. Juncal said that "[t]his is unfortunate since we think this is the exact kind of thing OBEY Clothing could get behind . . . [t]his does not just affect us, we have all of our accounts, our reps, and worldwide distributors to address with why this in not part of the OBEY program, but with a brand that hangs next to us in stores."  (AP SUF ¶ 136.)  Shortly after Mr. Juncal's February 26, 2008 e-mail, Fairey changed its position and sent Obey Clothing the necessary digital artwork for the Obama Image so that Obey Clothing could start producing t-shirts and apparel using the Obama Image (collectively, the "Obama Merchandise").  (See AP SUF ¶ 137.)

In a March 25, 2008 e-mail copied to Chris Broders and Romeo Trinidad of Obey Clothing, Mr. Juncal asked Mr. Fairey if Obey Clothing could sell the Obama Merchandise and "run it until it stops," stating that "[t]he concern is there are so many Obama tees out there that your tee should be the seminal one for the people."  (AP SUF ¶ 138.)  Consistent with his previous recognition of the need to obtain a license from photographers for the use of their work, Mr. Juncal also expressed concern in that same e-mail about the source for the Obama Image:

> *Another issue is since we do not know who the photographer is that took the photo you used for the art, and Olivia [Perches at Obey Giant Art] does not think we could get a full release to sell and use the image to retailers from Obama's camp. Olivia's concerned, and I agree, that if we sold it to Urban and the photographer came at Urban, that could open other legal issues.*

(AP SUF ¶¶ 138-39.)  Thus, by at least March 25, 2008, Mr. Juncal was aware of the risk that the owner of the rights in the source photo could assert a claim regarding the unauthorized use of the source photo in the Obama Image and Obama Merchandise.  (AP SUF ¶ 140.)  This is not surprising in light of the many previous situations, discussed above, where Fairey's use of

others' works without permission created legal issues for Obey Clothing. (See pages 13-14, supra.) Nevertheless, after March 25, 2008, Obey Clothing's principals made no effort to determine whether Mr. Fairey or obey Clothing had the right to use the source image in Obey Clothing's production, distribution and sale of the Obama Merchandise. (AP SUF ¶ 142.) Nor did Obey Clothing make any further efforts prior to this lawsuit to identify either the photographer who made the source image or who owned the copyright in the source image. (AP SUF ¶ 142.) At no time did Obey Clothing ever credit the AP or Mr. Garcia as the author or owner of the source image. (AP SUF ¶ 158.) At no time did Obey Clothing or Fairey seek a license for the Obama Photo from the AP. (AP SUF ¶¶ 156-57.)

Mr. Fairey gave Obey Clothing permission to sell Obama Merchandise starting in March 2008. (AP SUF ¶ 143.) Obey Clothing made approximately 35 different styles of the Obama Merchandise, including t-shirts that reproduced the Obama Image with its "Progress" tagline (examples shown below):



(AP SUF ¶¶ 145-46.)

Obey Clothing also made t-shirts that reproduced the Obama Image without any text — i.e., without the words "Hope" or "Progress" (examples shown below):

22



(AP SUF ¶¶ 145, 147.)

In addition, Obey Clothing made t-shirts and hooded sweatshirts that reproduced the Obama Image without any text and without its red-white-and-blue color scheme— i.e., styles that were in black and white and without the words "Hope" or "Progress" (example shown below):

 

(AP SUF ¶¶ 145, 148.)

Obey Clothing's Obama Merchandise styles also included t-shirts that reproduced, in both color and black and white,  Mr. Fairey's *Yes We Did* illustration, which Mr. Fairey made after the 2008 election and which used the Obama Image, in both color and black and white versions (examples shown below):

23



(AP SUF ¶ 149.)

Obey Clothing's sales of Obama Merchandise generated approximately ▮▮▮▮▮ in revenue for Obey Clothing.  (AP SUF ¶ 150.)  Approximately 70% of these sales, or ▮▮▮▮▮, was based on black-and-white styles.  (AP SUF ¶ 150.)  Adam Van Berckelaer, Obey Clothing's accountant and 30(b)(6) witness regarding the company's revenue and expenses, testified that in addition to direct sales of merchandise, Obey Clothing also benefitted indirectly from selling the Obama Merchandise because increased "market awareness" of Obey Clothing.  (AP SUF ¶ 152 ("I believe that — that we did gain more market awareness after the Obama project" and that "[i]ncreasing awareness can help increase sales …").)  In 2008, Obey Clothing's owners received ▮▮▮▮▮ distributions of profits, up from ▮▮▮▮▮ 2007.  (AP SUF ¶136.)  In 2009, Obey Clothing owners again received ▮▮▮▮▮ distributions of profits.  (AP SUF ¶ 153.)

From April 2008 until August 2009 — more than six months <u>after</u> this action was filed — Obey Clothing and Fairey produced, distributed and sold approximately <u>233,800 units</u> of apparel featuring the Obama Image.  (AP SUF ¶¶ 144, 155.)  Obey Clothing never sought a license from the AP for the sale and distribution of the Obama Merchandise, nor has it ever credited the AP on any of the Obama Merchandise.  (AP SUF ¶¶ 156-58.)

**I.      Mr. Fairey's Lies About The Source Image For The Obama Image**

All AP images, including the Obama Photo, include a caption that identifies the AP as the copyright owner of the work and includes the name of the photographer who made the image. (AP SUF ¶ 123.)  Mr. Fairey himself has claimed that he always knew that the Obama Photo was an AP image.  (See AP SUF ¶ 125.)  Indeed, he stated in a March 9, 2009 interview that:

> [w]hen I found the image I recall that it said it was an AP photo which I have
> acknowledged but it didn't have a name of the photographer.
> . . .
> I think I remember it being AP because maybe there was a watermark on it or something.
> I can't remember exactly why I remember it was AP.  But there was something that
> alerted me to the fact that it was an AP image.

(AP SUF ¶ 124.)  Nevertheless, Mr. Fairey did not publicly credit the AP as the copyright owner of the image until January 2009, shortly before filing the Complaint against the AP, amid public speculation regarding the identity of the source image.  (AP SUF ¶ 126.)

Starting with the filing of the Complaint in this case on February 9, 2009, Mr. Fairey falsely claimed that the source image for the Obama Image was not the Obama Photo, but rather a photograph of George Clooney and Barack Obama that Mr. Garcia also made at the NPC event (the "Clooney Photo").  (AP SUF ¶ 129.)  The Clooney Photo is pictured below.



Clooney Photo

(AP SUF ¶ 129.)

25

On approximately March 19, 2009, Mr. Fairey deleted from his computer the working, grayscale copy of the Obama Photo that he used to make the Obama Image.  (See AP SUF ¶ 127.)  Between approximately March 19, 2009 and March 26, 2009, Mr. Fairey destroyed, or attempted to destroy, documents, and fabricated new documents, in an effort to make it appear that he had used the Clooney Photo rather than the Obama Photo to make the Obama Image. (AP SUF ¶ 130.)  The original, unaltered copy of the Obama Photo that Mr. Fairey had downloaded through Google Images, and that he used to make the Obama Image, was never produced in this litigation.  (AP SUF ¶ 128.)

On October 1, 2009, counsel for the AP sent counsel for Fairey an e-mail identifying the file paths where it believed the original source material may have been located.  (AP SUF ¶ 131.) On October 9, 2009, Mr. Fairey was forced to admit that he had used the Obama Photo, as the source image.  (See AP SUF ¶ 132.)

**J.**     **Obey Clothing's Use of the Obama Photograph Harmed the AP**

The AP has lost significant licensing revenue from Fairey's and Obey Clothing's unlicensed and unauthorized uses of the Obama Photo.  (AP SUF ¶ 164.)  The harm to the AP includes lost licensing opportunities from other potential customers as a result of Fairey and Obey Clothing's failure to credit the AP as the source image of the Obama Merchandise, opportunities that likely would have resulted in significant additional revenue for the AP.  (AP SUF ¶¶ 164-69.)  Were others similarly able to use AP Images photos without credit or compensation, it would erode the AP's licensing business.  (AP SUF ¶ 170.)

26

## ARGUMENT

### I.   LEGAL STANDARD

The Court should grant summary judgment when there are "no genuine issues as to any material fact … and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  For purposes of summary judgment, a fact is "material" when it "might affect the outcome of the suit under the governing law," McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007), and an issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.  The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  Rossi v. City of New York, 246 F. Supp. 2d 212, 216 (S.D.N.Y. 2002) (quoting Fed. R. Civ. P. 56(e)).  Although the facts and inferences are to be construed in favor of the party opposing the motion, Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 498 (2d Cir. 2001), the non-moving party must raise more than just a "metaphysical doubt" as to a material fact.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion."  Harlen, 273 F.3d at 499.

The Court may award summary judgment to the AP even though Obey Clothing has asserted a fair use defense.  While "fair use is a mixed question of law and fact," Castle Rock Entmt., Inc. v. Carol Publishing Group, 150 F.3d 132, 137 (2d Cir. 1998), the Second Circuit has routinely "'resolved fair use determinations at the summary judgment stage' where, as here, there are no genuine issues of material fact."  Castle Rock, 150 F.3d at 137 (quoting Wright v. Warner Books, Inc., 953 F.2d 731, 735 (2d Cir. 1991)).  Rather, as the Second Circuit has

observed, "the mere fact that a determination of the fair use question requires an examination of the specific facts in each case does not necessarily mean that in each case involving fair use there are factual issues to be *tried*."  Wright, 953 F.2d at 735 (emphasis in original).

