Dale M. Cendali
Claudia Ray
Brendan T. Kehoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
Fax: (212) 446-4900

Michael F. Williams
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC  20005
Tel: (202) 879-5000
Fax: (202) 879-5200

*Attorneys for the Associated Press*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHEPARD FAIREY and OBEY GIANT ART, INC., | |
|         Plaintiffs, | Case No.:   09-CV-01123 (AKH) |
|     v. | ECF Case |
| THE ASSOCIATED PRESS, | |
|         Defendant/Counterclaim Plaintiff, | **REPLY MEMORANDUM OF LAW IN SUPPORT OF THE ASSOCIATED PRESS'S MOTION FOR SUMMARY JUDGMENT AGAINST ONE 3 TWO, INC. (d/b/a OBEY CLOTHING)** |
|     v. | |
| SHEPARD FAIREY, et al., | |
|         Counterclaim Defendants, | |
| And | |
| MANNIE GARCIA, | **CONFIDENTIAL** |
|         Defendant, Counterclaim Plaintiff & Cross Claim Plaintiff/Defendant, | **FILED UNDER SEAL** |
|     v. | **PUBLIC COPY** |
| SHEPARD FAIREY and OBEY GIANT ART, INC., | |
|         Counterclaim Defendants, | |
| And | |
| THE ASSOCIATED PRESS, | |
|         Cross Claim Plaintiff/Defendant. | |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

REPLY STATEMENT OF FACTS .......................................................................3

    A.    The AP's Established Licensing Business ............................................4

    B.    The Obama Photo is a Creative Work ................................................7

    C.    Shepard Fairey Copied the Obama Photo's Expressive Qualities Nearly Verbatim to Make the Obama Image ........................................9

    D.    Fairey and Obey Clothing Did Not Intend To Comment On The Obama Photo ................................................................................12

    E.    Obey Clothing Exploited the Obama Photo Knowing That It Was Unlicensed ............................................................................13

    F.    Obey Clothing's Unlicensed Use of the Obama Photo Harmed the Associated Press ......................................................................15

ARGUMENT ..........................................................................................................16

    I.    LEGAL STANDARD ................................................................14

    II.    THE UNDISPUTED FACTS SHOW THAT THE OBAMA IMAGE IS SUBSTANTIALLY SIMILAR TO THE OBAMA PHOTO. ................................15

        A.    The AP Correctly Applies the Ordinary Observer Test............................17

            1.    Obey Clothing Improperly Tries To Limit Copyright Protection For Photographs ............................................19

            2.    Mr. Garcia Used Significant Creative Skill And Judgment In Making The Obama Photo............................20

            3.    Fairey Copied The Obama Photo's Creative Expression. .............23

            4.    The Cases On Which Obey Clothing Relies Are Irrelevant. .........23

    III.    THE AP IS ENTITLED TO A DECISION OF NO FAIR USE AS A MATTER OF LAW BASED ON THE UNDISPUTED FACTS........................27

        A.    Factor One Favors The AP In Light Of Obey Clothing's Commercial, Rather Than Transformative, Purpose and Its Bad Faith Intent In Selling The Image. ..........................................29

            1.    Obey Clothing's Use of the Obama Photo by Distributing the Obama Image Was Neither Transformative Nor "Political Expression". ................................................30

            2.    Obey Clothing's Use of the Obama Image Was Clearly Commercial.....................................................36

            3.    Obey Clothing's Bad Faith Intent in Distributing the Obama Image. ..................................................38

i

B.   Under Factor Two, Even Mr. Fairey and His Expert Admitted that the Obama Image is a "Strong Portrait". ....................................................40

C.   Under Factor Three, Obey Clothing Took All of the Obama Image and Certainly Took the "Heart" of It ..........................................42

D.   Factor Four Weighs Heavily in Favor of the AP .......................................45

1.   Obey Clothing Cannot Dispute that Its Unlicensed Use Harmed the Market for the Obama Photo, as the Original Work. ............................................................................................46

2.   Obey Clothing Cannot Dispute that Its Unlicensed Use Harmed the Derivative Markets for the Obama Photo. .................48

3.   If Widespread, Unlicensed Uses Such as Obey Clothing's Would Cause  Significant Harm. ...................................................50

IV.   THE FIRST AMENDMENT DOES NOT PROTECT OBEY CLOTHING'S COPYRIGHT INFRINGEMENT.................................................53

V.   CONCLUSION......................................................................................................56

# TABLE OF AUTHORITIES

## Cases

American Geophysical Union v. Texaco, Inc.,
    60 F.3d 913 (2d. Cir. 1994)......................................................................... 46, 47

Apple Computer, Inc. v. Microsoft Corp.,
    35 F.3d 1435 (9th Cir. 1994). ....................................................................... 27

Bill Diodato Photography, LLC v. Kate Spade, LLC,
    388 F. Supp. 2d 382 (S.D.N.Y. 2005)............................................................ 24

Bill Graham Archives v. Dorling Kindersley, Ltd.,
    448 F.2d 605 (2d Cir. 2006)................................................................... *passim*

Blanch v. Koons,
    467 F.3d 244 (2d Cir. 2006)..................................................... 2, 30, 32, 36

Branch v. Ogilvy & Mather, Inc.,
    765 F. Supp. 819 (S.D.N.Y. 1990)................................................................ 15

Burrow-Giles Lithographic Co. v. Sarony,
    111 U.S. 53 (1884)........................................................................................ 19

Campbell v. Koons,
    Civ. No. 90 6055 (RO), 1993 WL 97381 (S.D.N.Y. April 1, 1993) ...................... *passim*

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)...................................................................................... 16

Commercial Data Servers, Inc. v. IBM Corp.,
    262 F.Supp.2d 50 (S.D.N.Y. 2003)............................................................ 3, 4

Crown Awards, Inc. v. Discount Trophy & Co., Inc.,
    326 Fed. Appx. 575 (2d Cir. 2009)........................................................ 18, 23

Danstan Properties v. Merex Corp.,
    Civ. No. 09 6137 (RMB) (RLE), 2011 WL 135843 (S.D.N.Y. Jan. 7, 2011) .................. 3

Davis v. The Gap, Inc.,
    246 F.3d 152 (2d Cir. 2001)......................................................................... 46

Eastern Am. Trio Prods., Inc. v. Tang Elec. Corp.,
    97 F. Supp. 2d 395 (S.D.N.Y. 2000)............................................................. 22

Eldred v. Ashcroft,
    537 U.S. 186 (2003)............................................................................... 32, 54

Feist Publ'n, Inc. v. Rural Tel. Serv. Co.,
    499 U.S. 340 (1991)......................................................................... 9

Fitzgerald v. CBS Broadcasting, Inc.,
    491 F. Supp. 2d 177 (D. Mass. 2007) ............................................. 52

Gaste v. Kaiserman,
    863 F.2d 1061 (2d Cir. 1988)......................................................... 15

Gaylord v. United States,
    595 F.3d 1364 (Fed. Cir. 2010)................................................. 31, 45

Gilliam v. American Broad. Cos.,
    538 F.2d 14 (2d Cir. 1976)............................................................. 51

Harlen Assocs. v. Inc. Village of Mineola,
    273 F.3d 494 (2d Cir. 2001)........................................................... 15

Harper & Row, Publ'g, Inc. v. Nation Enterprises,
    471 U.S. 539 (1985)............................................................... *passim*

Henley v. DeVore,
    F.Supp.2d, 2010 WL 3304211 (C.D. Cal. June 10, 2010.)......... *passim*

Ideal Toy Corp. v. Fab-Lu Ltd.,
    360 F.2d 1021 (2d Cir. 1966)................................................... 16, 17

Images Audio Visual Prods., Inc. v. Perini Bldg. Co.,
    91 F. Supp. 2d 1075 (E.D. Mich. 2000).......................................... 42

Infinity Broadcast Corp. v. Kirkwood,
    150 F.3d 104 (2d Cir. 1998)............................................... 27, 31, 43

J.D. Salinger v. Colting,
    641 F. Supp. 2d 250 (S.D.N.Y. 2009).............................................. 32

Kaplan v. The Stock Market Photo Agency, Inc.,
    133 F. Supp. 2d 317 (S.D.N.Y.2001)......................................... 20, 24

Kelly v. Arriba Soft Corp.,
    336 F.3d 811 (9th Cir.2003) ...................................................... 30, 43

Kerr v. The New Yorker Magazine,
    63 F. Supp. 2d 320 (S.D.N.Y.1999)................................................. 25

Lennon v. Premise Media Corp.,
    556 F. Supp. 2d 310 (S.D.N.Y. 2008)......................................... 34, 35

Los Angeles News Services v. KCAL-TV Channel 9,
    108 F. 3d 1119 (9th Cir. 1997) ................................................. 41, 42

Browne v. McCain,
    611 F. Supp. 2d 1062 (C.D. Cal. 2008) ................................... 54

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ................................................................ 15

Monster Communication, Inc. v. Turner Broadcasting Systems, Inc.,
    935 F. Supp. 490 (S.D.N.Y. 1996) .......................................... 41, 42

Nunez v. Carribbean Int'l News Corp.,
    235 F.3d 18 (1st Cir. 2000) ............................................. 31, 41, 52

Pagano v. Chas. Beseler Co.,
    234 F. 963 (2d Cir. 1916) ....................................................... 19

Perfect 10, Inc. v. Amazon.com, Inc.,
    508 F.3d 1146 (9th Cir. 2007) ................................................ 30, 43

Princeton Univ. Press v. Michigan Document Services, Inc.,
    99 F.3d 1381 (6th Cir. 1996) ........................................... 27, 46, 47

Psihoyos v. Nat'l Geographic Soc.,
    409 F. Supp. 2d 268 (S.D.N.Y. 2005) ..................................... 20

Reece v. Island Treasures Art Gallery, Inc.,
    468 F. Supp. 2d 1197 (D. Haw. 2006) ..................................... 24, 25

Ringgold v. Black Entm't Television, Inc.,
    126 F.3d 70 (2d Cir. 1997) ...................................................... 51

Rogers v. Koons,
    960 F. 2d 301 (2d Cir. 1992) ............................................. *passim*

Rossi v. City of New York,
    246 F. Supp. 2d 212 (S.D.N.Y. 2002) ..................................... 15

Salinger v. Random House, Inc.,
    811 F.2d 90 (2d Cir. 1987) ..................................................... 44, 47

Sarl Louis Feraud Intern v. Viewfinder, Inc.,
    627 F. Supp. 2d 123 (S.D.N.Y. 2008) ..................................... 41

Satava v. Lowry,
    323 F.3d 805 (9th Cir. 2003) .................................................. 20, 25

Scanlon v. Kessler,
 11 F. Supp. 2d 444 (S.D.N.Y. 1998)..................................................... 22

Sheldon Abend Recovable Trust v. Spielberg,
 F. Supp. 2d, 2010 WL 3701343 (S.D.N.Y. Sept. 21, 2010) ............................. 25

SHL Imaging, Inc. v. Artisan House, Inc.,
 117 F. Supp. 2d 301 (S.D.N.Y. 2000)..................................................... 16, 22

Silberman v. Innovation Luggage, Inc.,
 No. 01 Civ. 7109 (GEL), 2003 WL 1787123 (S.D.N.Y. Apr. 3, 2003) ................... *passim*

Sony Corp. of Am. v. Universal City Studios, Inc.,
 464 U.S. 417 (1984)...................................................................... 36, 52

Steinberg v. Columbia Pictures Indus., Inc.,
 663 F. Supp. 706 (S.D.N.Y. 1987)........................................................ 16, 18, 20, 26

Straus v. DVC Worldwide, Inc.,
 484 F. Supp. 2d 620 (S.D. Tex. 2007) .................................................... 24

Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.,
 996 F.2d 1366 (2d Cir. 1993).............................................................. 50

Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,
 338 F.3d 127 (2d Cir. 2003)................................................................ 18, 23

United Feature Syndicate, Inc. v. Koons,
 817 F. Supp. 370 (S.D.N.Y. 1993)......................................................... 16, 26, 32, 45

Video Pipeline, Inc. v. Buena Vista Home Entm't Inc.,
 192 F. Supp. 2d 321,  (D.N.J. 2002) ...................................................... 28

Warner Bros. Entertainment Inc. v. RDR Books,
 575 F. Supp. 2d 513 (S.D.N.Y. 2008)...................................................... 45

Worldwide Church of God v. Philadelphia Church of God, Inc.,
 227 F.3d 1110 (9th Cir. 2000) ............................................................ 34, 35, 37

Yurman Design, Inc. v. PAJ, Inc.,
 262 F.3d 101 (2d Cir. 2001)................................................................ 19, 23

**Rules**

Fed. R. Civ. P. 34, Rules 901(b)(1) and (b)(4) ........................................... 4

Fed. R. Civ. P. 56(e) ...................................................................... 16

Fed. R. of Evidence 901(b)(1) ............................................................. 3

The Associated Press (the "AP") respectfully submits this reply memorandum of law in support of its motion for summary judgment against One 3 Two, Inc. d/b/a Obey Clothing ("Obey Clothing").

## PRELIMINARY STATEMENT

Like the Wizard of Oz, Obey Clothing in its opposition to the AP's motion for summary judgment asks the Court to "pay no attention to that man behind the curtain," lest the Court discover the stunning lack of either authority or evidence supporting Obey Clothing's arguments. In fact, Obey Clothing's entire opposition brief is an exercise in misdirection, rife with miscited cases, misrepresented evidence, and unsupported denials of Obey Clothing's own documents and witnesses. Even a brief glance behind the curtain, however, clearly reveals that, as the AP demonstrated in its opening brief, this is a simple case that is easily decided by reference to the controlling law in this jurisdiction, including the Second Circuit's decision in Rogers v. Koons.

As the AP has previously noted, Rogers and the cases following it are directly applicable here, providing a clear roadmap for the Court as to (i) whether Obey Clothing infringed the AP's copyrighted photo of Barack Obama (the "Obama Photo") by using an image (the "Obama Image") that is substantially similar to the AP's photo (it did), and (ii) whether Obey Clothing can meet its affirmative burden of establishing fair use (it cannot). In a glaring omission, Obey Clothing fails to address Shepard Fairey's admissions that he made the Obama Image by directly copying the Obama Photo, and that he used the Obama Photo because it was a "strong portrait" that was superior to the almost 200 other images he considered. Given these admissions, the conclusion is inescapable under Rogers that Obey Clothing infringed the AP's copyright when it made, distributed, and sold ████████████ of units of clothing and other merchandise using the Obama Image (collectively, the "Obama Merchandise").

1

Regarding fair use, Obey Clothing makes virtually no effort to distinguish <u>Rogers</u>, limiting its discussion to a passing reference on the issue of its own bad faith.  (Docket # 180, Counterclaim Defendant One 3 Two, Inc.'s Opposition to Counterclaimant the Associated Press's Motion for Summary Judgment ("OC Opp. Br.") 47, 48.)  It wholly ignores <u>Rogers</u>'s holdings regarding the other fair use factors, including commercial use, transformative purpose, nature of the copyrighted work, amount and substantiality of the portion used, and the infringement's effect on the market for the original work — all of which clearly favor the AP under <u>Rogers</u> and its progeny.  Even its half-hearted reliance on <u>Blanch v. Koons</u> is telling, as it wholly fails to address the fact that <u>Blanch</u> actually <u>favors</u> the AP, as discussed at length in the AP's opening brief.  (Docket #152, Memorandum of Law in Support of the Associated Press's Motion for Summary Judgment Against One 3 Two, Inc., d/b/a/ Obey Clothing ("AP MSJ") 40.)

As for Obey Clothing's claim that it may assert whatever fair use defense its licensor, Shepard Fairey, may have had, the law is unambiguously to the contrary — in considering whether a fair use defense is available, courts judge each actor by its own conduct.  Thus, the only remaining fair use issue is not whether Mr. Fairey, an artist and successful entrepreneur, would have been entitled to assert fair use, but whether <u>Obey Clothing</u>, which by its own description is "a clothing manufacturer, not a photographer, artist or news-gathering organization," can do so.  (OC Opp. Br. 1.)  Under <u>Rogers</u>, the only possible answer is "no," as:

- Obey Clothing's unusual "reverse indemnity" in its license agreement with Mr. Fairey's company put it on express notice that he uses the "<u>protectable intellectual property</u>" of other, and that it if chose to use his work, it would do so at its own risk.