## II.   OBEY CLOTHING INFRINGED THE AP'S COPYRIGHTED PHOTOGRAPH

### A.    The Obama Image Copies Protectable Expression From The Obama Photo

To succeed on its copyright infringement claim, AP must show (i) ownership of a valid, existing copyright and (ii) unauthorized use of the copyrighted material.  See Castle Rock Entm't v. Carol Publ'g Group, 150 F.3d 132, 135, 137 (2d Cir. 1998) (affirming summary judgment for plaintiff for defendant's unlawful appropriation of portions of *Seinfeld* television series in a companion trivia book and awarding damages); Novelty Textile Mills v. Joan Fabrics Corp., 558 F.2d 1090, 1092 (2d Cir. 1977) (reversing finding of non-infringement of textile designs and issuing preliminary injunction).

Regarding the first element, Fairey has conceded[5] that the AP owns a valid copyright registration in the Obama Photo.  (Ltr. from W. Fisher and G. Stewart to J. Hellerstein (Dec. 22, 2010) ("Fisher Letter") 2; AP SUF ¶ 78.)  The registration for the Obama Photo is *prima facie* evidence of the photograph's copyrightability, and of the validity of the copyright.  See 17 U.S.C. § 410(c); see also Novelty Textile, 558 F.2d at 1092 & n.1 (copyright registration is "prima facie proof of ownership and validity").

As for the second element, AP must demonstrate that Obey Clothing (through Mr. Fairey) actually copied the Obama Photo and that the Obama Photo and Obama Image are

---

[5] Fairey's December 22, 2010 letter to the Court regarding fair use conceded both that the AP owns a valid copyright in the Obama Photo, and that Fairey actually copied the photo.  (Fisher Letter at 2; AP SUF ¶ 78).  Obey Clothing did not submit its own letter independent of Fairey, but has stated to the Court in the past that it is relying on Fairey's defenses in this case.  See Hr'g Tr. (Nov. 30, 2010) 15:16-9.

substantially similar, i.e., that Obey Clothing copied sufficient protectable expression to

constitute copyright infringement.  See Castle Rock Entm't, 150 F.3d at 135, 137.  In this case,

Fairey, the creator of the Obama Image, has admitted to actually copying the Obama Photo to

make the Obama Image.[6]  (Fisher Letter at 2; AP SUF ¶ 78.)  This admission is hardly

surprising, as a side-by-side comparison of the two nearly-identical works ably confirms that the

Obama Image is a literal, graphic rendition of the Obama Photo:



It is equally clear that Obey Clothing, Fairey's licensee for the Obama Image, used substantial

protectable expression from the Obama Photo when it reproduced, distributed, and sold a vast

amount of merchandise bearing the Obama Image, as the above photographs of the merchandise

show.

   More than a century ago, the Supreme Court held that a photograph is a creative work of

art, protected by copyright.  Burrow-Giles Litho. Co. v. Sarony, 111 U.S. 53, 58, 60 (1884) ("We

entertain no doubt that the constitution is broad enough to cover an act authorizing copyright of

photographs, so far as they are representatives of original intellectual conceptions of the

---

[6] Obey Clothing has violated the AP's exclusive rights by making, distributing and selling items bearing a derivative
work (the Obama Image) based on the Obama Photo.  See 17 U.S.C. § 106(1-3) (granting copyright owner exclusive
rights to copy, prepare derivative works and distribute works).

author.").  Several years later, Judge Learned Hand observed, "no photograph, however simple, can be unaffected by the personal influence of the author," reflecting the understanding that copyright protects the expressive elements of a photograph because "no two will be absolutely alike." Jewelers' Circular Publ'g Co. v. Keystone Publ'g Co., 274 F. 932, 934 (S.D.N.Y. 1921), aff'd, 281 F. 83 (2d Cir. 1922) (determining that there was substantial creative expression in photographs of jewelry and holding that illustrations based on the photos infringed the copyrights in them).

Since then, courts have routinely recognized photographers' creative choices in composing an image, finding not only that photos are entitled to copyright protection, but also that the alleged infringer has taken substantial copyrighted expression.  See, e.g., Rogers v. Koons, 960 F.2d 301, 307-08 (2d Cir. 1992) (finding that defendant Jeff  Koons' sculpture infringed the copyright in plaintiff's photograph and granting plaintiff's motion for summary judgment); SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 310-11 (S.D.N.Y. 2000) (holding that defendant had illicitly copied plaintiff's photos of framed mirrors and granting plaintiff's motion for summary judgment); Images Audio Visual Prods., Inc. v. Perini Bldg. Co., 91 F. Supp. 2d 1075, 1084-85 (E.D. Mich. 2000) (granting plaintiff's motion for summary judgment and holding that aerial photographs of construction site taken by professional photographer were creative works that were more than just factual because of the "creative insight provided by a professional photographer, whether he is shooting a construction site or a natural scene"); Campbell v. Koons, No. 91-6055, 1993 WL 97381, at *3 (S.D.N.Y. Apr. 1, 1993) (granting summary judgment to plaintiff for claim that Jeff Koons infringed the copyright in plaintiff's photograph by making a three-dimensional sculpture based on the photo, despite Koons defense that he did not copy certain portions of the photo).

In particular, courts have found that the copyright in a photograph broadly protects an image's particular expression, or portrayal, of the subject matter, pose, expression, demeanor, composition (rendition), lighting, angle, depth of field, the moment in time when the photograph was made, and "almost any other variable involved."  Rogers, 960 F.2d at 307; see also Burrow-Giles, 111 U.S. at 60 (originality in a photo may include depiction of light and shadow); Pagano v. Besler Co., 234 F. 963, 964 (2d Cir. 1916) (finding photograph of New York Public Library on Fifth Avenue was copyrightable and noting that "it undoubtedly requires originality to determine just when to take the photograph"); Edison v. Lubin, 122 F. 240, 242 (3d Cir. 1903) (finding film by Thomas Edison was copyrightable because making it involved "a study of lights, shadows, general surroundings, and a vantage point adapted to securing the entire effect"); Time Inc. v. Bernard Geis Assocs., 293 F. Supp. 130, 142-43 (S.D.N.Y. 1968) (finding that the approximately 480 frames of the Zapruder film of Kennedy assassination were copyrightable, and noting that the frames reflected many elements of creativity, including selection of camera, film, lens type, area where the pictures were made, the time at which they were made, and the placement of the camera).

Moreover, copyright in a photograph extends to derivative works, which, with respect to photographs, are works that are "based upon" a pre-existing photo and include any form in which the pre-existing photo "may be recast, transformed, or adapted."  17 U.S.C. § 101; see also Rogers v. Koons, 751 F. Supp. 474, 475 (S.D.N.Y. 1990), aff'd, 960 F.2d at 307-08 (holding that Jeff Koons use of plaintiff's photo was a derivative work: "Koons' effort to limit that protection to the photograph 'as a photograph' runs counter to caselaw.  In copyright law the medium is not the message, and a change in medium does not preclude infringement.").

As the Second Circuit recognized in <u>Rogers v. Koons</u>, substantial similarity "does not require literally identical copying in every detail," but rather is determined by "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  <u>Rogers</u>, 960 F.2d at 307; <u>see</u> <u>also</u> <u>United Feature Syndicate, Inc. v. Koons</u>, 817 F. Supp. 370, 377 (S.D.N.Y. 1993) (finding substantial similarity where "even the most casual observer" would recognize elements of defendant's sculpture as having been copied from plaintiff's copyrighted cartoon character); <u>Campbell</u>, 1993 WL 97381, at *3 (holding that works were substantially similar because Koons took the "heart" of plaintiff's photo despite not copying other portions of the photo).  The court in <u>Rogers</u> concluded that the artist Jeff Koons' sculpture was an unauthorized derivative work of plaintiff Art Rogers' photograph of a couple sitting on a bench with eight puppies on their laps.  <u>Rogers</u>, 960 F.2d at 308.  While the court noted that "the idea of a couple with eight small puppies seated on a bench" is not protectable, the photographer's particular "*expression* of this idea — as caught in the placement, in the particular light, and in the expressions of the subjects — that gives the photograph its charming and unique character," is protectable.  Applying the ordinary observer test, the court concluded that the two works, pictured below, were substantially similar and affirmed summary judgment for the plaintiff.



In finding for Rogers, the Court noted that "no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated," and concluded that the small changes made by Koons — such as colorizing Rogers' black-and-white photograph, recasting the original photograph as a sculpture, and adding flowers to the couple's hair and the puppies' noses — were "insufficient to raise a genuine issue of material fact."  Rogers, 960 F.2d at 307-08.

Rogers is directly applicable to Obey Clothing's use of the Obama Image.  As in Rogers, the Obama Image copies the Obama Photo nearly verbatim.  See also Images Audio Visual Prods., Inc., 91 F. Supp. 2d at 1085 (defendant produced "near-exact replicas" of the original photographs by making color photocopies); United Feature, 817 F. Supp. at 378 (dismissing addition of other images where one element of defendant Koons's sculpture was a "virtual reproduction" of plaintiff's cartoon character "in both its appearance and expression"); Campbell, 1993 WL 97381, at *3 (dismissing Koons' "claim of absolution that he did not copy the box and the boy in front from the photograph" because Koons had taken the "heart" of the work); cf. Nihon Kezai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.2d 65, (2d Cir. 1999) (finding that defendant's "adaptations" of Japanese news articles were substantially similar to the original works where adaptations consisted of "direct, if not word-for-word, translations, . . . edited for clarity").  The AP's expert, Professor Laurie Dahlberg of Bard College, concluded that the Obama Image copies virtually all of the qualities that made the Obama Photo a compelling political portrait of Mr. Obama, such as the photo's pose, expression, angle, point of view, and composition as well as all of its aesthetic qualities, including the sense of Mr. Obama's vision, leadership, intelligence and thoughtfulness.  (AP SUF ¶¶ 115-17.)  Indeed, it is evident that the Obama Image even copies the tiny, but crucial highlights, or "twinkles," in Mr. Obama's eyes that animates his gaze.  (AP SUF ¶ 117.)