- Obey Clothing stated that it knew that if it sold Obama Merchandise, the photographer who made the source image could assert a claim against it.

- Yet Obey Clothing never pressed Mr. Fairey for the identity of the source image — something that Mr. Fairey claimed he always knew — and never licensed the image or credited the photographer or the AP.

- Instead, Obey Clothing pressured Mr. Fairey for the right to sell the Obama Merchandise so it could cash in on the popularity of the Obama Image.

- Having secured the rights, Obey Clothing admits that "sales of Obama Merchandise were substantial, and generated profits" for it.  (OC Opp. Br. at 16-17.)[1]  In fact, Obey Clothing made and sold ██████████████ of units to over 100 of its retailer customers as well as directly to consumers.

- Obey Clothing never donated a single dime to the 2008 Obama Presidential campaign.

All told, this case has gone on long enough.  Obey Clothing infringed the AP's rights out of pure self-interest, and should not be permitted to keep its ill-gotten gains.  Nor should the AP, a not-for-profit organization, be burdened with this case any further.  The Court should find, based on the controlling authority and the uncontroverted evidence, that Obey Clothing infringed the AP's copyright, and that its conduct was not excused by fair use, and in fact is <u>inexcusable</u>.

### **REPLY STATEMENT OF FACTS**

Obey Clothing's Response to The AP's Rule 56.1 Statement of Undisputed Facts (Docket # 181("Obey Clothing's 56.1 Response" or "OC 56.1 RSUF")) demonstrates two key points: (1) setting aside Obey Clothing's unfounded objections to the AP's evidence,[2] there is no

---

[1] Obey Clothing's distribution of Obama Merchandise may be even more extensive than it disclosed in discovery. Although both Fairey and Obey Clothing claimed that the company had distributed ██████ units, Obey Clothing states in its opposition brief that it made more than <u>2 million units</u>.  (OC Opp. Br. 52-53.)

[2] Most of Obey Clothing's evidentiary objections claim that the AP somehow failed to authenticate the discovery-record evidence submitted in support of its Rule 56.1 Statement of Undisputed Facts (Docket #153 ("AP's 56.1 Statement" or "AP SUF")) — evidence that was attached to a declaration by Brendan T. Kehoe, an attorney for the AP and an officer of this Court.  These objections are unfounded.  Under Federal Rule of Evidence 901(b)(1), testimony of a knowledgeable witness can authenticate evidence for purposes of admissibility.  Further, under Federal Rule of Evidence 901(b)(4) the "distinctive characteristics" of a piece of evidence, including its "[a]ppearance, contents, substance, internal patterns . . . taken in conjunction with circumstances," can also provide adequate authentication.  Courts in this District have held that a declaration by an attorney of record that attaches true and correct copies of discovery materials, including documents produced pursuant to Federal Rule of Civil Procedure 34, serves to authenticate this evidence under Rules 901(b)(1) and (b)(4).  See <u>Commercial Data Servers, Inc. v. IBM Corp.</u>, 262 F. Supp. 2d 50, 57-60 (S.D.N.Y. 2003) (denying plaintiff's motion to strike discovery-record evidence as not properly authenticated where said evidence was attached to a declaration by plaintiff's counsel); <u>see also</u> <u>Danstan Properties v. Merex Corp.</u>, Civ. No. 09 6137 (RMB) (RLE), 2011 WL 135843, *3 (S.D.N.Y. Jan. 7, 2011) (rejecting plaintiff's objections to the authenticity of discovery documents where plaintiff used "(nearly identical) copies of the same documents" to support its opposition).  This is particularly so where the objecting party (Continued…)

genuine, triable issue of material fact preventing the Court from deciding the AP's motion for summary judgment; and (2) the undisputed facts and uncontroverted evidence show that Obey Clothing's mass-marketing of Mr. Fairey's Obama Image on t-shirts, hooded sweatshirts, tank-tops, and other products (the "Obama Merchandise") was not a fair use of the Obama Photo.

## A.    The AP's Established Licensing Business

It is undisputed that the AP maintains an image-licensing business that funds its news-gathering operations and helps offset current declines in other areas of its business.  Specifically, as Obey Clothing admits, the AP, a not-for-profit news-membership collective, funds its news-gathering operations almost exclusively through licensing content.  (AP SUF & OC 56.1 RSUF ¶¶ 1, 6-7.)  Traditionally, the AP relied primarily upon the contributions, or "assessments," paid by its news-media-outlet members (id. ¶ 7) but, because of financial difficulties facing the news industry, AP's members have been unable to continue funding assessments at the same levels (id. ¶ 8).  Starting in the early 2000s and building on its existing World Wide Press photo license business, the AP invested significant resources to create and develop AP Images, a photo archive business, as an alternate source of funding.  (See id. ¶¶ 9, 21-22.)

The evidence also shows that the AP licenses photographs for multiple uses, including personal, editorial, advertising, and artistic uses, among which are uses by political campaigns and supporters of political candidates as well as uses for derivative works. (AP SUF & OC 56.1 RSUF ¶¶ 10, 13, 16.)  As an example, in October 2008, the AP licensed a photograph of Mr.

---

produced the challenged evidence.  Commercial Data, 262 F. Supp. 2d at 60 ("It is disingenuous and wasteful for plaintiff to object that its own documents are not authenticated . . . .") (emphasis added).  Thus, Obey Clothing's objections to the authenticity of discovery-record evidence, including its own documents, should not be countenanced.  Id. at 58, n. 3 ("In this Court's experience, it is unprecedented to have reputable counsel (or any counsel for that matter) challenge the authenticity of . . . documents produced from his client's files.").

Obama to Flashbags, a Burlington, Vermont company, for use as a derivative work on up to

5,000 totes bags supporting Mr. Obama (as shown below).  (Id. ¶ 14.)




         AP Photograph         Flashbags' Licensed Work

In 2008, the AP also licensed photos to Mr. Obama's campaign for various uses. (Id. ¶ 15.)[3]

      Obey Clothing offers no evidence specifically disputing that either it or Mr. Fairey could

have licensed the Obama Photo prior February 9, 2009, when Mr. Fairey began the present

lawsuit by filing a declaratory-judgment action against the AP.  In fact, the evidence shows that:

- AP Images routinely licenses AP photographs for inclusion in derivative works (see DeGrave Decl. ¶¶ 9-13);[4]

---

[3] In its 56.1 Response, Obey Clothing asserts that evidence of these, and similar, licenses is immaterial, apparently because the AP entered them shortly after January 2008, when Mr. Fairey created the Obama Image.  (See OC 56.1 RSUF ¶¶ 14-15, 67-70.)  But Obey Clothing has offered no evidence — nor can it — that the AP's licensing practices changed in any way between early 2008 and late 2008, or even any time after that matter.  Moreover, it distributed the Obama Merchandise from March 2008 until August 2009, almost a year after Mr. Obama was elected President — at any time during that period it could have pressed Mr. Fairey for information about the owner of the source photograph that was used for the Obama Image and sought to license the Obama Photo.  It has failed, however, to offer any evidence that it ever did so.  (Id. ¶¶ 141-42, 157.)  Tellingly, during this same time period, Mr. Fairey licensed the "Palestinian Woman" image from the AP for use in making a derivative work — a fact that was well known to Obey Clothing at the time.  (Id. ¶¶ 70-71 (Kehoe Decl. ¶ 35, Ex. 34 (C. Broders Dep. 132:22-138:22)).)  Mr. Fairey and Obey Clothing could have easily licensed the Obama Photo too — a fact that Obey Clothing has in no way refuted.  (See id. ¶ 122; see also footnote 5 infra.)  Indeed, had Obey Clothing, as a commercial entity exploiting Mr. Fairey's images, done anything at all to investigate the ownership of the Obama Photo and seek a license, this entire litigation could have been avoided.

[4] In its 56.1 Response, Obey Clothing challenges Ms. DeGrave's sworn statement that "AP Image licenses its photos both to be used 'as is' and for incorporation into derivative works," asserting that she "was not able to identify a single derivative work for which she had licensed an AP photograph, although she speculated that she might have done one such license."  (OC 56.1 Response ¶ 12.)  This is misleading, as she was merely addressing whether she had ever "personally" executed a license for a derivative work.  (See Docket #182 Declaration of Robyn C. Crowther dated January 26, 2011 ("Crowther Opp. Decl."), Ex. L (96:23-98:6).)  Ms. DeGrave answered that she (Continued…)

- In January 2008, one of Obey Clothing's owners, Christopher Broders, discussed with Shepard Fairey's wife, Amanda Fairey, via e-mail, the need to license the photographs that Mr. Fairey uses for his works in light of his practice of incorporating in his works the protectable expression of others (AP SUF & OC 56.1 RSUF ¶ 64);

- In December 2008, AP Images licensed an image of a Palestinian Woman to Mr. Fairey's company, Obey Giant Art, Inc., for use on posters and merchandise sold by Obey Clothing, as pictured below (AP SUF & OC 56.1 RSUF ¶¶ 70-71);

  

- The AP has also licensed other images of world leaders (including other images of Mr. Obama) to Fairey for use in making derivative images (AP SUF & OC 56.1 RSUF ¶¶ 72-74; Degrave Decl. ¶¶ 10-12);

- The AP would have willingly licensed the Obama Photo to Mr. Fairey and Obey Clothing for their respective uses of the Obama Image.  (DeGrave Decl. ¶ 17; AP SUF & OC 56.1 RSUF ¶ 122.)[5]

- Laura Malone, in-house counsel for the AP, contacted Fairey to discuss a license for the Obama Photo.  (Declaration of Claudia Ray dated February 7, 2011, ("Ray

certainly had during her tenure with the AP, but could not recall the specific image that she had licensed.  (Id.)  She also testified that other AP Images licensing representatives had as well.  (Id. at 98:7-11.)  For Obey Clothing to claim the AP does not license derivative works is absurd given the evidence that Obey Clothing knew Mr. Fairey had obtained a license from the AP for the use of the Palestinian Woman photo on derivative works.  Apparently Obey Clothing expects the Court to ignore that license, as well as the Flashbags license mentioned above.

[5] In an attempt to manufacture a dispute regarding this issue, Obey Clothing asserts that "[i]t is also not certain that the AP would have permitted Fairey's intended use of the [Obama Photo]," selectively citing only portions of Ms. DeGrave's deposition transcript in which she discusses the AP's policy of reviewing proposed derivative works to ensure that the AP's copyrighted image is not being used in a way that harms the AP or the integrity of the image itself. (Crowther Opp. Decl., Ex.  L (92:1-24); Ray Decl., ¶ 2, Ex. 127 (F. DeGrave Dep. (Mar. 23, 2010) 92:25-93:7).)  In fact, Ms. DeGrave was simply describing the AP's general licensing process.  No one from the AP, including Ms. DeGrave, has ever suggested that the AP would not have been willing to license this use, nor does Obey Clothing cite any such evidence.  The AP has stated that it would have licensed the use of the Obama Photo to make the Obama Image and, in fact, was seeking to reach an agreement with Mr. Fairey for just such a license when he filed this lawsuit.  Ray Decl., ¶ 3, Ex.128 (L. Malone Dep. (Sept. 15, 2009) 186:1-188:25).)

Decl."), ¶ 3, Ex. 128 (L. Malone Dep. (Sept. 15, 2009) 186:1-188:25).)  Fairey's response was to file this lawsuit.

In keeping with Obey Clothing's awareness of the need to license <u>Mr. Fairey's</u> source material, the evidence also shows that, during the period in which it was selling the Obama Merchandise, Obey Clothing licensed images from photojournalist Al Rockoff and photographer Martha Cooper for use in derivative works made by Mr. Fairey that Obey Clothing then reproduced on t-shirts and merchandise (see below).  (AP SUF & OC 56.1 RSUF ¶¶ 67-68.)

       
Mr. Rockoff's Photo   Obey Clothing's T-Shirt          Ms. Cooper's Photo          Obey Clothing's T-Shirt

## B.   <u>The Obama Photo is a Creative Work</u>

Obey Clothing makes much of the fact that Mr. Garcia was on assignment for the AP on April 27, 2006, when he made the Obama Photo at a press conference at the National Press Club. ("NPC").  (OC Opp. Br. 6-8.)  It claims that the NPC's crowded conference room and Mr. Garcia's code of ethics as a press photographer somehow limited his ability to make a compelling portrait of then-Junior Senator Obama and that the Obama Photo is more "factual" than creative.  (<u>See</u> OC Opp. Br. 6-8, 51-52.)  But whether the room was crowded had no effect on Mr. Garcia's creative choices, including the crucial ones of where an how he stood, when and from what angle he chose to make the photo, and whether to zoom in on Mr. Obama's face or

make a long shot of the three speakers at the conference. [6]   Nor has Obey Clothing identified anything in the ethics code that would bar him from exercising such choices.  Regardless, none of this changes the fact that the Obama Photo is a creative, expressive portrait of Mr. Obama intended to capture his essence as a political leader.  (See AP SUF ¶ 83-87.)

As Mr. Fairey's expert admitted, in creating the Obama Photo Mr. Garcia made numerous creative choices, including:

- the composition and framing of the photograph;

- the choice of lens;

- the depth of field;

- his own positioning relative to Mr. Obama;

- capturing Mr. Obama in a three-quarter pose with a view from the bottom; and

- the moment in time to make the photograph.

(AP SUF & OC 56.1 RSUF ¶¶ 80-82, 90.)[7]   As discussed at pages 20 through 22 infra, these creative choices resulted in an Obama Photo that, instead of merely reporting on the news of the day, depicted then-Junior Senator Obama as thoughtful, forward-thinking leader.

---

[6] Seeking to downplay the Obama Photo's creativity, Obey Clothing tries to impugn Mr. Garcia's credibility, asserting that it alone establishes a triable issue preventing summary judgment.  (OC 56.1 RSUF ¶ 83.)  Though the AP accepts neither Obey Clothing's view of the facts nor its interpretation of the law, Mr. Garcia's credibility is not at issue because the creative aspects of the photograph speak for itself.  Moreover, Mr. Fairey repeatedly recognized in his deposition that the photograph was creative, admitting that it was a "strong portrait," and that he chose it because it depicted Mr. Obama in a "flattering" way, as "presidential," "dignified," and "serious" with a "sense of contemplation," and because of the "way the light fell on Senator Obama's face."  (AP SUF ¶¶ 96-107.)

[7] Mr. Fairey's visual studies expert, Professor Marita Sturken of NYU, admitted that Mr. Garcia made at least these creative choices in making the Obama Photo.  Obey Clothing's objection that she lacks foundation to comment on Mr. Garcia's creative choices is specious.  Obey Clothing itself relied on her report, attaching it to both its own motion for summary judgment and its present opposition.  (Crowther Decl., ¶ 14, Ex. U; Crowther Opp. Decl., ¶ 40, Ex. OO.)  Moreover, as Mr. Fairey's expert she had access to the complete discovery record, and, in fact, testified that she reviewed Mr. Garcia's deposition transcripts and the pleadings, which include the works in issue, providing her with a more-than-adequate foundation to comment on the creative elements of the Obama Photo.  (Crowther Opp. Decl., ¶ 40, Ex. OO (Expert Report of Professor Marita Sturken dated November 2, 2010, ¶ 8).)