Even Professor Sturken, the expert for Obey Clothing's licensor, Fairey, admitted in her deposition that Mr. Fairey copied numerous expressive elements of the Obama Photo. For example, she testified that Mr. Garcia's photograph effectively uses classic political portraiture techniques, such as (i) the three-quarters pose, which helps portray President Obama as a "strong leader" and connotes "leadership, inspiration, and forward-thinking," (ii) the gaze towards the horizon, which helps portray President Obama "as someone who is visionary and forward-thinking, [and] a little bit above the crowd," and (iii) the view from below, which helps portray Mr. Obama with "presence" and "as powerful," — all of which were copied by Mr. Fairey when he made the Obama Image. (AP SUF ¶¶ 108-10). Additionally, Professor Sturken testified that the Obama Photo portrays Mr. Obama as inspiring, presidential, visionary, powerful, and as a strong leader, all of which were qualities that Mr. Fairey also incorporated into the Obama Image. (Id.) Mr. Fairey himself admitted that he selected the Obama Photo from among 200 images that he reviewed and considered for precisely these qualities, which he incorporated and similarly conveyed in the Obama Image. (AP SUF ¶¶ 94-97, 99-104.)

Obey Clothing (or its licensor) could have made, commissioned or licensed a photo for use on t-shirts. Rather than doing that, however, it chose instead to copy the Obama Photo, such that the Obama Photo and the Obama Image portray the same pose, expression, demeanor, mood, attire, shading, lighting, red, white and blue coloring, angle, and cropping, as well as numerous other similarities. Given the degree to which the expression in the Obama Photo was copied in the Obama Image that Obey Clothing used on apparel, the AP is entitled to summary judgment on this issue. Rogers, 960 F.2d at 308; Images Audio Visual Prods., Inc., 91 F. Supp. 2d at 1086-87; Campbell, 1993 WL 97381, at *3.

34

**B.**    **The Fair Use Defense Does Not Excuse Obey Clothing's Sale Of Infringing Merchandise**

The AP having established copyright infringement, the remaining question is whether Obey Clothing can meet its burden of establishing that the creation and use of the Obama Image is a fair use. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994) (burden of proving fair use is on the defendant); College Entrance Exam. Bd. v. Pataki, 889 F. Supp. 554, 564-65 (N.D.N.Y. 1995) ("Fair use is an affirmative defense and, as such, the burden of proving fair use is always on the party asserting the defense."). As discussed below, the only possible answer to this question is a resounding "no."

The Constitution authorizes Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The purpose is "to motivate the creative activity of authors and inventors by [providing] a special reward," Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984), and ensure that copyright owners receive "a fair return for their labors." Harper & Row, Publ'g, Inc. v. Nation Enters., 471 U.S. 539, 545-46 (1985). Thus, the Copyright Act grants copyright owners the *exclusive* right to, among other things, reproduce their work, prepare derivative works based on it, and distribute copies of it. 17 U.S.C. § 106.

The affirmative defense of fair use is a limited exception to the copyright holder's exclusive rights. It is codified as Section 107 of the Copyright Act of 1976, which states that "reproduction . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research" is excused and not an infringement. 17 U.S.C. § 107. Fair use empowers courts to excuse infringement where the societal benefits of the infringement outweigh the costs to the copyright owner and society of doing so. In analyzing

35

fair use, "factors to be considered shall include": (i) the purpose and character of the use,

including whether it is of a commercial nature or for nonprofit educational purposes; (ii) the

nature of the copyrighted work; (iii) the amount and substantiality of the portion used in relation

to the copyrighted work as a whole; and (iv) the effect of the use upon the potential market for or

value of the copyrighted work.  Id.  The factors are non-exclusive; no one factor is dispositive.

See, e.g., Campbell, 510 U.S. at 578 ("[a]11 are to be explored, and the results weighed together,

in light of the purposes of copyright."); Harper & Row, 471 U.S. at 560; Castle Rock Entm't,

150 F.3d at 141.  Fair use is an equitable doctrine that is highly dependent on the specific facts at

issue.  See Stewart v. Abend, 495 U.S. 207, 236 (1990); Sony Corp., 464 U.S. at 448 & n. 31.

    The Second Circuit's analysis in Rogers v. Koons, which as noted above is compelling on

the issue of substantial similarity, is also directly on point regarding fair use.  Plaintiff Rogers

was a professional photographer who made a black-and-white photo entitled "Puppies" for a

client.  960 F.2d at 303-04.  In addition to selling prints to the client, Rogers also licensed the

photo, including for use on notecards.  Id.  Defendant Koons, an artist, bought a "Puppies"

notecard, tore off Rogers's copyright notice, and used it as the source for a painted wooden

sculpture entitled "String of Puppies."  Id. at 304-05.  The sculpture was displayed at a gallery

and four copies were made.  Id. at 305.  Two years later, Rogers learned of Koons's use of the

photo and sued, alleging claims for, inter alia, copyright infringement.  Id.  The district court

granted summary judgment for Rogers, finding that Koons had copied "Puppies" in creating

"String of Puppies" and that fair use did not apply.  Id. at 306.

    On appeal, the Second Circuit began its opinion by stating that the copying at issue:

> *was so deliberate as to suggest that defendants resolved so long as they were significant players in the art business, and the copies they produced bettered the price of the copied work by a thousand to one, their piracy of a less well-known artist's work would escape being sullied by an accusation of plagiarism.*

Id. at 303.  After first rejecting Koons's argument that the two works were not substantially similar, the Court rejected Koons's fair use defense and affirmed summary judgment for Rogers. As to the first factor, purpose and character of the use, the Court found that "Koons's copying of the photograph 'Puppies' was done in bad faith, primarily for profit-making motives, and did not constitute a parody of the original work," and thus the first factor favored the photographer.  Id. at 310.  As to the second factor, the nature of the original work, the Second Circuit found that the photo was more akin to fiction than to factual works such as biographies.  Id.  Because the photo was a creative work, and because "Rogers, who makes his living as a photographer, hopes to gain a financial return" from the photo, the second factor also weighed against fair use.  Id. Regarding the third factor, amount and substantiality of the use, the Court found that "the essence of Rogers's photo was copied nearly *in toto*," much more than would have been necessary even for a parody, and that Koons used "the very expression of the work created by Rogers."  Id. at 311.  Thus, the third factor also favored Rogers.  Id.  Finally, regarding the fourth factor, the effect of the defendants' use on the market value of the original, the Court noted that although the copy was a sculpture as opposed to a photo, Koons's work did harm the market for Rogers's work, and so this factor also weighed against fair use.  Id. at 312.

The Second Circuit's decision in Rogers, including both its analysis related to the copying of a photograph and its fair use analysis, applies directly to this case.  Moreover, subsequent decisions from this District also involving Koons have demonstrated the continuing validity of the Second Circuit's decision in Rogers.  See United Feature Synd., Inc., 817 F. Supp. at 384-85 (finding no fair use where Koons used plaintiff's copyrighted cartoon character as

component of a sculpture); <u>Campbell</u>, 1993 WL 97381, at *3 (finding willful infringement where Koons copied portions of plaintiff's photograph).

For example, in <u>United Feature Syndicate, Inc. v. Koons</u>, Koons copied a picture of a copyrighted character from the *Garfield* comic strip named "Odie" and used it as one element in a collage sculpture.  817 F. Supp. at 373.  In granting summary judgment to the plaintiff, the court noted that, unlike <u>Rogers</u>, Koons had not acted in bad faith by removing a copyright notice from the pre-existing work.  <u>Id.</u> at 379-80 & n.4 ("The finding of bad faith in <u>Rogers</u> was simply one of many factors considered by the Court and was not a prerequisite to the summary judgment determination.").  Nonetheless, the court determined that the two works were substantially similar and that all four fair use factors weighed in favor of the plaintiff.  <u>Id.</u> at 377-78, 382 ("[T]he 'Puppy' in Koons' sculpture is a virtual reproduction of the 'Odie' character in both its appearance and expression.  The addition of the two other images does not, in any way, affect the ability of a lay observer to recognize the 'Puppy' as 'Odie.'  Under such circumstances, the use of two other images in the sculpture in conjunction with the wholesale pirating of the 'Odie' character does not create a factual dispute which precludes summary judgment in favor of plaintiff on the issue of substantial similarity.").

Under fair use factor one, the <u>United Feature</u> court held that Koons' work was commercial and rejected his claim that the use was fair because it was for an "art" purpose.  <u>Id.</u> at 379 ("If the subjective classification of an otherwise infringing work as 'art' automatically immunized such work under the fair use doctrine, the doctrine would virtually eviscerate the protection afforded by the Copyright Act.").  Under the second fair use factor, the court concluded that the Odie character was a creative work.  <u>Id.</u> at 381.  With regard to the third fair use factor, the court determined that Koons had copied the Odie character "virtually in its

entirety" and weighed this factor in favor of the plaintiff.  Finally, under the fourth fair use factor, the court concluded that should Koons use of the Odie character become widespread, it would harm the plaintiff's market in derivative works.  Id. at 382.  The court therefore weighed factor four in favor of the plaintiff.  Id.