**C.   Shepard Fairey Copied the Obama Photo's Expressive Qualities Nearly Verbatim to Make the Obama Image**

Obey Clothing discusses at length Mr. Fairey's process for copying the Obama Photo and converting it into the Obama Image, claiming he used the Adobe Illustrator and Photoshop computer programs and a common screen-printing technique involving cutting Rubylith (thin, translucent, amber-tinted films).  (OC Opp. Br. 11-14, 38-39; OC 56.1 RSUF ¶ 79.)  The purpose of this extensive discussion of Mr. Fairey's "sweat of the brow" in making the Obama Image is unclear, given the Supreme Court's clear direction that it is irrelevant to issues of copyright infringement.  See Feist Publ'n, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 355-56, 360 (1991).  Further, the evidence is more consistent with an all-digital process done wholly on a computer.[8]

The Court need not address this issue, however, as it is immaterial to the issues raised in the AP's motion.  See, e.g., Rogers v. Koons, 960 F.2d 301, 304, 307-10 (2d Cir. 1992) (that defendant's wooden sculpture, which copied plaintiff's photograph, was hand carved and painted by artisans in Ortessi, Italy, over the course of weeks was not a significant factual issue in deciding substantial similarity or fair use against defendant on summary judgment); Campbell v. Koons, Civ. No. 90 6055 (RO), 1993 WL 97381 (S.D.N.Y. April 1, 1993) (same).  The Court could assume, arguendo, for purposes of this motion that Mr. Fairey did in fact use Rubylith, as Obey Clothing contends, because — regardless of which process Mr. Fairey used — the evidence in this case, including the deposition testimony of Mr. Fairey's own graphic design

---

[8] Among other things, prior to filing this case Mr. Fairey publicly claimed that he made the Obama Image in a single evening, and made no mention of Rubyliths.  (Crowther Decl., Ex. L.)  Moreover, using Rubyliths would necessarily have involved creating a digital file when the Rubyliths were scanned back into a computer to create the final image used on the Obama Merchandise, but no such files were ever produced, although the AP asked for them and Fairey insisted that a diligent search had been conducted (and despite the fact that many of the files from this same period that Mr. Fairey deliberately sought to destroy in this case were later recovered).  (Ray Decl., ¶ 4,  Ex. 129 (S. Fairey Dep. (Mar. 16, 2010) 253:1-256:23).)  Nonetheless, as described above, this is not a material issue that the Court need decide.

9

expert, shows that Mr. Fairey traced the Obama Photo to derive the Obama Image.  (Ray Decl., ¶ 5, Ex. 130 (F. Cost Dep. (Nov. 18, 2010) 178:6-180:20); ¶ 6, Ex. 131 (M. Essl Dep. (Nov. 22, 2010) 237:2-238:18.)

Furthermore, whatever Mr. Fairey's process, the uncontroverted facts show that (i) Mr. Fairey started by digitally copying the Obama Photo onto his computer, and (ii) using an all digital process, Mr. Fairey next made a colorized rough-cut of the Obama Image from the version of the Obama Photo that he downloaded — which took a matter of minutes.  (AP SUF & OC 56.1 RSUF ¶ 111-13.)[9]  As the side-by-side-by-side images below show, in this initial step, Mr. Fairey directly copied not only the Obama Photo's composition, pose, and angle, but also the nuanced expression on Mr. Obama's face, captured at a particular moment in time, looking out above the viewer with a glimmer[10] in his eye and the light raking across his face.  (See id. ¶ 115.)



The evidence — including, most directly, the images themselves — further shows that the Obama Image copied all of the expressive characteristics that helped make the Obama Photo

---

[9] Fairey admits in his deposition that it took around thirty minutes to make the computerized "rough cut."  (Kehoe Decl., Ex. 10 (S. Fairey Dep. (Mar. 16, 2010) 231:10-233:10).)

[10] Obey Clothing suggests Mr. Fairey added the highlights in Mr. Obama's eyes (OC Opp. Br. 13), but the Obama Photo captured highlights in both of Mr. Obama's eyes (see Docket #54, the AP's First Amended Answer, Affirmative Defenses and Counterclaims, Ex. B).

a compelling political portrait in its own right.  (AP SUF & OC 56.1 RSUF ¶ 115.)  Further, Mr.

Fairey admittedly chose the Obama Photo in part because of its raking lighting — or chiaroscuro

effect — which allowed him to break Mr. Obama's face down into red, white, and blue color

panes with minimal effort.  (Id. at 107.)  While Mr. Fairey may have made some minor changes

such as "[r]eshaping the outlines of both of Mr. Obama's ears" and "[e]xtending Obama's tie"

(OC 56.1 RSUF ¶ 114), the Obama Image is recognizably based on the Obama Photo.

 Obey Clothing's effort to make an issue of the words "Hope" or "Progress" and the red-

white-and-blue color scheme used in some versions of the Obama Image (OC Opp. 14) is also

unavailing.  First, as even it recognizes, Mr. Fairey changed the text from "Progress" to "Hope"

at the request of Mr. Obama's campaign, rather than on his own initiative.  (Id.)  Moreover, a

large portion of its Obama Merchandise included neither caption, instead displaying the Obama

Image alone.  (AP SUF & OC 56.1 RSUF ¶¶ 147, 148.)  Examples are shown below:



 Obey Clothing also makes of much Mr. Fairey's "red, white, and blue color palette," an

element that it claims increased Mr. Obama's "chances of election in a racially polarized United

States."  (OC Opp. 39.)  But a simple comparison of the Obama Image and Obama Photo shows

that both works share that color palette.  Further, Obey Clothing's reliance on this fact is ironic at

best: Obey Clothing's records clearly state that nearly 70% of Obey Clothing's sales of Obama

Merchandise involved styles that featured a black-and-white version of the Obama Image, not

one with the red, white, and blue colors.  (AP SUF & OC 56.1 RSUF ¶ 151.)

**D.** **Fairey and Obey Clothing Did Not Intend To Comment On The Obama Photo**

Mr. Fairey admittedly did not intend to comment on or parody the Obama Photo.  (AP

SUF ¶ 118 (S. Fairey Dep. (Mar. 17, 2010) 566:1-5 ("*Q: But you weren't trying to parody or

comment on the reference photo itself, right?  A: That's correct.*").)  Nor has Obey Clothing tried

to show that its sale of Obama Merchandise somehow commented on the Obama Photo.

**E.** **Obey Clothing Exploited the Obama Photo Knowing That It Was Unlicensed**

Obey Clothing insists that its motive in distributing and selling ████████████████ of

units of Obama Merchandise was not primarily commercial.  (OC Opp. 15-16; OC 56.1 RSUF ¶

150).  But the evidence tells a very different story:  despite being aware of the specific risk of

potential claims by the photographer who made the Obama Photo, Obey Clothing structured its

use of the Obama Image as a commercial transaction and marketing project from which it

ultimately earned ███████ of dollars in revenue and, by its own admission, over ██████████

dollars in direct profit.[11]  Specifically, the evidence shows that:

- In March 2008, Obey Clothing's largest owner, Don Juncal, <u>expressly acknowledged the risk</u> that its distribution and commercial use of the Obama Image could result in legal claims from the Obama Photo's photographer (AP SUF & OC 56.1 RSUF ¶¶ 139-140);[12]

- Yet Obey Clothing proceeded anyway, <u>making no effort to determine who the photographer of the Obama Photo was or whether Obey Clothing had the right to use the Obama Photo</u> as the source photograph for the Obama Image in its production, distribution, and sale of the Obama Merchandise (AP SUF & OC 56.1 RSUF ¶¶ 141; 142; Docket # 158, Declaration of Brendan T. Kehoe dated January 6, 2011 ("Kehoe Decl."), Ex. 18 (D. Juncal Dep. (Mar. 23, 2010) 105:7-18));

---

[11] The AP will demonstrate at the appropriate stage that Obey Clothing's actual total profit attributable to its infringing activities, including both direct and indirect gains, was much higher.

[12] In its 56.1 Response, Obey Clothing objects to the AP's submission of Obey Clothing's <u>own</u> documents as evidence and asserts that it was more concerned "about what Obama's campaign would say at the time."  (OC 56.1 RSUF ¶ 139-40.)  It has offered <u>no</u> evidence, however, contesting that by March 25, 2008, it expressly recognized the specific risk of a claim from the photographer for its unauthorized use of that image on the Obama Merchandise.

- Obey Clothing distributed and/or sold Obama Merchandise over the course of an <u>18-month period</u> starting in March 2008 and ending in August 2009, some 10 months after the 2008 election and six months after this lawsuit was filed (AP SUF & OC 56.1 RSUF ¶¶ 143, 144; Crowther Opp. Decl., Ex. SS (showing first promotional distribution of Obama Merchandise on March 7, 2008 and last sale on August 26, 2009));

- Obey Clothing began its distribution and sale of Obama Merchandise in order <u>to appease one of its largest retail accounts</u>, Urban Outfitters (AP SUF & OC 56.1 RSUF ¶ 150);

- From March 2008 to August 2009, Obey Clothing <u>sold over ███████ units</u> of Obama Merchandise in <u>at least 35 different styles</u> (AP SUF & OC 56.1 RSUF ¶¶ 144-49);[13]

- From its sale of Obama Merchandise, Obey Clothing earned at least ████████ in direct revenue (AP SUF & OC 56.1 RSUF ¶ 150); and

- Obey Clothing admittedly made <u>over ███████ in direct profit</u>, even after deducting ███████ of its alleged ███████ in donations[14] as marketing and advertising expenses for its distribution and sale of Obama Merchandise (Docket # 151, Memorandum in Support of Obey Clothing's Motion for Summary Judgment dated January 6, 2011 ("OC MSJ.") 24; Docket # 178, the AP's Counter-Statement of Material Facts ("AP CSMF") ¶ 46 ).[15]

Obey Clothing's own records further demonstrate that its distribution and sale of Obama

Merchandise included many of its major retail accounts and continued long after Junior Senator

Obama became President Obama.  More precisely, by August 2009, Obey Clothing had

distributed and sold Obama Merchandise to <u>over 100 of its retail accounts</u>, including a

substantial number of its top-selling accounts such as Nordstrom, Metropark, and Zumiez. (AP

---

[13] Obey Clothing objects that the AP failed to authenticate the Obey Clothing documents it submitted in support of these totals.  As discussed in footnote 2 <u>supra</u>, Obey Clothing's objections are unfounded.  Further, in its 56.1 Response, Obey Clothing offers no admissible evidence to controvert these facts.

[14] As discussed in the AP's opposition papers (AP Opp. at 16-17), Obey Clothing significantly overstates these purported donations.  In fact, the ███████ includes the wholesale value of certain promotional goods — rather than their cost to Obey Clothing — and much of this amount was advertising and marketing expenses related to sales of the Obama Merchandise.  (AP CSMF ¶¶ 44-46.)  Nor has Obey Clothing offered <u>any</u> evidence — no cancelled checks, receipts, or documentation of any kind – evidencing any donations to the 2008 Obama Campaign.

[15] Obey Clothing asserts without support that it distributed "more than <u>2 million</u> t-shirts and other merchandise featuring the Obama [I]mage."  (OC Opp. Memo. 51-52 (emphasis added)).  This is nearly ███████ <u>times</u> the number of units that Obey Clothing had previously disclosed, including in its expert reports.  (<u>See</u> Crowther Opp. Decl., Ex. SS (███████ net units, including "promotional" units).)  It also conflicts with Fairey's Court-ordered response to the AP's interrogatory asking how many copies of the Obama Image were made.  (<u>See</u> Kehoe Decl., Ex. 52 (listing Obey Clothing's "Volume" as ███████ units).)  Obey Clothing's admission suggests its infringing activities were ███████ <u>times as extensive</u> as previously thought and creates a material issue of fact regarding Obey Clothing's motion for summary judgment on the AP's damages claim for indirect profits.

CSMF ¶ 16.)  And it made <u>more</u> <u>than</u> <u>43%</u> (or ▮▮▮▮▮ units) of its total sales of Obama

Merchandise <u>after November 4, 2008</u>, when Mr. Obama won the General Election.  (<u>Id.</u> ¶ 17.)

**F.**    **Obey Clothing's Unlicensed Use of the Obama Photo Harmed the Associated Press**

As discussed in more detail at pages 45 through 53 <u>infra</u>, the evidence shows that Obey

Clothing's unlicensed, uncredited use of the Obama Photo harmed the AP in at least three

distinct ways:  (i) the AP lost significant licensing revenue as a result of Obey Clothing's

unlicensed use of the Obama Photo on ▮▮▮▮▮▮▮▮▮ of units of Obama Merchandise

and other items, (AP SUF & OC 56.1 ¶¶ 164-66); (ii) Obey Clothing's unlicensed use of the

Obama Photo harmed the AP's market for works derivative of the Obama Photo, (AP SUF & OC

56.1 RSUF ¶ 166-67);[16] (iii) if unlicensed uses like Obey Clothing's were to become widespread,

AP Images' photo licensing business would be significantly harmed.  Specifically, to the extent

that individuals like Mr. Fairey or companies like Obey Clothing are permitted to take AP

photographs, particularly ones capable of generating significant licensing revenues, and use them

in unlicensed derivative works, the AP would lose licensing revenue, which in turn would erode

its ability and incentive to continue to invest in and maintain its photo archive, thus reducing

content available for license by the public.  (<u>See</u> AP SUF & OC 56.1 RSUF ¶ 168.)

<u>ARGUMENT</u>

**I.**    **LEGAL STANDARD**

On summary judgment, the movant has the burden of "informing the district court of the

basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a

genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once it does

---

[16] Obey Clothing cites to the number of times that the Obama Photo was downloaded by AP customers, asserting that the photo was downloaded with greater frequency after Mr. Fairey's and Obey Clothing's use of it, and that Obama Image "led to the sale of dozens of fine prints of the [Obama] Photo." (OC 56.1 RSUF ¶ 167.)  As discussed 48 through 50 <u>infra</u>, Obey Clothing fails to raise a genuine, triable issue of fact.

so, the burden shifts to the non-movant to present "specific facts showing that there is a genuine

issue for trial." Rossi v. City of New York, 246 F. Supp. 2d 212, 216 (S.D.N.Y. 2002) (quoting

Fed. R. Civ. P. 56(e)).  The non-movant must raise more than a "metaphysical doubt" as to a

material fact.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87

(1986).  "[M]ere speculation and conjecture is insufficient to preclude the granting of the

motion." Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).  Because

Obey Clothing offers only conjecture and speculation, it cannot meet its burden and the AP is

entitled to summary judgment.

## II.     THE UNDISPUTED FACTS SHOW THAT THE OBAMA IMAGE IS SUBSTANTIALLY SIMILAR TO THE OBAMA PHOTO

As discussed in the AP's January 6, 2011, opening brief, and its January 26, 2011,

opposition to Obey Clothing's motion for summary judgment, incorporated herein by reference,

the undisputed facts and relevant case law clearly show that the Obama Image is substantially

similar to the Obama Photo.

As the AP previously noted, Mr. Fairey admitted copying the Obama Photo to make the

Obama Image.  (AP SUF ¶¶ 111-13; Kehoe Decl. ¶ 48, Ex. 47 (Ltr. from W. Fisher and G.

Stewart to J. Hellerstein dated December 22, 2010, at 2).)  In addition, both Fairey and Fairey's

expert, NYU Professor Marita Sturken, admit that the Obama Photo and the Obama Image share

numerous expressive similarities.[17]  (AP SUF ¶¶ 106-10.)  Because such copying is admitted,

---

[17] Contrary to Obey Clothing's assertion, (OC Opp. 30-32), in addition to Mr. Fairey's own admission, the AP may also rely on expert testimony regarding similarity to demonstrate that Mr. Fairey and Obey Clothing actually copied the Obama Photo.  See Branch v. Ogilvy & Mather, Inc., 765 F. Supp. 819, 824 (S.D.N.Y. 1990) ("[P]laintiff is entitled to introduce expert testimony that copying has occurred with respect to similarities between individual elements of the plaintiff's cookbook and defendants' ads").  In fact, expert opinion is particularly useful in cases such as this, to help the Court differentiate between the idea of a work and its expression.  See Gaste v. Kaiserman, 863 F.2d 1061, 1068 & n.5 (2d Cir. 1988) (crediting plaintiff's expert in finding that defendant had taken protectable expression rather than merely the idea of plaintiff's musical composition).  Obey Clothing's objection rings even (Continued…)

summary judgment is appropriate for the AP under controlling authority in this Circuit.  Rogers v. Koons, 960 F.2d 301, 307-08 (2d Cir. 1992) (granting summary judgment for plaintiff where "Koons used the identical expression of the idea that Rogers created; the composition, the poses, and the expressions were all incorporated into the sculpture to the extent that, under the ordinary observer test, we conclude that no reasonable jury could have differed on the issue of substantial similarity"); Silberman v. Innovation Luggage, Inc., No. 01 Civ. 7109 (GEL), 2003 WL 1787123, at *8-9 (S.D.N.Y. Apr. 3, 2003) (granting summary judgment for photographer where defendant copied and altered part of his photograph of the New York City skyline) (quoting Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir. 1966)); SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 310-11 (S.D.N.Y. 2000) (granting summary judgment for plaintiff where defendant illicitly copied photos of framed mirrors); United Feature Syndicate, Inc. v. Koons, 817 F. Supp. 370, 377 (S.D.N.Y. 1993) (granting summary judgment for plaintiff where "even the most casual observer" would recognize elements of defendant's sculpture as copied from plaintiff's cartoon character); Campbell, 1993 WL 97381, at *3 (granting summary judgment to plaintiff where defendant made a three-dimensional sculpture based on plaintiff's photo, and rejecting defendant's claim that he did not copy all of the photo); Steinberg v. Columbia Pictures Indus., Inc., 663 F. Supp. 706, 710 (S.D.N.Y. 1987) (granting summary judgment for plaintiff where defendants' poster was "so similar that it is impossible, especially in view of the artist's testimony, not to find that defendants' impermissibly copied plaintiff's").