The court's analysis in Campbell v. Koons also applies here.  In that case, Koons created a sculpture called "Ushering in Banality" for the same gallery show as the one for which he created the "String of Puppies" sculpture at issue in Rogers.  As in Rogers, the sculpture in Campbell was "deliberately and exactly copied from someone else's copyrighted photograph that Koons bought in a note card form in some store."  1993 WL 97381, at *1.  This time, the photo was Barbara Campbell's "Boys with Pig," showing two boys in a farmyard trying to push a large pig with a ribbon into a gift box.  Id.  Plaintiff Campbell was a professional photographer who was known for her work with children for a wide range of clients.  Id. at *2.  Like the plaintiff in Rogers, she also licensed her photos to others for a variety of uses.  Id.  She had licensed "Boys with Pig" to a company that produced and distributed birthday cards and note cards using the photograph.  Id.

Relying on United Feature Syndicate, Inc., the court in Campbell easily found that Koons' copying of portions of the plaintiff's photograph was "deliberate and willful" and therefore granted the plaintiff's motion for summary judgment.  Id. at *2-3.  In particular, the court noted that Koons' copying was willful because his documents showed that "he was well aware that he had to obtain permission to use copyrighted material in his works because he had asked for, and obtained, such permission many times in the past."  Id. at *3.  Here, as discussed supra at pages 13-16, Obey Clothing was extremely well-aware of the need to get permission from photographers for the use of their works.

In addition to <u>United Feature</u> and <u>Campbell</u>, also helpful is <u>Blanch v. Koons</u>, 467 F.3d 244, 257-58 (2d Cir. 2006).  In that case, the Court found that Koons's use of a photo was a fair use, but it did so on markedly different facts from both <u>Rogers</u>, as the district court in <u>Blanch</u> expressly noted, <u>Blanch v. Koons</u>, 396 F. Supp. 2d 476, 483 (S.D.N.Y. 2005), and this case. Unlike both <u>Rogers</u> and the present case, in <u>Blanch</u>, Koons used only part of plaintiff's photo (below left).  <u>Id.</u> at 479.  He also inverted the legs depicted in the original work so that they dangled from the top of his work, added a heel to the original picture, and combined plaintiff's photo with images of three other pairs of legs and feet to create a Niagara Falls-type motif titled "Niagara," over a painted landscape that included a brownie, ice cream, and donuts (below right).  <u>Id</u>.  As a result, unlike the situation either here or in <u>Rogers</u>, the resulting work by Koons looked significantly different from the original photo:



The fair use analysis in <u>Blanch</u> is nevertheless instructive.  Under the first fair use factor, the Court began by noting that a work is not transformative if the "defendant has done no more than find a new way to exploit the creative virtues of the original work."  467 F.3d at 252. However, in finding that Koons's work was transformative, the Court specifically found that Koons had deliberately commented on the original photo "rather than merely exploiting its creative virtues.  <u>Id.</u> at 257.  In addition, the plaintiff essentially conceded this factor, admitting

that Koons's purpose was dramatically different than hers.  Id. at 252-53.  By contrast, as

discussed below, Mr. Fairey has admitted that he never attempted to comment on the Obama

Photo, and Obey Clothing's conduct in selling clothing bearing the Obama Image is also clearly

devoid of any commentary on the original photo.  In addition, unlike Blanch where commercial

aspect of Koons's work was outweighed by its transformative character, here Obey Clothing's

use is far more commercial both qualitatively (i.e., merchandising uses) and quantitatively (i.e.,

hundreds of thousands of copies as opposed to a single painting).  As to bad faith, the Court in

Blanch noted that, unlike Rogers, there was no allegation that Koons had removed a copyright

notice from the original image, and thus the mere fact that Koons had not asked for permission

was no different than any other fair use case.  Id. at 255-56.  Here, as discussed below, Obey

Clothing's bad faith in using the AP's copyrighted image runs much deeper than was even found

in Rogers.

Regarding the second fair use factor, in Blanch the creativity of the plaintiff's photo was

outweighed by Koons's commentary on the original photo (id. at 257), which as discussed below

is non-existent here.  The third factor favored Koons in Blanch because, unlike here or in Rogers,

Koons only used a portion of the photo, discarding the male model's lap and the airplane setting

of the original.  Id. at 258.  Lastly, under the fourth fair use factor, the plaintiff in Blanch

admitted to a complete lack of market harm as she did not license, nor did she ever intend to

license, the photo at issue.  That is a far cry from either Rogers or this case, where the AP

frequently licensed the Obama Photo prior to Mr. Fairey's copying, and maintains an entire

business dedicated to licensing photos for a variety of purposes, including for political

campaigns and derivative artistic uses.  Because the fair use analysis in Blanch was based on

very different facts from those presented in either Rogers or this case, it actually makes clear that

41

while fair use may have been applicable to Koons's use in <u>Blanch</u>, it certainly was not applicable in <u>Rogers</u> and likewise is not applicable here.

In light of <u>Rogers</u>, and the other decisions involving Koons that relied on <u>Rogers</u>, it is clear that Obey Clothing's commercial exploitation of the AP's copyrighted Obama Photo simply is not fair use.

### 1. Factor One—All Three Sub-Factors Favor The AP

The first factor, the purpose and character of Obey Clothing's use of the Obama Photo, requires analysis of (i) Obey Clothing's bad faith conduct in using the Obama Photo, as embodied in the Obama Image, (ii) the commercial nature of Obey Clothing's use of the image, and (iii) the degree to which Obey Clothing's use "merely supersedes the objects of the original … or instead adds something new, with a further purpose or different character," <u>i.e.</u>, whether the use is "transformative." <u>Campbell</u>, 510 U.S. 578-79. In <u>Rogers v. Koons</u>, all three components of the first factor favored the photographer. As discussed below, the first factor similarly favors the AP in this case.

### a. Obey Clothing Acted In Bad Faith

Regarding the first sub-factor, because fair use is an equitable doctrine, the party invoking it must itself have acted equitably. <u>See</u> <u>Rogers v. Koons</u>, 960 F.2d 301, 309 (2d Cir. 1992). As the Second Circuit noted in <u>Weissman v. Freeman</u>, 868 F.2d 1313, 1323-24 (2d Cir. 1989), "to make use of another's copyright material fairly presupposes that the actor acted fairly and in good faith." Thus, in <u>Rogers</u>, the Second Circuit found that Koons's removal of the notecard's copyright notice, hiding the image's true source, suggested bad faith and weighed against fair use. <u>Rogers</u>, 960 F.2d at 309; <u>cf.</u> <u>Weissman</u>, 868 F.2d at 1323-24. Similarly, in <u>Weissman</u>, the Court found that defendant had acted in bad faith by (i) failing to credit the

plaintiff's contribution to the defendant's work, (ii) substituting the plaintiff's name on the work for the defendant's, and (iii) changing the title of plaintiff's work to a new title devised by the defendant.  Weissman, 868 F.2d at 1323-24.  Accordingly, the court concluded that the defendant's "conduct severely undermines his right to claim the equitable defense of fair use." Id. at 1824.

As in Rogers and Weissman, Obey Clothing acted in bad faith with respect to the Obama Photo.  Obey Clothing, which has long been associated with Mr. Fairey (and takes its name, Obey Clothing, from Mr. Fairey's own "Obey" logo (AP SUF ¶¶ 32, 43)), has long known that he makes a practice of using the works of others without permission, attribution or compensation.  (See AP SUF ¶ 39-40.)  In its license agreement with Mr. Fairey's company Obey Giant, Obey Clothing actually acknowledged that Mr. Fairey "occasionally incorporates into [his] art … [the] protectable intellectual property of a third party" and agreed to indemnify Mr. Fairey against any resulting third party claims in connection with Obey Clothing's use of his images on apparel.  (AP SUF ¶¶ 49-50.)

And in fact, that practice has previously resulted in claims against Mr. Fairey and/or Obey Clothing, including (i) claims by the estate of Cuban poster artist Felix René Mederos regarding Mr. Fairey's unauthorized use of one of Mr. Mederos's famous poster images as a source for one of the t-shirt designs he licensed to Obey Clothing (AP SUF ¶¶ 53-54), and (ii) claims by Bravado against Mr. Fairey and Obey Clothing for the use of Bravado's intellectual property on Obey Clothing's merchandise, which resulted in Obey Clothing entering into a settlement agreement with Bravado ████████████████████████████████

████████████████████████████████████████████████████████

████████████████ -- which Mr. Juncal of Obey Clothing dismissed as simply a "cost of doing

business."  (AP SUF ¶¶ 56-60.)  Moreover, Obey Clothing's principals had prior experience with licensing images, and were admittedly "well-versed" in the need to secure from photographers the rights to use their photographs in Obey Clothing's merchandising activities.  (AP SUF ¶¶ 64-66.)

As if that were not enough to put Obey Clothing on notice regarding Mr. Fairey's unauthorized use of others works, however, in October 2007 Mr. McCormack, Mr. Fairey's co-owner in Obey Giant, explicitly warned Mr. Juncal that "not all of Shepard's art can translate to apparel," and that Obey Clothing needed to exercise independent judgment in deciding whether it was appropriate to create t-shirts based on Mr. Fairey's designs, given Mr. Fairey's use of pre-existing works.   (AP SUF ¶ 55.)