---

more hollow when considered in light of its own reliance on the testimony and reports of the very same experts in its own motion for summary judgment, and in its own opposition brief.  (Crowther Decl., ¶ 14, Ex.U; ¶ 15, Ex. V; OC MSJ 18; OC Opp. 24 and Ex. NN.)  Nor does the expert testimony create an issue of fact, as Obey Clothing wrongly asserts.  (OC Opp. 31)  Both the AP's expert, Professor Laurie Dahlberg, and Fairey's expert, Professor Marita Sturken, agree that the Obama Photo contains significant expressive elements, which Mr. Fairey incorporated in the Obama Image.  (AP SUF ¶¶ 108-10; 114-115, 117.)

Faced with Fairey's admitted copying and this Circuit's controlling precedent, Obey Clothing fails to address either.  Instead, it tries to rewrite this Circuit's law regarding copyright protection for a photograph, asserting that:  (i) the AP is applying the wrong legal test, when in fact it is Obey Clothing that misapplies the relevant legal standards; (ii) Mr. Garcia did not have any creative input in making the photo, when in fact he used significant creative skill and judgment in making the Obama Photo, as Mr. Fairey and his expert admit; and (iii) any similarities between the Obama Photo and the Obama Image are of unprotectable ideas or are *scenes á faire*,[18] when in fact Obey Clothing copied specific protectable expression from the Obama Photo, down to the tiny, but crucial, highlights in Mr. Obama's eyes.  As its arguments are all unavailing, the Court should find that Obey Clothing infringed the AP's copyright.

## A.        The AP Correctly Applies the Ordinary Observer Test

As the AP correctly noted in its opening brief, the Second Circuit's test for substantial similarity, known as the "ordinary observer" test, examines "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." Silberman, 2003 WL 1787123, at *8-9 (quoting Ideal Toy, 360 F.2d at 1022); see also Rogers, 960 F.2d at 307-08 (the test is "whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same" (citation omitted).  Moreover, in cases like this, where copying is admitted, the necessary degree of similarity may be less than would be necessary absent proof of direct copying.

---

[18] As discussed in the AP's opening brief, the images of Mr. Obama that Mr. Fairey considered, but did not use, amply demonstrate that different photos of the same person can convey very different nuances of mood and emotion, and very different overall impressions.  (AP MSJ 18-19)  Similarly, the photos of political leaders that Obey Clothing includes in its opposition brief (OC Opp. Br. 24) actually prove the AP's point — that photographs of different persons using a similar pose also may convey different impressions — in some cases wise, visionary, or hopeful, in some bemused, and in some befuddled or confused.

17

Seeking to obfuscate the law on substantial similarity, however, Obey Clothing wrongly asserts that the AP erred by failing to rely solely on the "total concept and feel" test.  But that test applies to "inexact copying," where there is no direct copying, and is thus not applicable to this case, where Mr. Fairey has admitted to <u>directly</u> copying the AP's work.  For direct copying, the Second Circuit applies the ordinary observer test.  <u>Rogers</u>, 960 F.2d at 307-08; <u>Silberman</u>, 2003 WL 1787123, at *8-9; <u>Steinberg</u>, 663 F. Supp. at 714.  Moreover, even if total concept and feel were the right test, Obey Clothing misapplies it, asserting that the Court should "separate out" the elements of the Obama Photo that Obey Clothing considers "unprotectable," and compare, in isolation, only what is left.  (OC Opp. Br. 29-30.)  But the Second Circuit rejected that analysis in <u>Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.</u>, 338 F.3d 127, 134 (2d Cir. 2003) (reversing denial of summary judgment based on "total concept and feel" analysis and finding that defendant copied distinctive, creative aspects of rug design).  There, the Second Circuit expressly held that it is <u>not</u> appropriate to "*simply* . . . ascertain[] similarity between components viewed in isolation," but rather the court must consider the similarities between the works as a whole.  <u>Id.</u> at 134-36 (noting that a "defendant may infringe . . . not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art [including the arrangement of unprotectable elements] are considered in relation to one another").

Even applying that test here, however, it is clear that the Obama Photo and Obama Image are nearly identical in their overall concept, look and feel.  <u>See</u> <u>Crown Awards, Inc. v. Discount Trophy & Co., Inc.</u>, 326 Fed. Appx. 575, 579 (2d Cir. 2009) (finding that plastic trophies were substantially similar in "total concept and feel" and that defendant's "product, while not identical to Crown's, mimics Crown's protectable aesthetic decisions in the arrangement of the trophy's

elements"); <u>Tufenkian</u>, 338 F.3d at 136 (finding "overwhelming" similarities in selection and arrangement of elements, motifs, and structural layout of rug designs at issue); <u>Yurman Design, Inc. v. PAJ, Inc.</u>, 262 F.3d 101, 110-12 (2d Cir. 2001) (finding twisted cable designs were substantially similar and rejecting defendant's argument that combination of public domain elements was unprotectable under total concept and feel test).

### 1.   <u>Obey Clothing Improperly Tries To Limit Copyright Protection For Photographs</u>

As the AP discussed in its opening brief, <u>Rogers v. Koons</u> made very clear that copyright protects not only elements such as the pose of the subjects, the lighting, the angle, the selection of film and camera, and the perspective, but also "almost any other variant involved" in making a photograph.  <u>Rogers</u>, 960 F.2d at 307.  Indeed, as the AP also noted, numerous courts, including both the United States Supreme Court and the Second Circuit, have found that the protectable elements of a photograph include the selection of the subject matter, composition, expression, pose, posture, timing, placement, lighting, angle, background, cropping, framing, depth of field, use of light and shadow, and choice of equipment — indeed, <u>any</u> variant that is involved in creating the photo.  <u>See</u>, <u>e.g.</u>, <u>Burrow-Giles Lithographic Co. v. Sarony</u>, 111 U.S. 53, 58, 60 (1884) (finding infringement where defendant copied the depiction of light and shadow in the original photograph); <u>Rogers</u>, 960 F.2d at 307 (finding infringement where defendant copied the subject matter, pose, expression, composition, lighting, angle, depth of field, and timing from plaintiff's photo); <u>Pagano v. Chas. Beseler Co.</u>, 234 F. 963, 964 (S.D.N.Y. 1916) (finding infringement where defendant copied the moment in time captured in plaintiff's photograph); <u>Silberman</u>, 2003 WL 1787123, at *9.

Unable to deny the weight of this authority, Obey Clothing resorts to deliberately misstating the law, claiming that the Second Circuit has somehow limited protectable expression

in photographs to a supposed list of just nine elements.  (See OC Opp. Br. 20 (citing Psihoyos v.

Nat'l Geographic Soc., 409 F. Supp. 2d 268, 275 n.5 (S.D.N.Y. 2005); Kaplan v. The Stock

Market Photo Agency, Inc., 133 F. Supp. 3 317, 323-27 (S.D.N.Y.2001).))[19]  But as the AP's

prior brief and applicable case law, including Rogers, makes clear, that assertion is simply false.

     In addition to being directly contrary to the controlling law, Obey Clothing's argument

also makes no sense.  It would have this Court establish a hierarchy of creative works whereby

graphic works such as the Obama Image would be accorded more respect, and afforded greater

protection, than a photograph such as the Obama Photo.  To do so, however, would fly in the

face of more than one hundred years of case law making clear that photographs can be creative

works entitled to strong copyright protection.  (See AP MSJ 29-31.)  That Obey Clothing would

even contemplate such a result, much less advocate it, only serves to highlight its arrogance in

denigrating the very work that Obey Clothing and Fairey exploited as the basis for their Obama

Merchandise business.

### 2.     Mr. Garcia Used Significant Creative Skill And Judgment In Making The Obama Photo

     As the AP discussed in its opening brief, Mr. Garcia indisputably controlled the moment

in time when he made the Obama Photo, as well as his angle, positioning, view, the framing,

---

[19] Satava v. Lowry, 323 F.3d 805, 811 (9th Cir. 2003), on which Obey Clothing also relies, does not even involve a photograph, much less purport to specify what elements of a photo may be protected, but instead considers two glass jellyfish sculptures.  As for Psihoyos and Kaplan, unlike here where the AP's photo was admittedly copied, those cases both involved the very different situation of two different photographs by different photographers, where the courts found that the only similarities involved the respective ideas.  By contrast, the Obama Image was made by exactly copying the Obama Photo's expression, rather than by independently making a new photographic portrait of Mr. Obama.  See Rogers, 960 F.2d at 308 ("It is not therefore the idea of a couple with eight small puppies seated on a bench that is protected, but rather Roger's expression of this idea-as caught in the placement, in the particular light, and in the expressions of the subjects-that . . . makes it original and copyrightable." (emphasis in original)); Silberman, 2003 WL 1787123, at *8-9 ("Plaintiffs' claim is not that defendants copied the concept of Silberman's photograph [but rather] that defendants appropriated Silberman's particular means of expressing the skyline concept by digitally reproducing Silberman's photograph itself. . . ."); Steinberg, 663 F. Supp. at 714.

cropping, and overall composition of the photograph. (AP SUF ¶¶ 79-87.) The facts show that the creative elements present in the Obama Photo were the result of significant creative skill and judgment exercised by Mr. Garcia in capturing Mr. Obama's expression, pose, and other ideal qualities at a particular moment in time. (AP SUF ¶ 79.)

Mr. Fairey himself admittedly selected the Obama Photo, from among the approximately 200 images that he considered, because it portrays the very qualities that he was looking for in a source image, and which he incorporated and similarly conveyed in the Obama Image. (AP SUF ¶¶ 94-97, 99-104.) Mr. Fairey testified that the Obama Photo is a "strong portrait" that he chose to use because it depicted Mr. Obama in a "flattering" way, as "presidential," "dignified," and "serious" with a "sense of contemplation," and because of the "way the light fell on Senator Obama's face." (AP SUF ¶¶ 96-107.) This is consistent with Mr. Garcia's testimony that he intended to make a "portrait" that would "capture the essence of Senator Obama." (AP SUF ¶ 83.) Mr. Garcia also testified that he made creative choices regarding the Obama Photo's composition, the moment in time that he chose to make the photograph, the equipment that he used, as well as his selection of the background, angle, and Mr. Obama's expression and demeanor. (AP SUF ¶¶ 83-87.)[20] Even Fairey's own expert admitted that Mr. Garcia made creative choices with respect to framing the Obama Photo, the choice of lens, depth of field, moment in time he took the photograph, and his positioning in making the photograph. (AP SUF ¶ 82.) She also admitted that the Obama Photo portrays Mr. Obama as a "strong leader,"

---

[20] Obey Clothing's wholly unsupported assertion that the only creative choices Mr. Garcia made were with respect to his position in the room, his crouch, and the shallow depth of field in the photograph, (OC Opp. 21-22), are directly contradicted by Mr. Garcia's extensive testimony about his creative process and by common sense. (Kehoe Decl., ¶ 43, Ex. 42 (M. Garcia Dep. (Mar. 4, 2010) 30:25-40:25.)

"visionary and forward-thinking," with "presence," and "as powerful," all of which were qualities that Mr. Fairey incorporated in the Obama Image.  (AP SUF ¶¶ 108-10.)

Rather than addressing the qualities that the Obama Photo conveys, Obey Clothing asserts that because Mr. Garcia is a press photographer, he must not have exercised any creative skill or judgment when making the Obama Photo.  This narrow, and narrow-minded, understanding of copyright law, which would render even Pulitzer Prize-winning photographs unprotectable, is directly at odds with this Circuit's applicable law, which routinely holds that photographs of pre-existing people, places and things are entitled to strong copyright protection against the sort of near-verbatim copying involved here.  See, e.g., Rogers, 960 F.2d at 307-08 ;[21] Silberman, 2003 WL 1787123, at *8-9; SHL Imaging, 117 F. Supp. 2d at 310-11; Eastern Am. Trio Prods., Inc. v. Tang Elec. Corp., 97 F. Supp. 2d 395, 418-19 (S.D.N.Y. 2000) (finding that defendants infringed plaintiffs' photographs of telephones by copying them from plaintiff's telephone catalog and using the photos in their own catalog); Scanlon v. Kessler, 11 F. Supp. 2d 444, 447 (S.D.N.Y. 1998) (holding that defendant infringed plaintiff's copyrighted photographs taken at events hosted by defendant by using the photos on its website and giving them to a writer for use in an unrelated publication); Campbell, 1993 WL 97381, at *3.  Under the directly applicable law, Mr. Garcia's actions in making the Obama Photo evidenced significant creativity and skill, and the resulting photo more than merits copyright protection.

---

[21] Obey Clothing attempts to distinguish Rogers by stating that the photo at issue in that case was somehow more creative than the Obama Photo.  Though the Rogers court noted the photographer's "inventive efforts" in posing the photograph, Rogers, 960 F.2d at 307, it seems highly unlikely (if not impossible) that Rogers actually controlled the pose of eight puppies sitting on a bench simultaneously, such that — just as is the case here — the moment in time that Rogers made the photo was a significant aspect of his creative contribution.

**3.      Fairey Copied The Obama Photo's Creative Expression**

As the AP discussed in its opening brief, and as the comparison below shows, virtually all of the creative elements in the Obama Photo were copied in the Obama Image, including: (i) the selection of the subject matter; (ii) the particular arrangement of Mr. Obama's facial features and expression, reflecting the moment in time when Mr. Garcia made the photograph; (iii) Mr. Obama's pose and posture; (iv) the angle of Mr. Obama's gaze; (v) Mr. Obama's view to the horizon; (vi) the cropping and framing of the original photograph; (vii) the lighting and shadows in the Obama Photo, which form the lines of color in the resulting image; and (viii) the red, white, and blue background, which were simply brought forward in the Obama Image.



Given the numerous similarities between the two works, and the works' overall arrangement and portrayal of Mr. Obama's features, expression, qualities, and particular characteristics, it is clear that the two works are substantially similar.  See Crown Awards, 326 Fed. Appx. at 579; Tufenkian, 338 F.3d at 136; Yurman, 262 F.3d at 110-12.

**4.      The Cases On Which Obey Clothing Relies Are Irrelevant**

Obey Clothing tries to gloss over the significant fact that none of the cases on which it relies involve direct copying, defying common sense (and a plain comparison of the images at issue) to argue that the Obama Photo and Obama Image only share similar conventions and

23

poses under the *scenes á faire* doctrine.  But, as the AP has previously noted (AP. Opp. Br. 28-30), Obey Clothing's reliance on <u>Bill Diodato Photography, LLC v. Kate Spade, LLC</u>, 388 F. Supp. 2d 382 (S.D.N.Y. 2005) (finding no substantial similarity where different photographers made different photos of different pairs of women's sandals and different handbags shot from under different bathroom stalls); <u>Kaplan</u>, 133 F. Supp. 2d 317 (finding no substantial similarity between different photos by different photographers, depicting different businessman standing on different ledges in a typical "suicide jump" pose overlooking different scenes); and <u>Straus v. DVC Worldwide, Inc.</u>, 484 F. Supp. 2d 620 (S.D. Tex. 2007) (noting that defendant's photo "was not copied from, nor taken with any awareness of" the plaintiff's photograph)) is misplaced because they each involved two <u>different</u> photos of <u>different</u> subjects[22] made by <u>different</u> photographers.

In <u>Bill Diodato</u> and <u>Kaplan</u>, no two elements of the photographs were the same or taken from the other, and in <u>Straus</u>, the defendant's photo was completely different — and not copied — from the plaintiff's.  Because there was no evidence of direct copying in any of the cases on which Obey Clothing relies, and because the selection and arrangement of elements depicted in the photographs at issue were different, the cases Obey Clothing cites are easily distinguishable.