Yet, just a few months later, after Mr. Fairey created the Obama Image, Mr. Juncal encouraged Mr. Fairey to expand his exploitation of the Obama Image beyond the posters he had been making and distribute it much more widely on licensed apparel — to be marketed, distributed and sold by Obey Clothing as his licensee.  (AP SUF ¶¶ 133-38.)  Mr. Juncal even went so far as to complain to Mr. Fairey when another company, Upper Playground, was allowed to sell shirts with the Obama Image but Obey Clothing was not.  (AP SUF ¶ 136.)

Obey Clothing eventually did convince Fairey to let it sell Obama Merchandise.  (AP SUF ¶¶ 137-38.)  Before it began selling that merchandise, however, Obey Clothing told Mr. Fairey of its concern about possible claims from the photographer who created the source image for the Obama Image:

> *Another issue is since we do not know who the photographer is that took the photo you used for the [Obama] art [we are] concerned that if we sold it to Urban [Outfitters] and the photographer came at Urban, that could open up other legal issues.*

(AP SUF ¶ 138-39.)[7]  Although Obey Clothing never received any satisfactory response from Mr. Fairey (perhaps one saying "don't worry, I have gotten a license" or "don't worry, I made the photo myself"), Obey Clothing chose to proceed anyway, ignoring the many red flags and instead cashing in on the popularity of the Obama Image.  Obey Clothing did nothing whatsoever to confirm the identity of the photographer or seek a license, although there was more than enough time for Obey Clothing to do both of these things.  (AP SUF ¶¶ 142-43, 156-158.)  Obey Clothing also never gave any credit to the AP or included its copyright notice on the apparel -- even after Mr. Fairey finally admitted that he use an AP photo and this lawsuit began.  As noted above supra page 25, Mr. Fairey claims that he always knew that he used an AP photo, but in any case he acknowledged it publicly in January 2009 and filed this case on February 9, 2009.  (See AP SUF ¶ 126.)  Obey Clothing continued to sell apparel, without any compensation or credit to the AP, until August 2009, without regard to any of the AP's rights.  In light of Obey Clothing's egregious conduct, the first sub-factor weighs against fair use.

### b.    Obey Clothing's Use Was Highly Commercial

The second sub-factor, which considers whether a use is commercial, asks whether a revenue-generating user can, and should, absorb the costs of complying with copyright law and compensating the original author.  "[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright."  Sony Corp., 464 U.S. at 451; see also Harper & Row, 471 U.S. at 562 (same); cf.

---

[7] Significantly, although the Court ordered the parties, including Obey Clothing, to complete their respective document productions by no later than February 19, 2010, Obey Clothing delayed producing this damning e-mail until March 3, 2009, after the AP repeatedly pressed Obey Clothing to produce its documents and just eight days before the depositions of Obey Clothing's 30(b)(6) witnesses began.

Campbell, 510 U.S. at 583-84 (finding commercial use could be outweighed by parodic purpose).

In Rogers, Koons's art was highly commercial, generating substantial revenue, which weighed against fair use.  Rogers, 960 F.2d at 309; see also Harper & Row, 471 U.S. at 562 (the key to the commercial use analysis is "whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price"); Ty, Inc. v. Publications Int'l, Ltd., 333 F. Supp. 2d 705,711 (N.D. Ill. 2004) (use was commercial where defendant publishing business used plaintiff's photos in books that it sold for money without "paying the customary price").  Here, Obey Clothing's extensive commercial exploitation, which resulted in significant financial benefit to Obey Clothing without any compensation whatsoever to the AP, also weighs against fair use.

The entire Obama Image operation was commercial from the time Mr. Fairey first posted the Obama Image online in January 2008, selling posters at $45.  (See, e.g., AP SUF ¶ 119).  In all, Fairey sold, authorized, or gave away for promotional purposes a total of almost one million infringing items, including approximately: (i) 103,826 posters, (ii) 175,250 pasters; (iii) 12 artworks; (iv) 570,000 stickers; and (v) an untold number of Internet downloads, all of which generated ███████████ in revenue just for Mr. Fairey and his companies.  (AP SUF ¶ 120.)

Fairey's activities in selling Obama Image merchandise built demand for merchandise bearing the Obama Image, which Obey Clothing sought to capitalize on when it solicited from Mr. Fairey in early 2008 the right to sell clothing using the Obama Image.  (AP SUF ¶¶ 136-37.) Obey Clothing's apparel sales began in March 2008 and continued through August 2009, six months after this action began and long after Obey Clothing was on explicit notice that AP not

only was claiming rights in the Obama Photo, but had in fact had asserted claims against Fairey in connection with the Obama Image.  (See AP SUF ¶¶ 144, 155.)

Obey Clothing sold apparel directly, through its own <obeyclothing.com> site, as well as through its customers, who included major national retailers like Nordstrom's and Urban Outfitters.  (AP SUF ¶ 44.)  In all, Obey Clothing sold more than 233,800 units of apparel featuring the Obama Image covering more than 35 different style numbers.  (See AP SUF ¶¶ 144-46.)  Approximately 70% of Obey Clothing's revenue from that apparel was generated by sales of items bearing black and white versions of the Obama Image, without the red, white and blue colorization that Mr. Fairey had applied in the original poster using that image, and/or without the "Hope" or "Progress" text that appeared in the original posters. (AP SUF ¶¶ 150-51.)

Obey Clothing's extensive commercialization of the Obama Image on a wide range of products continued even after Fairey filed this action and Obey Clothing had been subpoenaed for documents and testimony in connection with this action (see AP SUF ¶ 155), putting it on notice of the AP's copyright infringement claims regarding the Obama Image.  In light of Obey Clothing's sales of 233,800 units, generating revenue of ██████████, it is clear that Defendants' use of the Obama Photo was commercial.  (AP SUF ¶¶ 144, 150.)  In addition, Obey Clothing's own accountant expressly recognized that it benefitted indirectly from selling the Obama Merchandise through increased "market awareness" of Obey Clothing.  (AP SUF ¶ 152.)

### c.    Obey Clothing's Use Was Not Transformative

Finally, the third sub-factor asks whether, and to what extent, the defendant's use is "transformative."  A transformative use is substantially different from the original work in terms of its purpose, meaning, or effect.  As the Supreme Court has noted, it does not merely supersede the original work, but instead has new features and brings new value.  Campbell, 510 U.S. at

579.  In a seminal law review article, Judge Leval explained that in order for a use to be considered transformative, it "must be productive and must employ the quoted matter in a different manner or for a different purpose than the original."  Hon. Pierre N. Leval, <u>Toward a Fair Use Standard</u>, 103 HARV. L. REV. 1105, 1111 (1990).  If "the secondary use adds value to the original—if [the original work's protected expression] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."  <u>Id.</u>  Examples of transformative works are those that criticize the quoted work, expose the character of the original author, prove a fact, or summarize an idea from the original work in order to defend or rebut that idea.  <u>Id.</u>  If the defendant's work "merely repackages or republishes the original," however, it is unlikely to be considered transformative or qualify as a fair use.  103 HARV. L. REV. at 1111.  This is because there is little reason to excuse infringement if the only payoff to society is another work that is largely indistinguishable from the original.  Moreover, the law is clear that there are degrees of transformation, and even a transformative use can still be unfair if its transformative nature is outweighed by other factors.  <u>See</u> <u>Salinger v. Colting</u>, 641 F. Supp. 2d 250, 257-58 (S.D.N.Y. 2009), <u>rem. and vac. on other grnds.</u>, 607 F.3d 68 (2d Cir. 2010); <u>Warner Bros. Entm't Inc. v. RDR Books</u>, 575 F. Supp. 2d 513, 551 (S.D.N.Y. 2008).

On the issue of transformativeness, the Second Circuit's decision in <u>Rogers</u> is again instructive.  After noting "Koons' [sic] substantial profit from his intentionally exploitive use of Rogers' [sic] work . . . militates against the finding of fair use," the Court there considered whether Koons's work "is properly considered a comment on or criticism of the photograph." 960 F.2d at 309.  Koons had argued that his work was "a fair social criticism" and that he belonged to an American artistic tradition that incorporated mass-produced images into artistic

works in order to comment on both the incorporated object and the political and economic

system that produced it.  Id.  The Second Circuit found, however, that even if it accepted that

Koons's sculpture was a kind of satirical critique of materialistic society, it was "difficult to

discern any parody of the photograph 'Puppies' itself," and rejected Koons's argument that his

sculpture was transformative of the original photograph.  Id. at 310.  Here, Obey Clothing's use

is likewise not transformative.

Here, it is clear that Obey Clothing did not even attempt to transform the Obama Photo—

it simply reproduced the derivative Obama Image on hundreds of thousands of units of apparel

that it manufactured, distributed and sold.  Obey Clothing added nothing of its own – no

commentary, expression, meaning or message, that could possibly be considered transformative.

Indeed, even the creator of the Obama Image, Mr. Fairey, has admitted that he was not even

trying to comment on the Obama Photo in making the Obama Image.  (AP SUF ¶ 118 (S. Fairey

Dep. (Mar. 17, 2010) 566:1-5 ("*Q: But you weren't trying to parody or comment on the*

*reference photo itself, right?  A: That's correct*.").)  Thus, neither Obey Clothing nor Mr. Fairey

did anything that could be considered transformative.  See Rogers, 960 F.2d at 310-11; see also

J.D. Salinger, 641 F. Supp. 2d at 257-58 (concluding that although defendant's work had some

transformative value, it did not sufficiently comment on Salinger's *Catcher in the Rye*).