Obey Clothing also relies on two Ninth Circuit cases both of which are easily distinguishable because unlike here they did not involve direct copying.  <u>Reece v. Island Treasures Art Gallery, Inc.</u>, 468 F. Supp. 2d 1197 (D. Haw. 2006) involved a photograph of a Hawaiian hula dancer and the defendant's stained-glass rendition of a similar subject matter, the defendant "testified that she did not copy [p]laintiff's photograph, but drew from her own

---

[22] In the case of <u>Straus v. DVC Worldwide, Inc.</u>, it was two different photographs of the famous golfer Arnold Palmer that were taken years apart by two different photographers.  484 F. Supp. 2d 620 (S.D. Tex. 2007).

memories."  468 F. Supp. 2d at 1201.  <u>Reece</u> stands in stark contrast to this case, where Mr. Fairey <u>admitted</u> that he directly copied the Obama Photo and did not draw the image from his "own memories."  Similarly, in <u>Satava v. Lowry</u>, 323 F.3d 805, 811-12 (9th Cir. 2003), although the defendant admitted seeing the plaintiff's physiologically accurate jellyfish sculptures, there was no evidence of direct copying and, at any rate, the two works looked quite different, as Obey Clothing's opposition brief makes clear.  (OC Opp. 25.)

As for <u>Kerr v. The New Yorker Magazine, Inc.</u>, that case actually supports the AP's position because, unlike here, the works at issue were not direct copies and, in fact, were only vaguely similar, as the images below make clear.  63 F. Supp. 2d 320, 325 (S.D.N.Y.1999) ("Although both images do include a male figure with a skyline Mohawk, the expressions of this idea are completely different.").[23]  Further distinguishing <u>Kerr</u> from this case, the defendant in <u>Kerr</u> asserted that she had independently created her work without reference to the plaintiff's work — which Obey Clothing has not, and cannot, claim here.  Perhaps most striking about <u>Kerr</u> is the level of abstraction at which the court considers the "idea" of plaintiff's image — "a male figure with a skyline Mohawk."  <u>Id.</u> at 325.




Plaintiff's Work          Defendant's Work

---

[23] <u>Sheldon Abend Recovable Trust v. Spielberg</u>, comparing a literary work to a movie, also is wholly inapplicable here.  <u>See</u> --- F. Supp. 2d ----, 2010 WL 3701343 (S.D.N.Y. Sept. 21, 2010).  Any similarity was only "at a high, unprotectible, level of generality," <u>id.</u> at *9, whereas here the works are similar at a very granular level of detail.

Applying the same level of abstraction to this case, the "idea" of the Obama Photo is a close-up portrait of Mr. Obama looking thoughtful. That idea can be expressed in countless different ways that do not copy nearly every last detail of the AP's copyrighted photograph. Indeed, several of Mr. Fairey's own other works of Mr. Obama portray the exact same idea, even using a similar pose and style as the Obama Image, as pictured below. But none are substantially similar to the Obama Photo because, most tellingly, none were copied from it. See Rogers, 960 F.2d at 307-08; Silberman, 2003 WL 1787123, at *8; Steinberg, 663 F. Supp. at 712.



While it is certainly true that the AP does not have exclusive rights to President Obama's face or pose, the AP does own a copyright in the particular photographic expression of Mr. Obama's facial features, pose, and other qualities as depicted in the Obama Photo, which were the result of very deliberate creative choices by Mr. Garcia. See Rogers, 960 F.2d at 307-08; United Feature Syndicate, 817 F. Supp. at 377; Campbell, 1993 WL 97381, at *2. Those creative choices resulted in a photo that presciently depicted Mr. Obama in a very particular way as a visionary leader, even before he announced his candidacy. And, as discussed in the AP's opening brief, Mr. Fairey recognized its special qualities as compared to other photos that he considered, and rejected, in selecting a source image, and copied them to make the resulting Obama Image. (AP MSJ 18-20, 33-34.) As in Steinberg, this use of the underlying work here constitutes strong evidence of substantial similarity. 663 F. Supp. at 713. As the Second Circuit

26

determined in <u>Rogers</u>, Obey Clothing cannot "defend the act of plagiarism by pointing out how much of the copy [it] has not pirated."  960 F.2d at 308.  Accordingly, summary judgment for AP is appropriate.

## III.   THE AP IS ENTITLED TO A DECISION OF NO FAIR USE AS A MATTER OF LAW BASED ON THE UNDISPUTED FACTS

In its own motion and its opposition papers, Obey Clothing sets out entirely inconsistent positions regarding its fair use defense.  On the one hand, it argues that it should not be impugned with Mr. Fairey's egregiously bad conduct in lying about the source image and intentionally destroying and fabricating documents to cover up the infringement.  (See OC MSJ 9-11.)  On the other hand, Obey Clothing argues that it "is only fair" to imbue it with the benefit of Mr. Fairey's purported fair use defense[24] and any attendant artistic or political purpose that he had.  (See OC Opp. Br. 33.)  Obey Clothing, however, fails to cite a single case finding that a licensee is entitled to the fair use defense of its licensor.[25]  This glaring omission is not surprising, as the law is to the contrary — courts repeatedly have held that a party must be judged on the merits of its <u>own</u> fair use defense and cannot stand in the shoes of another, potentially less culpable party.  <u>See</u>, <u>e.g.</u>, <u>Infinity Broad. Corp. v. Kirkwood</u>, 150 F.3d 104, 108 (2d Cir. 1998) (holding that broadcast re-transmitter could not stand in the shoes of downstream users for purposes of fair use); <u>Princeton Univ. Press v. Michigan Document Scrvs., Inc.</u>, 99 F.3d

---

[24] The AP does not believe that Mr. Fairey and his companies actually had a meritorious fair use defense, but since they are no longer in the case, that issue is obviously moot.

[25] Obey Clothing's reliance on <u>Apple Computer, Inc. v. Microsoft Corp.</u>, 35 F.3d 1435, 1447 (9th Cir. 1994), is just another example of its attempt to mislead this Court regarding the applicable case law.  Rather than holding that a licensee may assert the fair use defense of its licensor, that case actually stands for a wholly different proposition — namely, that an exclusive licensee is entitled to sue and collect damages for infringement of the licensed copyrighted works.  <u>See</u> 17 U.S.C. § 201(d)(2) ("The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.").  While that uncontroversial proposition is no doubt true, it has no bearing whatsoever on the fair use issues here.

1381, 1389 (6th Cir. 1996) (holding that Kinko's was not entitled to fair use defense of its student customers who could have cited a "nonprofit educational" purpose for using unlicensed college coursepacks); see also Video Pipeline, Inc. v. Buena Vista Home Entm't Inc., 192 F. Supp. 2d 321,  333-35 (D.N.J. 2002) (holding that creator and distributor of unlicensed movie trailers could not stand in shoes of retailers for purpose of asserting first sale doctrine defense).

The reason for this rule is simple.  As the AP explained in its opening brief, fair use is an equitable doctrine that empowers courts to excuse infringement where the societal benefits of the infringement outweigh the costs to the copyright owner and society of doing so.  (AP MSJ 35-36.)  Thus, each infringer must stand in its own shoes and be judged by the particular facts that pertain to it, which — as applied to Mr. Fairey and Obey Clothing — involve sharply different sets of policy tradeoffs.  For example, in Princeton University Press, while it may have been appropriate for the students who bought unlicensed college course packs to rely on fair use in support of their own academic work, it was not fair for the for-profit copy center to make and sell the course packs.  99 F.3d at 1386.  Among other things, the copy center was copying the works on a much larger scale than each individual student, which meant more harm to the original publishers under the fourth fair use factor.  It also was a larger entity that had the means to seek a license from publishers and pay the customary price.  Id. at 1386, 1389.

Here, similarly, Mr. Fairey's shoes simply do not fit Obey Cothing's feet.  Though the AP would have strongly disputed that Mr. Fairey's use fell within the fair use exception, there can be no doubt that Obey Clothing added nothing to the Obama Photo and that its use of the infringing Obama Image on the Obama Merchandise, including t-shirts, hoodies, and the like, for nearly a year after the 2008 election, substantially harmed the AP.  Thus, not only is the weight

of authorities against Obey Clothing on this point, but those authorities are entirely correct in light of the purpose and limited nature of the fair use defense.

Finally, Obey Clothing's assertion that the AP is somehow seeking to do an "end-around" fair use law is disingenuous as best.  As discussed at pages 53 through 56 infra, the AP has more than a century of experience in conducting activities protected by the First Amendment, and is well aware of the Constitutionally-mandated balance between the First Amendment and the protections afforded by copyright law.  Obey Clothing is the one seeking to upset that balance by vitiating copyright protection for photographs in pursuit of its own narrow commercial interests. The Court should reject this specious argument, and find in favor of the AP on fair use.[26]

### A.   Factor One Favors The AP In Light Of Obey Clothing's Commercial, Rather Than Transformative, Purpose and Its Bad Faith Intent In Selling The Image

To assist the Court in analyzing how this Circuit has balanced the copyright owner's exclusive against an infringer's claimed fair use in circumstances similar to this case, the AP in its opening brief discussed at length in its opening brief the four leading cases in this area, each of which involved the artist Jeff Koons use of a photograph to make a derivative work.  (AP MSJ 36-42.)  However, Obey Clothing's opposition brief does virtually nothing to distinguish this controlling authority on any of the fair use factors.  Its utter failure to deal with these cases, in particular Rogers v. Koons, where the Second Circuit affirmed a finding of no fair use in factual

---

[26] Obey Clothing has asserted that even if the Court grants the AP's motion for summary judgment, there would still need to be trial on its thirteen additional affirmative defenses.  (OC Opp. Br. 32 n. 7.)  But this a red herring.  A number of its affirmative defenses involve damages issues, including that Obey Clothing did not wilfully infringe the AP's copyright. (Docket #71, Obey Clothing's Answer and Affirmative Defenses.)  The remainder involve unsupported defenses such as laches, waiver, unclean hands, and estoppel, for which Obey Clothing has yet to posit a theory, as well as defenses that are part-and-parcel of its fair use defense, such as the First Amendment, which as explained herein are without merit.

circumstances that are clearly on point here, only serves to further illustrate Obey Clothing's attempt to mislead this Court and argue that this is somehow a close case, when it is not.

Instead of addressing the AP's discussion of the controlling authorities, Obey Clothing makes three other arguments regarding the first fair use factor, the purpose and character of the use:  (i) that Obey Clothing's use of the Obama Photo was different than Mr. Garcia's or the AP's because it was for "political expression"; (ii) that Obey Clothing did not have a "primarily commercial motive" in selling the Obama Merchandise when it did so for profit; and (iii) that the evidence of Obey Clothing's bad faith conduct is not as bad it appears.  However, as with Obey Clothing's arguments regarding substantial similarity, none of these assertions can withstand scrutiny.  Essentially, Obey Clothing seeks to take its fair use defense to unprecedented heights, asserting that a for-profit clothing company can use an image on t-shirts for profit without paying for a license.  That simply is not the law, and no court has ever found fair use on such facts.

### 1. Obey Clothing's Use of the Obama Photo by Distributing the Obama Image Was Neither Transformative Nor "Political Expression"

Under the first fair use factor, the nature and purpose the of the use, the Second Circuit in Blanch noted that for a use to be fair, the infringer must do more than merely "exploit the creative virtues" of the original work, such as by commenting on, or criticizing it, or otherwise making a productive use of the underlying work.  See 467 F.3d 244, 252, 257 (2d Cir. 2006).  Thus, a book review, which necessarily references the book being reviewed for the purpose of criticism, is a classic fair use.  Similarly, other productive uses that do not merely "exploit the creative virtues of the original," such as Google's use of "thumbnail" images to improve image search-results, news reporting, or historical or biographical purposes, are generally also considered fair uses.  See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007) (fair use of works as "thumbnails" on Internet search-results); Kelly v. Arriba Soft Corp., 336

F.3d 811 (9th Cir.2003) (same); Nunez v. Carribbean Int'l News Corp., 235 F.3d 18 (1st Cir.

2000) (fair use of photograph for news purposes and not to exploit aesthetic qualities); Bill

Graham Archives v. Dorling Kindersley, Ltd., 448 F.3d 605 (2d Cir. 2006) (fair use of works

reproduced for biographical purposes to preserve historical accuracy).  However, Obey

Clothing's reliance on these cases for the proposition that it was entitled to copy virtually all of

the Obama Photo for its own economic gain is entirely misplaced.[27]

    Here, it is clear that Obey Clothing merely "exploit[ed] the creative virtues" of the

Obama Photo in distributing and selling the Obama Image.  As discussed in the AP's opening

brief, (AP MSJ 16-17), the AP made the Obama Photo as an inspiring, flattering image of Mr.

Obama.  Mr. Fairey later used the photograph to make an inspiring, flattering image of Mr.

Obama, which Obey Clothing then sold on t-shirts, generating, in its own words, "significant

revenue."  (OC Opp. Br. 46.)  Moreover, Mr. Fairey admitted that he did not intend to comment

on or parody the Obama Photo.  (AP SUF ¶ 118 (S. Fairey Dep. (Mar. 17, 2010) 566:1-5.)  Thus,

there is simply no justification for allowing Obey Clothing to use the AP's copyrighted work

without paying a license fee.  See Rogers, 960 F.2d at 309-10 (rejecting Koons's argument that

use was "a fair social criticism" or that his appropriation art techniques were otherwise

_____

[27] Tacitly conceding the scope of the taking here, Obey Clothing misleadingly cites several cases for the proposition that an infringer may copy an entire work given a stated different purpose.  But even if Obey Clothing could show that it was pursuing a different purpose from the AP in using the Obama Photo, which it cannot, the Second Circuit has recognized that a "difference in purpose is not quite the same thing as transformation."  Infinity. Broad., 150 F.3d at 108-09 (finding no fair use where retransmission of radio broadcasts, although arguably done for a different purpose from original transmission (information rather than entertainment), offered no new expression, meaning or message).  Because the Obama Image conveyed the same expression, meaning, and message as the Obama Photo — that Mr. Obama was an intelligent and visionary leader — it cannot be considered transformative.  See id.; see also Gaylord v. United States, 595 F.3d 1364, 1373-74 (Fed. Cir. 2010) (rejecting fair use where photo of sculpture used on postage stamp was not transformative because "alterations [did] not impart a different character").  Moreover, Sarl Louis Feraud Int'l v. Viewfinder Inc., on which Obey Clothing relies for the proposition that an infringer may take the entire work, is entirely miscited.  In that case, the court not only denied the the motion for summary judgment, it explicitly found that the defendant "did not make an exact replication of plaintiffs' copyrighted works."  627 F. Supp. 2d 123, 128 (S.D.N.Y. 2008).  Thus, it clearly does not support Obey Clothing's contention that it was entitled to use all of the Obama Photo.

transformative because he was not commenting on, or criticizing, plaintiff's photograph); United Feature Syndicate, 817 F. Supp. at 380, 383-85 (finding first factor weighed against defendant, and no fair use, despite secondary work's purported commentary on "the cynical and empty nature of society"); compare J.D. Salinger v. Colting, 641 F. Supp. 2d 250, 257-58 (S.D.N.Y. 2009), rem. and vac. on other grnds., 607 F.3d 68 (2d Cir. 2010) (concluding that although defendant's work had some transformative value, it did not sufficiently comment on Salinger's *Catcher in the Rye*), with Blanch, 467 F.3d at 257.

As a stand-in for transformative purpose, Obey Clothing argues that its conduct in selling t-shirts bearing the Obama Image to its largest commercial customers at a substantial profit should be protected by the First Amendment as political speech. But even if this was an appropriate political speech case — and it is not — First Amendment concerns are appropriately considered under the first fair use factor and not as a separate analysis. See Eldred v. Ashcroft, 537 U.S. 186, 219 (2003) (noting that "copyright law contains built-in First Amendment accommodations," and that the "Copyright Clause and First Amendment were adopted close in time," which "indicates that, in the Framers' view, copyright's limited monopolies are compatible with free speech principles"); Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 559-60 (1985) ("In view of the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use, we see no warrant for expanding … fair use to create what amounts to a public figure exception.").

For example, in the recent case of Henley v. DeVore, defendant Charles DeVore, a Republican candidate for the U.S. Senate from California, lampooned several Don Henley songs for use in DeVore's political campaign. Henley, --- F.Supp.2d ---, 2010 WL 3304211 (C.D. Cal.

June 10, 2010.)  DeVore revised the lyrics of one well-known Henley song titled "Summer" to

"poke[] fun at Obama, House Speaker Nancy Pelosi . . . and Obama's supporters."  Id. at *1.