To the extent Obey Clothing attempts to argue that its use of the Obama Image was

somehow transformative because it was used for a different purpose than the original

photograph, that argument must also fail.  First, Mannie Garcia, the AP staff photographer who

made the Obama Photo, explicitly testified that he intended to make a "portrait" that would

"capture the essence of Senator Obama."  (AP SUF ¶¶ 83-89.)  Indeed, the parties' experts agree

that the AP's staff photographer, Mannie Garcia, applied significant creative skill and judgment

49

in making a portrait of Mr. Obama that portrayed Mr. Obama in an inspiring manner, conveying qualities of leadership, intelligence and vision.  (AP SUF ¶¶ 79-82.)  And Mr. Fairey repeatedly admitted that he chose the Obama Photo because it portrayed Mr. Obama as "presidential" and "gazing off in to the future, saying 'I can guide you.'"  (AP SUF ¶¶ 94-95.)  In essence, the AP made the Obama Photo as an inspiring, flattering image of Mr. Obama that Mr. Fairey, who created the Obama Image, later used to make an inspiring, flattering image of Mr. Obama.  The Second Circuit made clear in <u>Blanch</u> that that this type of use is not transformative, expressly noting that "[w]e have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work."  467 F.3d at 252.

As for Obey Clothing, it did nothing to transform anything, contributing no artistic or creative expression.  All that Obey Clothing did was to urge Mr. Fairey to allow it to put the Obama Image on clothing and apparel, in an effort to capitalize on the Obama Image's popularity.  (<u>See</u> AP SUF ¶¶ 137-45.)  There was nothing transformative about its use.  <u>See</u>, <u>e.g.</u>, <u>Ringgold v. Black Entm't. Television, Inc.</u>, 126 F.3d 70, 79 (2d Cir. 1997) (finding that the first factor weighed against fair use where defendants' used plaintiff's "story quilt" for its central, decorative purpose by using it as part of television program's set decoration); <u>Schiffer Publ'g, Ltd. v. Chronicle Books, LLC</u>, No. Civ. A. 03-4962, 2004 WL 2583817, at *11-12 (E.D. Pa. Nov. 12, 2004) (finding no fair use where the defendants used plaintiffs' photos of fabrics in a book about fabric patterns, which "merely supersedes the objects of the original").

Second, the AP's purposes in making the Obama Photograph included making it available for licensing by customers for myriad different forms and products.  Indeed, Mr. Garcia also testified that he created his portrait of Mr. Obama knowing that it would be made available for licensing through the AP Images archive.  (AP SUF ¶ 89.)  In making, selling and

distributing merchandise using the Obama Image, Obey Clothing was doing nothing more than what AP intended its customers to do — use the photo to make other works — albeit without bothering to credit either Mr. Garcia or the AP for the original photo or pay for its use.  See Ty, 333 F. Supp. 2d at 712-13 (finding that publisher's use was not transformative where it used plaintiff's photographs of its toys in licensed books and magazines, where they served the same aesthetic, decorative purpose that plaintiff intended in making the photos).  This is emphatically not transformative.

Third, even if Obey Clothing could show that it was pursuing a different purpose from the AP in using the Obama Photo, which it cannot, the Second Circuit has recognized that a "difference in purpose is not quite the same thing as transformation."  Infinity. Broadcast Corp. v. Kirkwood, 150 F.3d 104, 108-09 (2d Cir. 1998) (finding no fair use where retransmission of radio broadcasts, although arguably done for a different purpose from original transmission (information rather than entertainment), offered no new expression, meaning or message). Because the Obama Image conveyed the same expression, meaning and message as the Obama Photo — that Mr. Obama was an intelligent and visionary leader who could be president — it cannot be considered transformative.  Id.; see also Gaylord v. United States, 595 F.3d 1364, 1373-74 (Fed. Cir. 2010) (rejecting fair use where photo of copyrighted Korean War memorial sculpture that was used on postage stamp did not transform the sculpture despite adding snow and muting color, where "these alterations do not impart a different character to the work"); Reyes v. Wyeth Pharma., Inc., 603 F. Supp. 2d 289, 297 (D.P.R. 2009) (finding that use of sculpture in ad for arthritis drug was only somewhat transformative, and not fair use, despite addition of text regarding treatment options because "this additional text does not completely

change the character of the sculpture which is still presented to the viewer as a creative work of art").

Fourth, it should not be forgotten that even transformative uses may not be fair uses. See, e.g., Warner Bros., 575 F. Supp. 2d at 551 (determining that though defendant's "lexicon" of the *Harry Potter* series had some transformative value, it was not consistently transformative, which weighed against fair use in granting injunction to plaintiff on copyright infringement claims); Video-Cinema Films, Inc. v. The Lloyd E. Riggler-Lawrence E. Deutch Foundation, No. 04 Civ. 5332, 2005 U.S. Dist. LEXIS 26302, at * 32-33 (S.D.N.Y. Nov. 2, 2005) (finding no fair use even though defendant's use of plaintiff's copyrighted films was limited and had a transformative purpose where use was likely to adversely affect the market for licensing of plaintiff's film clips).  For example, no one would argue that a motion picture based on a book, which is clearly transformative of the book, is a fair use — yet movies are widely recognized as derivative works that must be licensed.  Where courts have found that a transformative use warrants a finding of fair use, they have typically done so in the context of parodies, commentaries, educational uses, news reporting, or some other purpose that likely could not have been achieved if the defendant were required to seek a license.  Where the defendant's purpose could have just as easily been achieved by licensing the original work, however, courts have rejected fair use.  See, e.g., Video-Cinema, 2005 U.S. Dist. LEXIS at *32-33 (finding no fair use where defendant could have licensed film clips).

Finally, even if the Court were to accept, *arguendo*, that the work was transformative to some degree, which it was not, it still begs the question of whether it is sufficiently transformative in ways that could not have been as easily achieved absent the infringement.  The only possible answer to that question is "no."  The AP maintained an entire licensing program

whose whole purpose was to license photos for uses just like Obey Clothing's use (see AP SUF

¶¶ 10-18) — a program that Obey Clothing was well aware of from its collaborations over the

years with Mr. Fairey, including on the Palestinian Woman image.  (AP SUF ¶¶ 70-71.)  Given

the existence of the AP Images photo-archive business, Obey Clothing could have easily licensed

the Obama Photo, such that there was no need, or justification, for its unauthorized,

uncompensated use of that photo in producing, distributing and selling the Obama Merchandise.

<h4 align="center">2.  <u>The Second Factor Favors The AP Because The Obama Photo Is A<br>Creative Work</u></h4>

The second fair-use factor favors The AP because the Obama Photo was the result of

"[s]ubstantial creative effort."  <u>See</u> <u>Rogers</u>, 960 F.2d at 304.  The second factor looks to "the

nature of the work that has been copied," 17 U.S.C. § 107(2), with creative expression

considered closer to the core interests protected by copyright than works based on facts,  see

Rogers, 960 F.2d at 310.  As judges of this District and scholarly commentators have observed,

this factor distinguishes creative works from "compilations or scholarly publications that are

expected to be freely excerpted as a matter of custom and used in future publications."  <u>Wade</u>

<u>Williams Distrib., Inc. v. American Broad. Co., Inc.</u>, No. 00 Civ. 5002(LMM), 2005 WL

774275, at *10 (S.D.N.Y. Apr. 5, 2005) (citing NIMMER, supra, § 13.05[A][2][a]).

In this case, AP staffer Mannie Garcia made numerous critical creative choices with

respect to what to include in the Obama Photo (<u>i.e.</u>, whether to include all three speakers at the

NPC press conference or only then-Senator Obama), which lens to use, the depth of field, the

moment in time when he made the photograph, and his positioning relative to Mr. Obama.  (AP

SUF ¶¶ 85-87.)  Mr. Garcia made creative decisions about the composition of the Obama Photo.

(AP SUF ¶ 87  ("With regard to the composition . . . I'm waiting on the subject to give me an

expression, and then I lowered myself so that it would appear as if I'm looking up, I'm looking

53

up to the subject so the subject looks as if they're looking out.").)  He also decided what

equipment to use to make the Obama Photo.  (AP SUF ¶ 86 (". . . , I was able to take off a piece

of glass and put on another one that suited the purpose for what I wanted.").)

> Mr. Garcia has described, in part, his process in making the Obama Photo:

> *I looked up and I saw, I saw a nice image, and it was — but I was — I had to get myself over, because the background was so — I didn't like the background.  Part of the flag was in it and part of the wall paper was in it, and I, I saw something.  I just had to move my way over, and I did move my way over to the right a little bit.  I changed the lens. I kept looking for an angle.  I had made a couple of shots . . . and then all of a sudden it just happened.  It was there.  He moved himself.  I moved myself into position.  I waited for the eyes and then made it.*

(AP SUF ¶ 84.)  The moment in time that Mr. Garcia selected for making the Obama Photo was

his creative decision.  (AP SUF ¶ 85.)  As Mr. Garcia described, he waited for the precise

moment when Mr. Obama's gaze was in just the right direction, and at the right angle.  In so

doing, Mr. Garcia was able to depict Mr. Obama in a forward-looking, visionary manner.