After receiving a cease-and-desist letter from Henley, DeVore modified the lyrics to another

Henley song titled "Dance," in order to "lampoon Barbara Boxer . . . and to criticize the cap-and-

trade and global warming policies" that she supported.  Id. at *2.  On cross motions for summary

judgment, the court granted summary judgment in favor of Henley, holding that under the first

fair use factor, DeVore failed to target or comment on Henley's songs themselves, instead

poking fun at society as a whole, and, to a lesser extent, Henley himself.  Id. at *12-13.  As for

DeVore's defense, the court concluded that although speech targeting public figures generally is

protected, the proper analysis was whether the copyrighted works at issue were sufficiently

transformative, which the court held they were not.  Id. at *8, 13.

Likewise, here Obey Clothing's use of the Obama Photo falls far short of the type of

commentary on the original work that courts require.  Indeed, whereas DeVore used Henley's

songs for political criticism, a wholly different purpose than Henley's use of the songs, as

discussed above, Obey Clothing used the Obama Photo for its intended purpose, using a

flattering, inspiring portrait of then-Senator Obama that made Mr. Obama look presidential, to

make a flattering, inspiring portrait of Candidate Obama that made him look presidential.  And in

any case, despite the clearly political context, the Henley court found no fair use.

In addition, as discussed in the AP's opening brief, the AP made the Obama Photo

available for licensing for the exact purposes it was used for by Obey Clothing, including to

support political campaigns and to make derivative works.   (AP MSJ 49-51.)  And, because the

Obama Image conveyed the same expression, meaning and message as the Obama Photo — that

Mr. Obama was an intelligent and visionary leader who could be president — it cannot be

considered transformative.  See Henley, 2010 WL 3304211, at * 13; see also Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1116-17 (9th Cir. 2000) (holding that re-publication of religious text for non-profit, religious purpose served the same purpose of the original, and was not transformative, nor separately protected under the First Amendment).

The principal cases that Obey Clothing relies upon under the first fair use factor, Blanch and Lennon v. Premise Media Corp., are inapposite, as the court in each case determined that the defendant had commented on or criticized the original work — an element that is wholly absent in this case.  For example, as explained in the AP's opening brief, (AP MSJ 40-42), and above at page 30 supra, the Blanch court began its analysis by noting that a work is not transformative if the "defendant has done no more than find a new way to exploit the creative virtues of the original work."  467 F.3d at 252.  In finding that Koons's work was transformative, the Second Circuit specifically found that Koons had deliberately commented on the original photo rather than merely "exploit[ing] its creative virtues."  Id. at 257.  In addition, the plaintiff essentially conceded the first fair use factor, admitting that Koons's purpose was dramatically different than hers.  Id. at 252-53.  Although the AP discussed these key considerations in its opening brief, Obey Clothing tellingly does not discuss any of them in its opposition brief, instead mischaracterizing the Second Circuit's holding as only focusing on Koons's overall social commentary, as opposed to his commentary on the photograph.  (OC Opp. Br. 37.)

Obey Clothing's reliance on Lennon is similarly misplaced.  There, the defendants' use of 15 seconds of John Lennon's classic song, "Imagine," including the lyrics, "Nothing to kill or die for / And no religion too," juxtaposed against the broader themes of defendants' movie about intelligent design as a theological alternative to Darwinian evolution, was clearly for the purpose of "criticism and commentary."  556 F. Supp. 2d 310, 317, 322 (S.D.N.Y. 2008).  The Lennon

34

case is also distinguishable because "Imagine" only comprised an exceedingly small portion of the one hour and thirty-nine minute movie.  Id. at 324 ("[A]lthough a minor factor, it weighs in favor of finding a transformative use that the excerpt of 'Imagine' in [defendants' movie] constitutes only 0.27 percent of the movie's total running time.").  As with Blanch, Obey Clothing's opposition brief fails to discuss these relevant considerations, acting as though its use of the Obama Image was somehow comparable, when it was not.

Obey Clothing also relies on Bill Graham Archives v. Dorling Kindersley Ltd., which is easily distinguishable.  There, the court found that the defendant used seven thumbnail-size images of Grateful Dead concert posters in a 480-page visual biography of the famous rock band without permission.  448 F.3d at 607 (determining under the first fair use factor that because the images at issue "account for less than one-fifth of one percent of the book," this weighed in favor of the defendant's use).  In finding that the use of the thumbnail images of the posters was transformative, the Second Circuit concluded that the reduced size of the images and the small percentage of the overall book using the plaintiff's works stood in "stark contrast to the wholesale takings" in other cases finding no fair use.  Id. at 611.  Significantly, it also noted that inclusion of the posters at issue in the defendant's book was not merely to exploit their creative virtues, but rather served a significant biographical purpose for "historic scholarship," id. at 609, that is not present here.  The Second Circuit explained that because the defendants only used "thumbnail" copies of the works, their use of the copyrighted images did not "offer more than a glimpse of their expressive value," weighing in favor of fair use.  Id. at 611.  By contrast, there can be no doubt that Obey Clothing took virtually all of the Obama Photo in reproducing and selling the Obama Image.  As such, its use of the Obama Photo was not transformative.  See Worldwide Church, 227 F.3d at 1117.

35

The Second Circuit also recognized in <u>Bill Graham</u> that the defendant "has not used any of [plaintiff's] images in its commercial advertising or in any other way to promote the sale of the book. . . . [and thus] the use of [plaintiff's] images is incidental to the commercial biographical value of the book," which weighed in favor of fair use.  448 F.3d at 612.  Here, as set forth in the AP's opposition to Obey Clothing's motion for summary judgment, (AP Opp. Br. 35-44), Obey Clothing used the Obama Image extensively to promote its entire brand, growing sales in new markets and significantly increasing its overall revenues as a result of the fame and success of the Obama Image.  To this day, it continues to be strongly associated with the Obama Image, with the Obama Image even featured in a recent article about Obey Clothing's move to new offices.  (Ray Decl. ¶ 7, Ex. 132 (<u>see</u> http://www.ocbj.com/news/2011/jan/30/clothes-maker-obey-expanding-irvine/).)  Such promotional use of the Obama Image readily distinguishes Obey Clothing's use of the Obama Image from any of the uses in <u>Bill Graham</u>, <u>Lennon</u>, or <u>Blanch</u>.  <u>Cf.</u> <u>Henley</u>, 2010 WL 3304211, at *13 (noting that DeVore "stands to get publicity for his campaign and openly hoped that his use of Henley's music would spur campaign donations" in finding against DeVore on factor one).

### 2.    Obey Clothing's Use of the Obama Image Was Clearly Commercial

Contrary to its absurd assertions, Obey Clothing's purpose in reproducing, distributing, and selling the Obama Merchandise was primarily profit-driven, and therefore commercial in nature.  (AP MSJ 45-47.)  As the AP explained in its opening brief, "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright," <u>Sony Corp. of Am. v. Universal City Studios, Inc.</u>, 464 U.S. 417, 451 (1894), which weighed heavily against Koons's highly commercial use of Rogers' photograph there.  <u>Rogers</u>, 960 F.2d at 309.

36

Instead of addressing the clear-cut authority the AP cited, Obey Clothing instead argues that "[g]iven the popularity of the Obama Image . . . [Obey Clothing] could have earned substantially more revenue" had it sought to maximize profits.  Even assuming that Obey Clothing did not do all it could to maximize its profits — a dubious conclusion at best — it is in any case irrelevant as a profit maximization motive is not essential to showing a commercial purpose.  For example, in <u>Henley</u>, where DeVore lampooned Henley's well-known songs in political ads, the court found that DeVore had a primarily commercial purpose and the first fair use factor favored Henley, even though DeVore did not financially profit at all from the infringing works.  Instead, the court held that DeVore's increased publicity and potential campaign donations from using Henley's music satisfied the commercial prong of the fair use test.  2010 WL 3304211, at *13-14; <u>see</u> <u>also</u> <u>Worldwide Church</u>, 227 F.3d at 1118 (finding defendant's distribution of copyrighted religious texts to its members was commercial because it could attract new paying members).  Here, Obey Clothing's significant revenue and profit from the sale of the Obama Merchandise far surpasses the relevant test for commerciality.  As set out in the AP's opposition brief, in addition to its direct profits from the Obama Merchandise, Obey Clothing also reaped ███████ of dollars in indirect profits.  (AP Opp. Br. 35-47.)

Moreover, there is no evidence that Obey Clothing's intended to use its profits from the Obama Merchandise to support Mr. Obama's campaign.  (<u>See</u> OC Opp Br. 46.)  Obey Clothing's purported intent is belied by the evidence regarding its actions.  Although it made more than ████████ in direct revenue from the Obama Merchandise, (AP SUF ¶ 150), there is no evidence that Obey Clothing <u>ever</u> made a donation of <u>any</u> amount to the Obama Campaign.  In other words, Obey Clothing cannot point to a single check, record of a check, bank statement, tax form, or even deposition testimony indicating that it donated money from the sale of the Obama

Merchandise to Mr. Obama's campaign or even to a qualified non-profit organization.  Instead, Obey Clothing's purported Obama-related donations involved activities such as (i) giving promotional items to its own retail accounts, including Zumiez, one of its largest customers, which of course benefitted Obey Clothing in both marketing its Obama Merchandise and in helping to ingratiate Obey Clothing with its largest customer; and (ii) making additional promotional copies of posters bearing the Obama Image. (AP Opp. Br. 16-17.)[28]

Given the significant commerciality of the Obama Merchandise and lack of transformative value, factor one weighs against Obey Clothing.

### 3.     Obey Clothing's Bad Faith Intent in Distributing the Obama Image

As discussed in the AP's brief in support of its motion for summary judgment, (AP MSJ 42-45), Obey Clothing's bad faith intent and conduct in using the Obama Photo without permission, knowing that the owner of the photograph could bring legal action, also weighs strongly against fair use.  In its opposition brief, Obey Clothing does nothing to counter the damning e-mail sent by Obey Clothing's principal owner, Don Juncal, which Mr. Juncal himself failed to produce in discovery because he had deleted all of his e-mails in April 2008 -- conveniently, right after key documents would likely have been created.  In other words, there is no record of what other e-mails Mr. Juncal may have been sending at or around the same time regarding the source image that Mr. Fairey used for the Obama Image.  As Mr. Juncal made clear in the e-mail (which fortunately was produced from another Obey Clothing employee's files),

---

[28] Obey Clothing's assertion that it used at least ▮▮▮▮ of profits related to the Obama Merchandise for Obama campaign-related projects is both wrong and misleading.  For example, included in that number are giveaways of merchandise that did not include the Obama Image and which make no reference at all to President Obama or his 2008 campaign.  (AP CSMF ¶ 43.)  Moreover, Obey Clothing significantly overstates the value of any contribution by recording  the wholesale value of these promotional items rather than their cost (i.e., the amount it cost to make them), resulting in a significant overstatement.  (AP CSMF ¶ 43.)  As one example, Obey Clothing counts ▮▮▮ for t-shirts that it gave to Zumiez although it spent less than ▮▮▮▮ producing the shirts (i.e., nearly ▮▮▮▮ less than the amount Obey Clothing claims).  (AP CSMF ¶¶ 44-45.)

Obey Clothing was well aware that it was taking a huge risk in distributing the Obama Image given concerns about the photographer's rights in the image, and proceeded to distribute the merchandise for profit in spite of that risk.  Mr. Juncal wrote:

> Another issue is since we do not know who the photographer is that took the photo you used for the [Obama] art [we are] concerned that if we sold it to Urban [Outfitters] and the photographer came at Urban, that could open up other legal issues.

(AP SUF ¶ 138-39 (Kehoe Decl. ¶ 63, Ex. 62).)

In its opposition brief, Obey Clothing describes Mr. Juncal's e-mail as "vague" and "taken out of context," without ever identifying what supposedly is either vague or out of context about it, essentially admitting the truth of its contents.  (OC Opp. Br. 48.)  Moreover, the opposition brief does not dispute that the "reverse indemnity" provision in its 2006 trademark licensing agreement with Mr. Fairey and Obey Giant LLC expressly acknowledges that Mr. Fairey incorporates the "protectable" expression of others in his works, and that if Obey Clothing "elects to use such art containing both the ["Obey" trademarks] and protectable intellectual property of a third party, [Obey Clothing] shall do so at its own risk . . . ."  (AP SUF ¶ 80 & OC 56.1 RSUF ¶ 50.)  Thus, despite receiving no assurances from Mr. Fairey whatsoever regarding permission to use the source image, Obey Clothing chose to proceed anyway, ignoring many red flags, including its knowledge of Mr. Fairey's prior use of third-party intellectual property and its own settlement of claims related thereto, in its quest to cash in on the Obama Image's popularity. (AP MSJ 42-45.)

The fact is Obey Clothing did nothing whatsoever to confirm the identity of the photographer or seek a license, although there was more than enough time for Obey Clothing to do both of these things.  (AP SUF ¶¶ 142-43, 156-158.)  Obey Clothing also never gave any credit to the AP or included its copyright notice on the apparel — even after Mr. Fairey finally

admitted that he use an AP photo and this lawsuit began.  (AP MSJ 45.)  Instead, Obey Clothing

continued to sell apparel, without any compensation or credit to the AP, until August 2009, six

months after this litigation began and several months after it had specifically asked Fairey about

possible liability as a result of this lawsuit, without regard to any of the AP's rights.  (Ray Decl.

¶ 8, Ex. 133 (C. Broders Dep. (Mar. 16, 2010) Ex. 6).)  In light of Obey Clothing's cavalier and

egregious conduct, the first sub-factor weighs against fair use.

### B.     Under Factor Two, Even Mr. Fairey and His Expert Admitted that the Obama Image is a "Strong Portrait"

It is undisputed that Shepard Fairey admitted in his deposition that the Obama Photo is a

"strong portrait," (AP SUF ¶ 97), with the qualities that were important for his use of the Obama

Photo, (see, e.g., AP SUF ¶¶ 94-95) ("wise, but not intimidating"); ("having some sort of

wisdom . . .  that was really what struck me about the photo'"").  Mr. Fairey also testified that he

chose the Obama Photo because it depicted Mr. Obama in a "flattering" way, as "presidential,"

"dignified,"  "serious" and with a "sense of contemplation," and that he chose it from among 200

photographs that he considered for its special qualities.  (AP SUF ¶¶ 99-106.)  Fairey's expert,

Prof. Sturken, also testified at length about the creative qualities present in the Obama photo,

including that: (i) Mr. Garcia's use of the three-quarter pose technique in the Obama Photo helps

portray Mr. Obama as a "strong leader" and "connotes leadership, inspiration and forward-

thinking"; (ii) Mr. Garcia's decision to depict Mr. Obama gazing toward the horizon helps

portray Mr. Obama as "someone who is visionary and forward-thinking, [and] a little bit above

the crowd"; and (iii) by showing Mr. Obama from below, Mr. Garcia helps portray Mr. Obama

with "presence" and "as powerful."  (AP SUF ¶¶ 108-110.)

Notwithstanding these undisputed admissions, Obey Clothing argues, wrongly, that "the

only apparent evidence" to support AP's claim that the Obama Photo is highly expressive is the

AP's own expert's testimony.  (OC Opp. Br. 52.)  This is yet another example of Obey Clothing playing fast and loose with the evidentiary record.  Mr. Garcia's testimony, as discussed at pages 20-22 supra, demonstrates the numerous creative choices he made in making the Obama Photo. Nor does Obey Clothing dispute the substance of the AP's expert's testimony, which is that the Obama Photo was the result of significant creative skill and judgment exercised by Mr. Garcia in capturing Mr. Obama's expression, pose, and other ideal qualities at a particular moment in time. (AP SUF & OC 56.1 RSUF ¶ 79.)  Given the weight of the undisputed evidence on this point, summary judgment is appropriate for AP.  See Rogers, 960 F.2d at 306-07.