> The result was a photograph that Mr. Fairey himself acknowledged was a "strong

portrait," (AP SUF ¶ 97), with the qualities that were important for his use of the Obama Photo,

(see, e.g., AP SUF ¶¶ 94-95) ("wise, but not intimidating"); ("having some sort of wisdom . . .

that was really what struck me about the photo'") .  Indeed, even Fairey's own expert, Professor

Sturken, agrees that Mr. Garcia used numerous classical portraiture techniques in making the

Obama Photo, with the Senator gazing out into the horizon, in a three-quarters pose, from a

vantage below the Senator's line of vision.  (AP SUF ¶¶ 80-82.)

> Nor can Obey Clothing avoid summary judgment by arguing that Mr. Garcia's portrait

was merely "factual," and somehow less creative than its use of the photograph.  As a legal

matter, the Second Circuit dismissed that sort of arrogance in Rogers, rejecting the defendant's

argument that the photograph in that case lacked original expression.  See Rogers, 960 F.2d at

306–07; see also Sarl Louis Feraud Int'l v. Viewfinder Inc., 627 F. Supp. 2d 123, 128 (S.D.N.Y. 2008) ("[T]he notion that photographs merely reproduce reality, and do not apply a creative, or even distorting, eye to the events is long discredited.").  Indeed, by selecting the Obama Photo rather than another of the approximately 200 photos that he considered (AP SUF ¶ 96), Mr. Fairey himself recognized that the Obama Photo captured Mr. Obama's likeness in a way that no other photo did.  See Images Audio Visual, 91 F. Supp. 2d at 1085 (finding second fair use factor weighed against fair use where defendant copied aerial photographs for use in arbitration proceeding).  And the four photographs that Mr. Fairey considered, but did not use, all would have required him to make substantial changes to the images, which he did not have to make with the Obama Photo.  (See AP SUF ¶ 99-105.)

Moreover, it should not be forgotten that the Obama Photo is not merely a news photo that conveyed the news of the day.  As Fairey's expert admits, the portrait does not report on the 2006 press conference on Darfur attended by George Clooney and then-Senator Obama.  (AP SUF ¶ 90.)  Rather, it is a stand-alone, prescient portrait of then-Senator Obama, reflecting the creative choices of its photographer.  As such, the Obama Photo is an expressive work that is within core of copyright's protections.  See Rogers, 960 F.2d at 310.

### 3. The Third Factor Favors The AP Because The Obama Image Copied The Obama Photo Almost Verbatim

The third fair use factor considers the amount and substantiality of portion of the original that the defendant used, i.e., "what degree of the essence of the original is copied in relation to its whole."  Rogers, 960 F.2d at 311.  The extent of the copying often is a good proxy for the harm to the plaintiff.  That said, even copying a small amount from a work can still be problematic if the copied portion turns out to be "essentially the heart" of the work.  Harper & Row, 471 U.S. at 565-66; see also Infinity Broadcast, 150 F.3d at 109 (finding that third factor favored plaintiff as

even societal benefit in making radio transmissions available to the public did not justify copying the entirety of those broadcasts).  In general, the greater the taking, quantitatively and qualitatively, the less likely the use was fair.

Rogers found that this factor weighed strongly against Koons precisely because he copied the photo at issue there "nearly *in toto,*" going beyond the amount of taking that might have been appropriate even for a parody whose whole object was the original work and copying "the essence of the photograph."  Rogers, F.2d at 311; see also United Feature, 817 F. Supp. at 381 (finding that no reasonable fact finder could conclude that Koons did not exceed a permissible level of copying by taking plaintiff's copyrighted character "virtually in its entirety").  The same is true here, where Obey Clothing copied the entire photo without even cropping it — a full-frame, wholesale taking that copied all of the key aspects of the Obama Photo, including Mr. Obama's expression, demeanor, pose, angle, the patriotic flag motif that was used to derive the colors on the Obama Image, even the tiny but crucial highlights (the so-called "twinkles") in Senator Obama's eyes that animate his gaze (AP SUF ¶ 116 (L. Dahlberg Dep. (Dec. 10, 2010) 101:4-23).  It also copied all of the characteristics that helped make the Obama Photo a compelling political portrait, including, as identified by Fairey's expert, Prof. Sturken, the three-quarters pose, gaze toward the horizon, and the view from below (AP SUF ¶¶ 108-10 (M. Sturken Dep. (Nov. 24, 2010) 50:25-53:6, 58:3-61:13, 62:3-62:13), as well as copying the size, cropping, framing, lighting, and focus of the Obama Photo almost verbatim. (AP SUF ¶¶ 114-117.)

56

Given Obey Clothing's almost verbatim taking, including all of the qualities that make the Obama Photo special, the third fair use factor, measuring the amount of the copyrighted work taken, clearly weighs conclusively against fair use.[8]

4.      **The Fourth Fair Use Factor Favors The AP Because Obey Clothing's Use Of The Obama Image Harms The AP**

The fourth factor of the fair-use inquiry—which focuses upon "the effect of the use on the potential market or value of the copyrighted work," 17 U.S.C. § 107(4)—also favors the AP.

In analyzing the fourth factor, courts consider (i) harm to the market for the original work, (ii) harm to the market for derivative works based on the original work, and (iii) harm to the copyright owner were the challenged use to become widespread.  See Campbell v. Acuff-Rose Music, Inc., 510 U.S. at 590  (noting that fourth fair use factor requires consideration of impact if conduct such as the defendant's were unrestricted and widespread); Harper & Row, 471 U.S. at 568 ("one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work."); Princeton Univ. Press v. Mich. Doc. Serv., 99 F.3d 1381, 1386-87 (6th Cir. 1996); Twin Peaks Prods., Inc. v. Publ's Int'l, Ltd., 996 F.2d 1366, 1377 (2d Cir. 1993) (courts must consider "not only the primary market for the copyrighted work, but the current and potential market for derivative works"); Warner Bros., 575 F. Supp. 2d at 549 ; Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007).  All three types of harm are present here.  Although all of the fair use factors favor the

---

[8] The comprehensive nature of the copying of the Obama Photo can be seen by comparing the extent of that copying with what would have been necessary had the Clooney Photo instead been used as the source image for the Obama Image.  As shown above at page 25, supra, the Clooney Photo had a much wider focus than the Obama Photo, depicting then-Senator Obama and Mr. Clooney with their upper bodies visible, sitting at a table at the NPC press conference.  (See AP SUF ¶ 129.)  Had Mr. Fairey in fact used the Clooney Photo, as he falsely represented, the portion of the photo that he took would have been a smaller part of that photo, and arguably not the most important part — i.e., not the part with Mr. Clooney in it.  By contrast, the true source image, the Obama Photo, was copied in its entirety.  (See AP SUF ¶ 114.)

AP, factor four is so compelling that it alone is sufficient to support the conclusion that Obey

Clothing's unauthorized use of the Obama Photo was not a fair use.

First, there is, there is no doubt that Obey Clothing's unauthorized use of the Obama

Image on hundreds of thousands of units of apparel and posters, generating millions of dollars in

revenue, directly harmed the market for the Obama Photo by depriving it of the royalty fee that it

should have received from Obey Clothing for that use.[9]  See Davis v. The Gap, Inc., 246 F.3d

152 (2d Cir. 2001) (finding that fourth factor weighed against fair use where Gap took plaintiff's

copyrighted eyewear for its ads, depriving plaintiff of licensing revenue that plaintiff would have

paid as well as impairing plaintiff's ability to license eyewear to others).[10]

Second, Obey Clothing also cannot dispute that its use of the Obama Image supplanted

the market for licensing the Obama Photo for derivative works on just this type of merchandise.

See Harper, 471 U.S. at 568 ("[w]ith certain exceptions … a use that supplants any part of the

normal market for a copyrighted work would ordinarily be considered an infringement.");

Infinity Broadcast, 150 F.3d at 111(finding that the fourth factor weighed against fair use where

defendant's use supplanted plaintiff in a market it already occupied, which was "precisely the

kind of harm the fourth factor aims to prevent").  Indeed, Obey Clothing itself has sold apparel

---

[9] Had Mr. Fairey or Obey Clothing approached the AP for a license before this lawsuit was filed, the AP would have willingly licensed their use of the Obama Photo.  (Degrave Decl. ¶ 14.)

[10] The AP's economics and market harm expert, Prof. William Landes, Ph.D., from the University of Chicago, explained in his deposition that because licensing for the types of uses done by Fairey and Obey Clothing were expected revenue streams for AP Images, AP was significantly harmed by Fairey's and Obey Clothing's use.

> I think an additional consideration, which clearly is relevant in deciding whether licensing fees should be considered as part of the harm is whether, in fact, licensing is feasible, right.  If you're an organization [like the AP] where the revenue primarily comes from licensing uses of your copyrighted images and you have an organization in place that facilitates that licensing, it's clear that the harm to you is, in fact, you would [received a license for] this work.

 (AP SUF ¶ 164.)

bearing Fairey's Palestinian Woman image pursuant to a license that Obey Clothing received from the AP for those products.  (See AP SUF ¶ 70.)  Similarly, the AP licensed photographs of President Obama for commercial use on a tote bag and apparel, and for many other purposes. (See AP SUF ¶¶ 13-18).

The law is clear that harm to the market for derivative works is also actionable harm.  See Twin Peaks, 996 F.2d at 1377 (rejecting fair use defense where book about plaintiff's television series might interfere with the primary market for the copyrighted work and "almost certainly interferes with legitimate markets for derivative works"); Paramount Pictures Corp. v. Carol Publ'g Group, 11 F. Supp. 2d 329, 336 (S.D.N.Y. 1998) (fourth factor favored plaintiff where defendant's purported guide to Star Trek was a potential substitute for plaintiff's own licensed derivative works); United Feature, 817 F. Supp. at 382 (noting that "variations in the medium in which the copy is made do not, in any way, diminish the copyright owner's ability to protect potential markets" and finding "no question" that if Koons' use became widespread, it would prejudice plaintiff's potential market for derivative works based on its cartoon character); Roy Export, 503 F. Supp. at 1146 ("The value of the right to . . . make a derivative work, which the copyright owner may sell or himself exercise, would certainly seem to be diminished by the ability of another to use the copyrighted work in order to compete at will with the derivative work.").