Obey Clothing also cannot avoid summary judgment by arguing that Mr. Garcia's portrait was merely "factual,"[29] and somehow less creative than Obey Clothing's and Fairey's own use of the photograph.  As a legal matter, the Second Circuit dismissed similar arguments in Rogers, rejecting the defendant's assertion that the photograph in that case lacked original expression, which Obey Clothing does not even address in its opposition brief.  See Rogers, 960 F.2d at 306-07; see also Viewfinder, 627 F. Supp. 2d at 128 ("[T]he notion that photographs merely reproduce reality, and do not apply a creative, or even distorting, eye to the events is long discredited.").  Here, by selecting the Obama Photo rather than another of the approximately 200

---

[29] Obey Clothing argues that the Obama Photo should be entitled to lesser copyright protection than "a more fanciful work" because it is a "news" photo that contains factual elements.  (OC Opp. Br. 51-52.)  The cases on which Obey Clothing relies are inapposite.  First, in Obey Clothing's lead case, Nunez v. Caribbean International News Corp., the court found that promotional modeling pictures "could be categorized as either factual or creative," but given the publicity nature of the images, this factor was "neutral."  235 F.3d at 23.  Because the Obama Photo did not serve a limited, publicity purpose, Nunez does not support Obey Clothing's narrow, self-serving claims regarding the Obama Photo.  Second, both Monster Communication, Inc. v. Turner Broadcasting Systems, Inc., 935 F. Supp. 490 (S.D.N.Y. 1996), and Los Angeles News Services v. KCAL-TV Channel 9, 108 F.3d 1119 (9th Cir. 1997), involved unlicensed use of copyrighted video footage depicting the informational value and context of a given historical moment: in Monster, Muhammad Ali's trip to Zaire to fight George Foreman in the "Rumble in the Jungle," 935 F. Supp. at 494, n. 6, and in Los Angeles News, the beating of Reginald Denny in the aftermath of the Rodney King verdict, 108 F. 3d. at 1120.  In both cases, the informational or historical nature of the copyrighted works favored the alleged infringer under the second fair use factor.  See Monster, 935 F. Supp. at 494-95; Los Angeles News, 108 F.3d at 1122.  Here, the Obama Photo is decidedly not informational, it is a stylized, close-up portrait of Mr. Obama that says nothing about the particular setting in which it was made.

photos that he considered, (AP SUF ¶ 96), Mr. Fairey himself recognized that the Obama Photo

captured Mr. Obama's likeness in a way that no other photo did.  See Images Audio Visual

Prods., Inc. v. Perini Bldg. Co., 91 F. Supp. 2d 1075, 1085 (E.D. Mich. 2000) (finding second

fair use factor weighed against fair use where defendant copied aerial photographs for use in

arbitration proceeding).[30]  Moreover, the photos that Mr. Fairey considered but did not use would

have required substantial changes, which the Obama Photo did not.  (See AP SUF ¶ 99-105.)

It also should not be forgotten that the Obama Photo is not merely a news photo that

conveyed the news of the day.  As Fairey's expert admits, the portrait does not report on the

2006 press conference on Darfur attended by George Clooney and then-Senator Obama.  (AP

SUF ¶ 90.)  Rather, it is a stand-alone, prescient portrait of then-Senator Obama, reflecting the

creative choices of its photographer.  As such, the Obama Photo is an expressive work that is

within core of copyright's protections.[31]  See Rogers, 960 F.2d at 310.

## C.    Under Factor Three, Obey Clothing Took All of the Obama Image and Certainly Took the "Heart" of It

As set forth in the AP's opening brief, (AP MSJ 55-57), the third fair use factor considers

the amount and substantiality of the portion of the original that the defendant used, i.e., "what

---

[30] Even Monster, on which Obey Clothing relies, recognized that certain photos of actual people, places, and events — for example, "great pieces of photojournalism" like the AP's "stirring photograph of U.S. Marines raising the American flag atop Mount Surabachi on Iwo Jima — may be "as creative and deserving of protection as purely fanciful creations."  935 F. Supp. at 494.  The Obama Photo has more in common with such photographs (for numerous reasons) than with the video footage examined in Monster and Los Angeles News.

[31] Obey Clothing's reliance on the fact that the Obama Photo was published is similarly misplaced.  (OC Opp. Br. 53-54.)  Whether a work is unpublished may be relevant to a finding of no fair use, because the second comer has usurped the plaintiff's exclusive right of first publication.  Harper & Row, 471 U.S. at 463-64.  It would make no sense, however, to reward an infringer simply because a work was published.  Nearly every case of copyright infringement involves a published work, which is how the infringer typically gets access to the work in the first place.  That is why, in cases such as this where the published copyrighted work was created, at least in part, for licensing by others, the Second Circuit has recognized that this consideration is entitled to little or no weight.  See, e.g., Rogers, 960 F.2d at 310 (noting that Rogers' photograph was published, but weighing this factor in his favor since the photograph was "was creative and imaginative and Rogers, who makes his living as a photographer, hopes to gain a financial return for his efforts with this photograph, this factor militates against a finding of fair use").

degree of the essence of the original is copied in relation to its whole." Rogers, 960 F.2d at 311.
The extent of the copying often is a good proxy for the harm to the plaintiff. That said, even
copying a small amount from a work can still be problematic if the copied portion turns out to be
"essentially the heart" of the work. Harper & Row, 471 U.S. at 565-66; see also Infinity Broad.,
150 F.3d at 109 (finding that third factor favored plaintiff as even societal benefit in making
radio transmissions available to the public did not justify copying the entirety of those
broadcasts). In Rogers, the Second Circuit determined that this factor weighed strongly against
Koons precisely because — as Obey Clothing has done here — Koons copied the photo "nearly
in toto." Rogers, 960 F.2d at 311; see also United Feature Syndicate, 817 F. Supp. at 381
(finding that no reasonable fact finder could conclude that Koons did not exceed a permissible
level of copying by taking plaintiff's copyrighted character "virtually in its entirety").[32]

Rather than address this controlling authority, Obey Clothing seeks to up-end these well-
established principles, stating that that the third factor "depends in good measure on an analysis
of other factors," citing the Supreme Court's decision in Campbell v. Acuff-Rose Music, Inc.,
510 U.S. 569, 587 (1994), and asserting that "what is relevant is the amount and substantiality of
the copyrighted expression that has been used," which Obey Clothing defines exceedingly
narrowly, citing to Salinger v. Random House, Inc., 811 F.2d 90, 97 (2d Cir. 1987). But, once
again, Obey Clothing misconstrues the law.

---

[32] Obey Clothing cites two Ninth Circuit Internet-thumbnail cases, Perfect 10, Inc. v. Amazon.com, Inc. and Kelly
v. Arriba Soft Corp., for the proposition that an infringer may copy the entire work. (OC Opp. 36-37, 54-55.) But
as discussed pages 30 through 31 supra, those are clearly distinguishable as each turned on the informational value
of making the works available in reduced-size, "thumbnail" form to search for on the Internet. See Perfect 10, Inc.,
508 F.3d at 1165 ("Although an image may have been created originally to serve an entertainment, aesthetic, or
informative function, a search engine transforms the image into a pointer directing a user to a source of
information.") With regard to fair use factor three in particular, because the images at issue had only been
reproduced at a significantly smaller size and image quality, this factor was neutral. Id. at 1167-68; cf. Gaylord, 595
F.3d at 1373-74.

First, nowhere in <u>Campbell</u> does the Supreme Court state that the third fair use factor "depends" on any of the other fair use factors.  <u>See</u> <u>Campbell</u>, 510 U.S. at 586.  Rather, the Court held that a parodist commenting on the original work is entitled to borrow "no more [than] was . . . necessary" to conjure up the original work in order to poke fun at it.  <u>Id.</u> at 589.  To the extent this inquiry has some overlap with the first fair use factor in a parody/commentary case, it has no relevance here given that (i) Mr. Fairey admitted that he was not using the Obama Photo to comment on or parody it (AP SUF ¶ 118 (S. Fairey Dep. (Mar. 17, 2010) 566:1-5); and (ii) Obey Clothing has not claimed that its use of the Obama Image comments on the Obama Photo.

As for <u>Salinger v. Random House</u>, that case strongly <u>supports</u> the AP's argument regarding the third factor.  In reversing the district court's decision in that case, the Second Circuit noted that Judge Leval (then a district court judge) had construed the scope of protectable expression in J.D. Salinger's <u>Catcher in the Rye</u> too narrowly under this factor:

> [W]e conclude that [Judge Leval] misapplied the governing standard in determining the number of instances in which [the defendant] has used Salinger's copyrighted expression. The District Judge rejected Salinger's claim of infringement as to several passages of the letters because they "employ[ed] a cliche or a word-combination that is so ordinary that it does not qualify for the copyright law's protection."  Though a cliche or an "ordinary" word-combination by itself will frequently fail to demonstrate even the minimum level of creativity necessary for copyright protection, such protection is available for the "association, presentation, and combination of the ideas and thought which go to make up the [author's] literary composition."

<u>Random House</u>, 811 F.2d at 98 (internal citations omitted).  Obey Clothing essentially makes the same arguments here that were rejected in <u>Random House</u>, wholly failing to account for the overwhelming degree of similarity between the Obama Photo and the Obama Image.

At any rate, Obey Clothing does not seriously dispute that it copied the entire photo — a full-frame, wholesale taking of all of the photo's key aspects, including Mr. Obama's expression, demeanor, pose, angle, the patriotic flag motif that was used to derive the colors on the Obama

Image, even the tiny but crucial highlights (the so-called "twinkles") in Senator Obama's eyes that animate his gaze.  (AP SUF ¶ 116 (L. Dahlberg Dep. (Dec. 10, 2010) 101:4-23).[33]  It also copied all of the characteristics that helped make the Obama Photo a compelling political portrait, including, as identified by Fairey's expert, Prof. Sturken, the three-quarters pose, gaze toward the horizon, and the view from below (AP SUF ¶¶ 108-10 (M. Sturken Dep. (Nov. 24, 2010) 50:25-53:6, 58:3-61:13, 62:3-62:13), as well a the size, cropping, framing, lighting, and focus of the Obama Photo almost verbatim. (AP SUF ¶¶ 114-117.)  Given Obey Clothing's almost verbatim taking, including all of the Obama Photo's special qualities, the third fair use factor clearly weighs conclusively against fair use.[34]

### D.   Factor Four Weighs Heavily in Favor of the AP

The fourth fair use factor takes into consideration whether a use that interferes with the value of the original undermines copyright's system of economic incentives.  In its opening brief, the AP cited several distinct economic harms from Obey Clothing's unlicensed use, including (i) harm to the market for the original work, (ii) harm to the market for derivative works based on the original work, and (iii) harm to the copyright owner, or the markets for its works, were the challenged use to become widespread.  (AP MSJ 57-63.)  A finding of cognizable harm under

---

[33] Without explanation, Obey Clothing states that the AP "inappropriately" relies on "its experts" in support of its fair use argument.  But the AP knows of no reason why the Court should not consider the experts' testimony regarding the fair use factors, and, in an ironic twist, Professor Sturken is Fairey's expert, not the AP's, though her testimony is helpful regarding the extent of the taking in this case.  (AP SUF ¶¶ 108-10 (Professor Sturken testified that Mr. Fairey copied the three-quarters pose, gaze toward the horizon, and the view from below, among other things, from the Obama Photo and incorporated those same elements in the Obama Image.)  See Warner Bros. Entertainment Inc. v. RDR Books, 575 F. Supp. 2d 513, 526 (S.D.N.Y. 2008) (crediting plaintiffs' experts testimony regarding fair use factors, including with respect to the extent of the defendants' "verbatim copying").

[34] The comprehensive nature of the copying of the Obama Photo can be seen by comparing it with what would have been necessary had the Clooney Photo instead been used as the source image for the Obama Image.  The Clooney Photo had a much wider focus than the Obama Photo, depicting then-Senator Obama and Mr. Clooney with their upper bodies visible, sitting at a table at the NPC press conference.  (See AP SUF ¶ 129.)  Had Mr. Fairey used the Clooney Photo, as he falsely represented, the portion of the photo that he took would have been a smaller part of that photo, and arguably not the most important part — i.e., not the part with Mr. Clooney in it.  By contrast, the true source image, the Obama Photo, was copied in its entirety.  (See AP SUF ¶ 114.)

any one of these considerations is sufficient to weigh this fourth factor in the AP's favor on summary judgment.  Here, the AP's harm under factor four is so compelling that it alone is sufficient to support the conclusion that Obey Clothing's unauthorized use of the Obama Photo was not a fair use.  With both the facts and legal authority militating against its unlicensed use, Obey Clothing makes of mash of the points at issue, hiding from the relevant facts and advancing a view of the law under factor four that is too narrow and would, if countenanced, severely erode the incentives for the AP, and other photo-content providers, to develop and maintain their photo-licensing businesses.  To set the record straight, the AP will address, seriatim, the categories of economic harm flowing from Obey Clothing's unlicensed use.

### 1.    Obey Clothing Cannot Dispute that Its Unlicensed Use Harmed the Market for the Obama Photo, as the Original Work

Under the first consideration, the harm to the market for the original work, AP correctly cites its lost licensing revenue as a result of Obey Clothing's unlicensed use of the Obama Photo as a significant harm.  See Davis v. The Gap, Inc., 246 F.3d 152, 175-76 (2d Cir. 2001) (finding that fourth factor weighed against fair use where Gap took plaintiff's copyrighted eyewear for its ads, depriving plaintiff of licensing revenue that plaintiff would have received as well as impairing plaintiff's ability to license eyewear to others).  It is black letter law that this is an appropriate harm under factor four in circumstances, such as here, where the defendant's unlicensed use falls within an expected or developed market of the plaintiff's original work.  Princeton University Press, 99 F.3d at 1387 ("Where . . . the copyright holder clearly does have an interest in exploiting a licensing market — and especially where the copyright holder has actually succeeded in doing so — 'it is appropriate that potential licensing revenues . . . be considered in a fair use analysis.'" (citing American Geophysical Union, 60 F.3d 913, 930 (2d. Cir. 1994).)  Here, the facts show that the AP had an existing market for licensing the Obama

46

Photo — including for use in political campaigns and as derivative works — when Obey Clothing used the image.  (AP SUF & OC 56.1 RSUF ¶¶ 10, 12-16, 70-72.)  Indeed, Obey Clothing has not disputed that by failing to obtain a license for its use of the Obama Photo, Obey Clothing deprived the AP of licensing revenue.  (AP SUF & OC SUF ¶ 164.)  There is thus no doubt that the market for the original was harmed by Obey Clothing's failure to pay the customary price, which weighs in favor of AP under this factor.

To avoid the significance of this fact, Obey Clothing tries to warp the law under factor four, asserting that "[t]he AP's potential lost licensing fee . . . should not impact the Court's fair use analysis."  (OC Opp. Br. 57.)  But American Geophysical Union v. Texaco Inc., on which Obey Clothing relies, actually stands for the opposite proposition, as the Second Circuit conclude that "[i]t is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work . . . and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." 60 F.3d 913, 929, 931 (fourth factor favored plaintiff "[p]rimarily because of lost licensing revenue.")

Nonetheless, Obey Clothing takes this argument one step further in the wrong direction, asserting that it would be "circular" to consider lost licensing revenue under the fourth factor "because the purpose of the fair use test is to determine whether [it] would have been required to pay a licensing fee in the first instance."  (OC Opp. Br. 56.)  But cases, including at least two cited by Obey Clothing, have addressed — and rejected — this very argument where the challenged use falls within an expected or developed licensing market for the original work . Princeton University Press, 99 F.3d at 1407 (cited at OC Opp. Br. 60 n. 19) (rejecting circularity argument as "too much."); American Geophysical Union, 60 F.3d at 938 (cited at OC Opp. Br.

56, 58) ("The vice of circular reasoning arises only if the availability of payment is <u>conclusive</u> against fair use.") (emphasis added).

As discussed in the AP's opening brief, (AP MSJ 60-61), another harm to the market for the original work is that, by failing to properly credit the AP, Obey Clothing's unlicensed use deprived the AP, and the Obama Photo, of any positive association with the Obama Image during its widespread circulation and success, and denied the AP the opportunity to promote the Obama Photo as the source of the Obama Image in 2008, when it would have earned the most licensing revenue.  (AP SUF ¶ 166 (Kehoe Decl., ¶ 12, Ex. 1 (B. Sell Dep. (Dec. 2, 2010) 187:9-189:15 ("[The Obama Image] was appearing in a lot of places and getting a lot of attention.  So the fact that The Associated Press photographer and The Associated Press had been connected to it would have had a benefit to The Associated Press.").)