As explained above, supra at pages 9-10, the AP routinely licenses its photos, including photos of Mr. Obama, for use in derivative works.  Here, however, the Obama Photo was used in a derivative work without credit or compensation.  As a result, the Obama Photo has become unsuitable for use by others in similar derivative works because it is too closely associated with Mr. Fairey and Obey Clothing, who have appropriated it for themselves.  (See AP SUF ¶ 167

(citing Professor William Landes for principle that the derivative market for AP's photo was significantly harmed).)   That close association with Mr. Fairey and Obey Clothing would not be problematic if the AP had consented to the use and been compensated for it, but such was not the case.  In effect, Obey Clothing's unlicensed use of the Obama Image deprives the AP of "the intrinsic value of the right to control the content of the copyrighted work which is the essence of copyright."  Clean Flicks of Colorado, LLC v. Soderbergh, 433 F. Supp. 2d 1236, 1241-42 (D. Colo. 2006) (finding no fair use and rejecting defendants' argument that movie studios actually benefitted from unauthorized editing of films to remove sex and violence where defendants purchased a single copy and sold edited version to customers who would not have purchased original films absent editing).

Third, there was additional harm here due to the unique facts of this case, including Mr. Fairey's concealment of the fact that the true source image was an AP photo and the total failure of both Fairey and Obey Clothing to credit the AP as the owner of the source image.  (AP SUF ¶ 165 (AP photo industry expert Blake Sell testified that: "Shepard Fairey said publicly that basically, you know, you need to license pictures, and he's got a federal case here where he's trying to defend his not needing to license a picture.  So the longer this continues, the more publicity he gets, it continues to be a perception that perhaps you don't need to license pictures from The Associated Press.").)  In 2008, when Mr. Fairey first made the Obama Image and Obey Clothing began selling the Obama Merchandise, the Obama Image was a very hot property, with both it and Mr. Fairey attracting widespread public attention.  (AP SUF ¶ 166.)  Had it been known at that time that the AP was the owner of the source image for the Obama Image, more people might have become familiar with the AP's AP Images business and sought to license photos from the AP, including the Obama Photo.  (Id.)  The AP was deprived of this opportunity,

however, as a result of the actions of Fairey and Obey Clothing in failing to credit the AP as the owner of the source image or attribute the image to the AP.

While the harms discussed above would alone be sufficient to justify a finding of no fair use, there is also the fact that it is hard to imagine a more compelling case for a finding that the defendant's actions, if they became widespread, would have serious consequences for the copyright owner.  As discussed above, supra pages 7-8, the revenue from AP Images is crucial for funding the AP's ongoing news-related activities.  (AP SUF ¶¶ 8-9.)  The AP has invested significant amounts of money and other resources in developing the AP Images business as an alternative source of revenue in order to make up for the declines in member contributions.  (Id.) If this Court were to find that taking an AP photo and using it on t-shirts and other merchandise, as Obey Clothing has done, without permission and without paying the customary price for such use, it would undermine the AP's entire business model.  See Harper & Row, 471 U.S. at 568; Ringgold, 126 F.3d at 81 (finding that defendants' conduct in using plaintiff's work for its intended purpose without compensation, if widespread, would adversely impact the market for licensing plaintiff's work); cf. Gilliam v. American Broad. Cos., 538 F.2d 14, 23 (2d Cir. 1976) (noting that copyright law should be used to encourage the production and dissemination of new creative works by providing "adequate legal protection for one who submits his work to the public").  In fact, Mr. Fairey's public comments about this suit, including his public assertions that he did not need to license the Obama Photo, have already cause harm to the AP, prompting customers to question whether perhaps they also do not need a license.  (AP SUF ¶ 166.)

In a broader sense, a finding of fair use in this case would undermine the system of Constitutionally-mandated incentives that copyright law is designed to protect.  Under Article I, Section 8 of the Constitution, Congress is authorized "[t]o promote the Progress of Science and

useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  The purpose is "to motivate the creative activity of authors and inventors by [providing] a special reward," Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984), and to ensure "contributors to the store of knowledge a fair return for their labors."  Harper & Row., 471 U.S. at 546.  (AP SUF ¶ 168 (AP's economics expert, Prof. William Landes, Ph.D., explained:  "[T]o the extent that people could use an AP image in T-shirts, posters, calendars and so forth without paying, and particularly if they took images that were particularly desirable, so that is a limit number of AP images, that could significantly reduce the licensing revenues AP would get and therefore reduce the incentive to maintain and continue to invest in developing the database and hiring photographers and so forth.").)  The 1976 Copyright Act was implemented to achieve these goals.  It grants copyright owners the *exclusive* right to, among other things, reproduce their work, prepare derivative works based on it, and distribute copies of it.  17 U.S.C. § 106.  In the case of the AP, copyright law's system of incentives has worked exactly as intended.

In order to offset the declines in its traditional newsgathering business, the AP developed AP Images with the express goal of increasing its photo licensing business.  (AP SUF ¶¶ 8-9.)  As part of that process, the AP took numerous steps to ensure the creation of more content that could be made available for licensing through AP Images.  (AP SUF ¶¶ 21-22, 25-28.)  Thus, the AP now saves photos in its archive, at great expense, that once would have been discarded, and trains its photographers to go beyond documenting the news of the day and actively seek out opportunities to create additional images suitable for licensing by AP Images.  (AP SUF ¶¶ 25-26.)  In addition, the AP also has reorganized its business and hired new employees.  (AP SUF ¶ 22.)  All of these steps have required a very significant investment by the AP.  (AP SUF ¶¶ 23,

29.)  Moreover, because the AP cannot know beforehand which images will generate substantial revenues, those images that are successful are very important because they help to fund the entire business.  (AP SUF ¶ 20.)  If the AP were now told that an entity such as Obey Clothing could use the AP's images without permission or compensation, it would undermine the AP's incentive to invest in creating and preserving a large number of images and developing effective ways of making them available to potential users.  (See AP SUF ¶ 168.)

The result would be a decrease in the breadth and variety of the images that the AP makes available to the public — a loss not only for The AP but also for the many individuals and entities who rely on The AP to provide images that they cannot themselves directly make or acquire.  Notably, one of those most affected in such a situation would be Mr. Fairey himself, who has frequently used the AP's images in his own works (AP SUF ¶¶ 70-74), and has acknowledged his potentially "symbiotic relationship" with content-providers like the AP.  (AP SUF ¶ 171.)  Likewise, Obey Clothing, as the merchandiser of Mr. Fairey's work, would be similarly disadvantaged, given its dependence on Mr. Fairey for images to use on its apparel.  Nevertheless, Obey Clothing and Fairey have argued for a misguided view of copyright law, one that would only serve to impair the incentives for the AP and others to create the very images on which Obey Clothing and Mr. Fairey rely.  This Court can prevent this outcome, however, by finding, as the undisputed facts and clearly applicable case law demonstrate, that this is not a case of fair use.

\*       \*       \*

When considered in light of the policies and incentives on which copyright law is based, it is clear that all four of the statutory fair use factors favor AP.  See, e.g., Castle Rock, 150 F.3d at 141 ("[T]he four listed statutory factors in § 107 guide but do not control our fair use analysis and are to be explored, and the results weighed together, in light of the purpose of copyright.")

63

(citations and quotations omitted).  At bottom, the simple fact is that Obey Clothing knew very well that it should get the permission of the source image's owner, but it proceeded anyway in order to make money.  It was a "cost of doing business," one they had budgeted for and against which they had indemnified Mr. Fairey.  (AP SUF ¶ 60.)  Obey Clothing chose to roll the dice and take a chance that the owner of the source image for the Obama Image would never find out about its infringing use.  Unfortunately for Obey Clothing, it lost that bet.  On the record presented here, because there was no reason for Obey Clothing not to seek a license for its use of the derivative Obama Image, other than its own desire to avoid "paying the customary price," see Harper & Row Publ'r, Inc., 471 U.S. at 562, Obey Clothing cannot meet its burden of establishing an affirmative defense to copyright infringement based on the fair use exception to copyright protection.  The Court should find that its use was anything but fair.

## <u>CONCLUSION</u>

Because the AP owns a valid copyright in the Obama Photo and Obey Clothing's conduct in producing, selling and distributing the Obama Merchandise violated the AP's exclusive rights to copy and distribute its work and to prepare derivative works based on it, and because Obey Clothing's use of the Obama Photo was not a fair use, this Court should grant the AP's motion and find that Obey Clothing is liable for infringing the AP's copyright in the Obama Photo.

Date: January 6, 2011                           Respectfully submitted,

/s/ Dale M. Cendali
Dale M. Cendali
Claudia Ray
Brendan T. Kehoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: 212-446-4800
Fax: 212-446-4900

Michael F. Williams
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC  20005
Tel: (202) 879-5000
Fax: (202) 879-5200

Attorneys for Plaintiff/Counterclaim
Defendant
*THE ASSOCIATED PRESS*

*Of counsel:*
Prof. Douglas Lichtman
UCLA Law School