### 2.    <u>Obey Clothing Cannot Dispute that Its Unlicensed Use Harmed the Derivative Markets for the Obama Photo</u>

In addition to harming the market for the Obama Photo itself, Obey Clothing's unlicensed use harmed the derivative market for the Obama Photo.  Specifically, as discussed in the AP's opening brief (AP MSJ 59-60), the AP routinely licenses its photos for use in derivative works.  (<u>See</u> <u>also</u> AP SUF & OC 56.1 ¶¶ 10, 12-16, 70-72; DeGrave Decl. ¶¶ 9-13.)  By failing to license its merchandising application of the Obama Image, Obey Clothing usurped a derivative market for the Obama Photo without crediting or compensating the AP.  (AP SUF ¶ 167; Kehoe Decl. ¶ 74, Ex. 73 (W. Landes Dep. (Dec. 8, 2010) 149:13-154:18 ("Q: You suggest in your report that there is a market consisting of people who want to make derivative works of the [Obama Photo], correct?  A: Of course, there are close to, you know, one million copies, which I would call works there were derivative from the [Obama Photo.]").)

Obey Clothing attempts to diminish this harm in two ways, one legal and one factual —
both unavailing.  First, it argues that the Court should ignore the harm to the derivative market
for Obama Photo because the company's "use of the Obama Image on merchandise was
transformative," citing Bill Graham for the proposition that a copyright holder must show
"impairment to a traditional, as opposed to a transformative market." (OC Opp. Br. 58.)  This
argument fails for several reasons.

As an initial matter, as discussed at pages 30 through 36 supra, Obey Clothing's use of
the Obama Photo as the source for the Obama Image cannot be considered transformative.  In
Bill Graham, the Second Circuit considered whether the use of "thumbnail" versions of seven
Grateful Dead concert posters for historical, biographical purposes in a 400+ page book
constituted fair use.  448 F.3d at 610-11.  In analyzing the defendants' biography of the band, the
Second Circuit specifically noted that courts "frequently afforded fair use protection to the use of
copyrighted material in biographies to use of copyright material in biographies, recognizing such
works as forms of historic scholarship, criticism, and comment that require incorporation of
original source material for optimum treatment of their subjects."  Id. at 609 (emphasis added).
Here, there can be no doubt that Mr. Fairey and Obey Clothing had other options available
besides using the Obama Photo without permission — they could have used a different photo, or
even commissioned a photo if they felt that the other available photos were not suitable.  Thus,
the present case is a far cry from Bill Graham and its particular facts, where there was no way to
show the posters in issue other than by depicting them.  Id.

Further, Obey Clothing's argument that there was no derivative market for the Obama
Photo makes no sense, either factually or legally.  Obey Clothing cannot deny that the AP had an
existing derivative market as to Obey Clothing — which it plainly did as evidenced by the

license for the Palestinian Woman photo.  But in any case, the relevant legal test goes beyond Obey Clothing specifically to assess whether the AP had an existing derivative market in general, for <u>all</u> of its customers (<u>see</u>, <u>e.g.</u>, <u>Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.</u>, 996 F.2d 1366, 1377 (2d Cir. 1993) (rejecting fair use where book about plaintiff's TV series might interfere with primary market for copyrighted work and "almost certainly interferes with legitimate markets for derivative works"), which it indisputably did.  (<u>See</u> AP SUF ¶¶ 70, 13-18.)

Next, Obey Clothing attempts to dispute the harm to the Obama Photo's derivative market by asserting that "Obama Image caused more people to purchase the [Obama Photo], and led to the sale of dozens of fine prints of the Garcia Photo."  (OC Opp. Br. 59.)  This argument is so factually confused and unfounded that it collapses under its own weight.  First, Mr. Fairey failed publicly to identify the Obama Photo as the source image for the Obama Image until <u>October 2009</u>, when he also admitted to spoliation in an effort to conceal the true source image; thus none of the uses of the Obama Photo before that date can plausibly be attributed to its use in the Obama Image.  In fact, it makes far more sense to conclude that the pre-October 2009 uses were due to Mr. Obama's successful candidacy for president.  Second, as Prof. Landes testified, any fine-art print sales of the Obama Photo would also have occurred <u>even if</u> Mr. Fairey and Obey Clothing had properly licensed the Obama Photo.  (AP SUF ¶ 165.)  Indeed, the AP likely would have had even more such licensing opportunities if it had been publicly credited as the owner of the source image for the Obama Photo.  (AP SUF ¶ 166.)  Thus, despite Obey Clothing's arguments, the AP has established harm to derivative markets for the Obama Photo.

**3.**     <u>**If Widespread, Unlicensed Uses Such as Obey Clothing's Would Cause  Significant Harm**</u>

As the AP discussed in its opening brief, (AP MSJ 61-62), if Obey Clothing's use of an AP photo to market and sell derivative works without permission were to become widespread, it

would significantly erode the AP's incentive to maintain and develop its photo-licensing

business.  Specifically, the AP developed AP Images with the express goal of increasing its

licensing business in order to offset declines in its traditional newsgathering business.  (AP SUF

¶¶ 8-9.)  To do so, the AP has made numerous investments and changes to its policies to broaden

the photo-content available for license by its customers.  (AP SUF ¶¶ 21-23, 25-28.)  If

companies like Obey Clothing were permitted to use AP's images without permission or

compensation, then the AP's incentive to continue to maintain, develop, and expand its photo-

licensing business would be substantially undermined.  See Harper & Row, 471 U.S. at 568;

Ringgold v. Black Entm't Television, Inc., 126 F.3d 70, 80-81 (2d Cir. 1997) (finding

defendants' conduct in using plaintiff's work for its intended purpose without compensation, if

widespread, would adversely impact market for licensing plaintiff's work); cf. Gilliam v.

American Broad. Cos., Inc., 538 F.2d 14, 23 (2d Cir. 1976) (noting that copyright law should

encourage the production and dissemination of new creative works by providing "adequate legal

protection for one who submits his work to the public").  The result would be a decrease in the

breadth and variety of the photo-content that the AP makes available to the public — a loss to

both the AP and those individual and entities who rely on the AP to provide images that they

cannot otherwise acquire for use in their professional and artistic works.

Obey Clothing urges the Court to ignore this harm, attempting to turn factor four into

another consideration of its purported "First Amendment" purpose and failing to address the

opinions of the AP's expert, Dr. William Landes from the University of Chicago, who is the

leading economist on markets for copyrighted works.  (OC Opp. Br. 60-61.)[35]  Obey Clothing

---

[35] In its 56.1 Response, Obey Clothing baldly asserts that Professor Landes lacks foundation to testify regarding the economic harm flowing from Obey Clothing's unlicensed use of the Obama Photo.  (OC 56.1 RSUF ¶¶ 167-68.) Yet in making this claim, Obey Clothing cites neither any particular evidentiary rule nor any specified grounds.  Nor (Continued…)

again fails to understand the issues at stake.  Copyright law promotes and protects a system of

incentives that both motivates creative activity and ensures creators a fair return for their labors.

See Sony Corp. of Am., 464 U.S. at 429; Harper & Row., 471 U.S. at 546.  The fourth factor

operates with this system of incentives in mind, asking how it would be affected if the particular

use at issue were to become unrestricted and widespread.  See, e.g., Fitzgerald v. CBS Broad.,

Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007) (finding that a fair use ruling would destroy

market for photographs at issue such that it would have been "hard to imagine that freelance

photojournalists would continue to seek out and capture difficult to achieve pictures" and noting

that "[t]his is exactly the kind of situation that copyright is meant to impact where unrestricted

use would likely dry up the source."); Nunez, 235 F.3d at 25 (discussing whether "wide-scale

reproduction of professional photographs in newspapers (for similar purposes) would in general

affect the market for such photography.")

    Here, there can be no doubt that if unlicensed uses like Obey Clothing's become

widespread and unrestricted, then the AP — and other photo-content providers throughout the

country, like Getty Images and Reuters — would have far less incentive to make their

photographs available to the public.  (See AP SUF ¶ 168 (AP's economics expert, Prof. William

Landes, Ph.D., explained: "[T]o the extent that people could use an AP image in T-shirts,

posters, calendars and so forth without paying, and particularly if they took images that were

---

could it.  Professor Landes, who received his Ph.D. in Economics from Columbia University in 1966 and has since
taught at Stanford, Columbia, the Graduate Center of the City University of New York, and, most recently, the
University of Chicago, is an authority in the area of law and economics.  In the area of intellectual property, in
particular, he co-authored, with Circuit Court Judge Richard A. Posner, *The Economic Structure of Intellectual
Property Law* (Harvard University Press, 2003) and has otherwise published extensively.  In forming his expert
opinion and providing testimony here, Professor Landes independently reviewed the relevant pleadings, five days of
Mr. Fairey's deposition testimony, several expert reports, as well as numerous materials from the discovery record.
He also held conversations with AP employees, conducted independent research, and applied his more than 40 years
of experience and research in the relevant fields.  Accordingly, Obey Clothing's naked objection carries no weight.

particularly desirable, so that is a limit number of AP images, that could significantly reduce the licensing revenues AP would get and therefore reduce the incentive to maintain and continue to invest in developing the database and hiring photographers and so forth.").)  Notably, one of those affected in such a situation would be Mr. Fairey himself, who has frequently used the AP's images in his own works (AP SUF ¶¶ 70-74), and has acknowledged his potentially "symbiotic relationship" with content-providers like the AP.  (AP SUF ¶ 171.)  Likewise, Obey Clothing, as the merchandiser of Mr. Fairey's work, would be similarly disadvantaged, given its dependence on Mr. Fairey for images to use on its apparel.  Nevertheless, Obey Clothing has argued for a misguided view of copyright law, one that would serve only to impair the incentives for the AP and others to create the very images on which Obey Clothing and Mr. Fairey rely.  This Court can prevent this outcome, however, by finding—as the undisputed facts and clearly applicable case law demonstrate—that fourth factor weighs against Obey Clothing, and that the company's mass-marketing of the Obama Image was not a fair use.

## IV.   THE FIRST AMENDMENT DOES NOT PROTECT OBEY CLOTHING COPYRIGHT INFRINGEMENT

Recognizing that its fair use defense is fundamentally flawed, in concluding, Obey Clothing again appeals vaguely to the First Amendment in a last-ditch effort to excuse its infringement, arguing, without support, that if the AP is allowed to enforce its copyright with respect to Obey Clothing's use of the Obama Photo, the AP may seek "to secure injunctions against and recover damages from many other persons and organizations who have built upon Fairey's poster."  (OC Opp. Br. 63.)  Obey Clothing's argument is utterly devoid of any merit — both as a matter of law and as a matter of fact — and shows only that it will stop at nothing in its efforts to protect its ill-gotten gains.

First, the applicable law requires that the Court reject this argument because, as discussed above, the fair use exception fully accounts for any First Amendment concern, and the First Amendment by itself offers no protection to copyright infringers.  (See page 32 supra (citing Eldred, 537 U.S. at 219; Harper & Row, 471 U.S. at 559-60).)  Courts have rejected First Amendment arguments even where a use plainly had a political context — even one far more compelling than sales of t-shirts to retailers like Urban Outfitters and Nordstrom.  See, e.g., Henley, 2010 WL 3304211, at *8, *13-14 (rejecting fair use defense for appropriation of well-known Don Henley songs in political campaign messages); Browne v. McCain, 611 F. Supp. 2d 1062, 1072-73 (C.D. Cal. 2008) (finding that the use of well-known songwriter Jackson's Browne's composition in a McCain political advertisement was not transformative under California's right of publicity statute); see also Harper & Row, 471 U.S. at 560-61 (rejecting fair use defense for claimed political figure exception to copyright law).  Thus, under well-settled law, the First Amendment does not provide Obey Clothing a license to infringe.

Second, the facts of this case also dictate that the Court reject this argument.  Obey Clothing asserts, without even the pretense of any evidentiary support, that if the Court rules in the AP's favor, the AP will view that as a license to limit the free expression of others.  This assertion is patently absurd.  Since its founding in 1846, the Associated Press has consistently sought to advance the First Amendment by providing to U.S. citizens unbiased, truthful news from all around the world.  For more than 150 years, the AP's photographers and reporters have dedicated their professional lives — and often sacrificed life and limb — to do so.  The AP's commitment to the First Amendment and its core principles is unwavering, and will not be affected by the outcome of this case, or any other.

Furthermore, the evidence in this case shows that it is Mr. Fairey and Obey Clothing, and not the AP, who have aggressively pursued third-parties making use of the Obama Image. Mr. Fairey's business manager, Olivia Perches, testified that she sent so many "cease and desist" letters to third parties complaining about their use of the Obama Image that she had to use a spreadsheet to keep track of them — but, because there were so many, the spreadsheet was not even up to date and Ms. Perches had "no idea" how many letters were sent. (Ray Decl. ¶ 9, Ex. 61 (O. Perches Dep. (Sept. 23, 2009) Ex. 61 ("Cease and Desist Report" listing more than 20 alleged infringements of the Obama Works), 426:23-435:3).) Not only was Obey Clothing aware of these efforts, but it went so far as to identify potential targets and urge Mr. Fairey to police their use of the Obama Image. (Ray Decl. ¶ 10, Ex. 135 (OTT015195; OTT 027016).) Mr. Fairey's company, Obey Giant Art, Inc., even sent a series of cease and desist letters to ProjectHOPE08 about its use of the Obama Image, despite the fact that the organization asserted it had "registered over 400 California voters, signed up over 300 Obama volunteers, donated over $10,000 and given away numerous buttons, shirts, stickers and posters" and thus actually was an entity that supported the 2008 Obama Campaign. (Ray Decl. ¶ 11, Ex. 136 (FAIREY12572-74); ¶ 12, Ex. 137 (FAIREY91006-07); ¶ 13, Ex. 138 (SIGLER000066-73); ¶ 14, Ex. 139 (FAIREY18237-39); ¶ 15, Ex. 140 (FAIREY81309-10).) Thus, although Obey Clothing speculates, without any evidence whatsoever, that the AP may seek to pursue others making use of the Obama Image if it secures a ruling in its favor, the evidence shows that Obey Clothing and Fairey were the ones preventing others from using the image.

Obey Clothing's specious claim that it is trying to protect the First Amendment rights of others against the AP is emblematic of its entire approach throughout its opposition papers (and indeed in its own motion papers) – it miscites cases, misrepresents its own documents and the

testimony of its witnesses, and ignores controlling authority from this Circuit as well as basic common sense.  For the AP, a not-for-profit news service with a storied history, to be lectured by a t-shirt vendor about the First Amendment requires a great deal of chutzpah.  Regardless, the bottom line is that the Constitution provides for both First Amendment rights <u>and</u> for copyright protection.  These important interests must be appropriately balanced under the fair use test.  A finding of no fair use here would ensure that copyright owners such as the AP continue to have an economic incentive to create additional works, for the benefit of society as a whole, including not only the AP but also Mr. Fairey, Obey Clothing, and the many others like them who depend on having a steady stream of works available for use.  Such a holding is fully in keeping with First Amendment values, as it would serve to encourage the creation of new expressive works.

## V.    <u>CONCLUSION</u>

Because Obey Clothing used the unlicensed Obama Image, which is substantially similar to the Obama Photo, on the Obama Merchandise, generating ███████ of dollars in revenue, and because it has not, and cannot, show that it is entitled to invoke the fair use exception to copyright protection, the Court should grant the AP's motion in its entirety and find Obey Clothing liable for infringing the AP's copyright in the Obama Photo.

Date: February 7, 2011                    Respectfully submitted,


                                          /s/ Dale M. Cendali
                                          Dale M. Cendali
                                          Claudia Ray
                                          Brendan T. Kehoe
                                          KIRKLAND & ELLIS LLP
                                          601 Lexington Avenue
                                          New York, New York 10022
                                          Tel: 212-446-4800
                                          Fax: 212-446-4900
                                          Dale.cendali@kirkland.com
                                          Claudia.ray@kirkland.com
                                          Brendan.kehoe@kirkland.com


                                          Michael F. Williams
                                          KIRKLAND & ELLIS LLP
                                          655 15th Street, NW
                                          Washington, DC  20005
                                          Tel: (202) 879-5000
                                          Fax: (202) 879-5200
                                          Michael.williams@kirkland.com


                                          Attorneys for Plaintiff/Counterclaim
                                          Defendant
                                          *THE ASSOCIATED PRESS*


*Of counsel:*
Prof. Douglas Lichtman
UCLA Law School